E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**25-C-05638-S2**
**5/9/2025 5:07 PM**
TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **NEQWAUN ROBERSON** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIVIL ACTION FILE NO:** |
| **v.** | ) |
| | ) 25-C-05638-S2 |
| **TYRONE OLIVER, in his individual capacity;** | ) |
| **JAMIE CLARK, in his individual capacity;** | ) |
| **AHMED HOLT, in his individual capacity;** | ) |
| **TOMMY BOWEN, in his individual capacity;** | ) |
| **MARGARET BROWN, in her individual** | ) |
| **capacity;** | ) |
| **KEVIN HARDY, in his individual capacity;** | ) |
| **C. GOOCH, in his individual capacity; and** | ) |
| **GEORGIA DEPARTMENT OF** | ) |
| **CORRECTIONS.** | ) |
| | ) **Jury Trial** |
| **Defendants.** | ) **Demanded** |

---

## COMPLAINT FOR DAMAGES

COMES NOW NEQWAUN ROBERSON (hereinafter referred to as "Plaintiff"), and, by and through undersigned counsel, hereby files this Complaint for Damages against Defendant Tyrone Oliver, in his individual capacity, Defendant Jamie Clark, in his individual capacity, Defendant Ahmed Holt, in his individual capacity, Defendant Tommy Bowen, in his individual capacity, Defendant Margaret Brown, in her individual capacity, Defendant Kevin Hardy, in his individual

capacity, Defendant C. Gooch, in his individual capacity, and Defendant Georgia Department of Corrections respectfully showing the Court as follows:

## **Preliminary Statement**

1.

This is a civil action pursuant to 42 U.S.C. §1983 to redress deprivations, under color of state law, of Plaintiff's clearly established civil rights secured by the Eighth Amendment to the United States Constitution. Claims are hereby filed pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 for civil rights violations, unsafe prison conditions, failure to protect, deliberate indifference, deliberate indifference to serious medical needs, cruel and unusual punishment, and supervisory liability.

2.

Claims are also brought pursuant to O.C.G.A. § 50-21-20 et. seq. for Warden Tommy Bowen's, Lieutenant Kevin Hardy's, and other Dodge State Prison officers' and employees' negligent provision of medical care towards Plaintiff at Dodge State Prison arising from an incident which took place on May 11, 2023. This negligent medical care caused Plaintiff to suffer from prolonged pain and suffering as well as worsened injuries and delayed recovery.

3.

Claims are also brought pursuant to O.C.G.A. § 50-21-20 et. seq. for Dodge State Prison officers' and employees' negligent provision of medical care towards

Plaintiff at Dodge State Prison arising after an incident which took place on October 3, 2023. This negligent medical care caused Plaintiff to suffer from prolonged pain and suffering as well as worsened injuries and delayed recovery.

4.

Claims are also brought pursuant to O.C.G.A. § 50-21-20 et. seq. for Wilcox State Prison officers' and employees' negligent provision of medical care towards Plaintiff at Wilcox State Prison arising after an incident which took place on October 3, 2023. This negligent medical care caused Plaintiff to suffer from prolonged pain and suffering as well as worsened injuries and delayed recovery.

**Parties**

5.

Plaintiff seeks to recover for claims against Defendants arising under federal and state law. Plaintiff is a resident of Georgia and consents to the venue of Gwinnett County.

6.

Defendant Tyrone Oliver, at all times relevant to this Complaint, was the Commissioner of the Georgia Department of Corrections and was acting in the course and scope of his employment and under color of law. Defendant Tyrone Oliver, (hereinafter referred to as "Defendant Oliver") is sued herein in his individual capacity for purposes of his actions and policies and staffing of law

enforcement personnel under his control and supervision and for establishing a

policy or pattern of widespread constitutional deprivations at Georgia prisons,

which includes Dodge State Prison and Wilcox State Prison.

7.

Defendant Oliver can be served at his place of employment.

8.

Defendant Oliver is a Policy Maker for Georgia prisons, which includes

Dodge State Prison and Wilcox State Prison.

9.

Defendant Jamie Clark, at all times relevant to this Complaint, was the

Director of Engineering and Construction Services for the Georgia Department of

Corrections and was acting in the course and scope of his employment and under

color of law. Defendant Jamie Clark (hereinafter referred to as "Defendant Clark")

is sued herein in his individual capacity for purposes of his actions and policies and

supervision of the maintenance of dilapidated Georgia prison facilities, which

includes Dodge State Prison.

10.

Defendant Clark is a Policy Maker for Georgia prisons, which includes

Dodge State Prison.

11.

Defendant Clark can be served at his place of employment.

12.

Defendant Ahmed Holt, at all times relevant to this Complaint, was the Assistant Commissioner for the Facilities Division of the Georgia Department of Corrections and was acting in the course and scope of his employment and under color of law. Defendant Ahmed Holt, (hereinafter referred to as "Defendant Holt") is sued herein in his individual capacity for purposes of his actions and policies and supervision and for establishing a policy or pattern of widespread constitutional deprivations related to inmate classifications at Georgia prisons, which includes Dodge State Prison.

13.

Defendant Holt is a Policy Maker for Georgia prisons, which includes Dodge State Prison.

14.

Defendant Holt is a resident of Gwinnett County and can be served at his place of employment.

15.

Defendant Tommy Bowen, at all relevant times, was the warden of Dodge State Prison and was acting in the course and scope of his employment and under the color of law. Defendant Tommy Bowen, (hereinafter referred to as "Defendant

Bowen") is sued herein in his individual capacity for purposes of his actions and policies and supervision of law enforcement personnel under his control and for establishing a policy or pattern of widespread constitutional deprivations at Dodge State Prison. Defendant Bowen is also sued herein for his personal participation in the subject incidents.

16.

Defendant Bowen was a Policy Maker for Dodge State Prison

17.

Defendant Bowen can be served at his residence or place of employment.

18.

Dodge State Prison and Wilcox State Prison receive some form of federal funding.

19.

Defendant Margaret Brown (hereinafter referred to as "Defendant Brown") was at all relevant times an employee at Dodge State Prison and was acting under color of state law and was acting in the course and scope of her employment at the time the subject incidents occurred.

20.

Defendant Brown was a Correctional Lieutenant at Dodge State Prison. Defendant Brown is sued for her supervisory conduct as well as her personal participation in the subject incidents.

21.

Defendant Brown is a resident of Georgia and can be served at her place of employment or residence.

22.

Defendant Kevin Hardy (hereinafter referred to as "Defendant Hardy") was at all relevant times an employee at Dodge State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

23.

Defendant Hardy was a Correctional Lieutenant at Dodge State Prison. Defendant Hardy is sued for his supervisory conduct as well as his personal participation in the subject incidents.

24.

Defendant Hardy is a resident of Georgia and can be served at his place of employment or residence.

25.

Defendant C. Gooch (hereinafter referred to as "Defendant Gooch") was at all relevant times an employee at Dodge State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

26.

Upon information and belief, Defendant Gooch was a Correctional Seargent at Dodge State Prison. Defendant Gooch is sued for his supervisory conduct as well as his personal participation in the subject incidents.

27.

Defendant Gooch is a resident of Georgia and can be served at his place of employment or residence.

28.

Pursuant to O.C.G.A §50-21-23, the State of Georgia waived its sovereign immunity for the torts of state officers and employees, including Warden Bowen and Lieutenant Hardy while acting within the scope of their official duties or employment and shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances.

29.

The State of Georgia's waiver of sovereign immunity applies to the negligence claims in this case.

30.

Defendant Georgia Department of Corrections is the State government entity, which employed Dodge State Prison and Wilcox State Prison officers and employees, including Warden Bowen and Lieutenant Hardy, at the time the subject incidents occurred.

31.

Warden Tommy Bowen was a State officer or employee who was acting on behalf of Defendant Georgia Department of Corrections in the course and scope of his employment and in the course and scope of his official duties at all relevant times to this Complaint.

32.

Lieutenant Kevin Hardy was a State officer or employee who was acting on behalf of Defendant Georgia Department of Corrections in the course and scope of his employment and in the course and scope of his official duties at all relevant times to this Complaint.

33.

The Dodge State Prison and Wilcox State Prison officers and employees described herein were State officers or employees who were acting on behalf of Defendant Georgia Department of Corrections in the course and scope of their employment and in the course and scope of their official duties at all relevant times to this Complaint.

34.

Defendant Georgia Department of Corrections and the State of Georgia are liable to Plaintiff for the torts of the Dodge State Prison and Wilcox State Prison officers and employees, including those of Warden Bowen and Lieutenant Hardy, which were committed in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances.

35.

Defendant GDC may be served as consistent with the Georgia Tort Claims Act. A certificate pursuant to O.C.G.A. §50-21-35(f) will be attached to this Complaint when mailed to the Attorney General as consistent with the law.

36.

At all times mentioned in this Complaint, the individual Defendants acted jointly and in concert with each other. Each individual Defendant had the duty and the opportunity to protect Plaintiff from the unlawful actions of the other individual

Defendants, but each individual Defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

## **Jurisdiction & Venue**

37.

Venue is proper in this Court pursuant to O.C.G.A. § 50-21-28 as Defendant Holt is sued in his individual capacity in this suit and is a resident of Gwinnett County. Defendant Holt as well as all other Defendants who were sued in their individual capacities are not sued under the Georgia Tort Claims Act but rather under 42 U.S.C. § 1983.

38.

Defendant Oliver's, Defendant Clark's, Defendant Holt's, Defendant Bowen's, Defendant Brown's, and Defendant Hardy's conduct under color of state law proximately caused the deprivation of Plaintiff's federally protected rights, injuries, and pain and suffering.

39.

Jurisdiction supporting a claim for attorney fees and costs is conferred by 42 U.S.C. §§ 1983, 1988, the 14th and 8th Amendment to the United States Constitution, and relevant Georgia law.

40.

Notice of Claim pursuant to O.C.G.A §50-21-26 has been sufficiently and timely sent in this case. An ante-litem notice sent in this case is attached as Exhibit A.

41.

This action has been brought within 2 years of the subject incidents.

42.

All claims which arise out of the facts and circumstances relating to the commission of the alleged crimes committed in this case, the beatings and stabbings of Plaintiff, are tolled by operation of O.C.G.A. §9-3-99 from the dates of the commissions of the alleged crimes, May 11, 2023 and October 3, 2023, until the prosecution of such crimes or acts has become final or otherwise terminated.

43.

This Court has personal jurisdiction over Defendant Oliver.

44.

This Court has personal jurisdiction over Defendant Clark

45.

This Court has personal jurisdiction over Defendant Holt.

46.

This Court has personal jurisdiction over Defendant Bowen.

47.

This Court has personal jurisdiction over Defendant Brown.

48.

This Court has personal jurisdiction over Defendant Hardy.

49.

This Court has personal jurisdiction over Defendant Gooch.

50.

This Court has personal jurisdiction over Defendant Georgia Department of Corrections.

## **Facts Related to All Counts**

51.

Plaintiff was in the custody of the Dodge State Prison serving a sentence in May and October of 2023.

52.

On May 11, 2023, Plaintiff was attacked by several inmates and stabbed 20 to 25 times all over his body. (hereinafter referred to as "First Attack").

53.

Leading up to the First Attack, Defendant Brown, was seen speaking briefly to one of the inmates and "popped the lock" of the B2 dorm to let the attackers come in from outside of the B2 dorm.

54.

Defendant Brown walked off as the First Attack unfolded and there were no guards in the watchtower at that time.

55.

During the First Attack, Plaintiff was stabbed in his chest and his lungs collapsed, and he suffered multiple lacerations.

56.

After the First Attack, Plaintiff was found by another inmate, who contacted Plaintiff's mother, Sharlisa Roberson via phone and told her that her son had been attacked and stabbed several times and that there was no one there to help and no guard in the watchtower.

57.

Ms. Roberson then contacted the prison immediately and told them her son had been attacked and he needed medical attention.

58.

Ms. Roberson was eventually contacted by Defendant Bowen, who told her that he wasn't a doctor but that her son looked fine.

59.

Defendant Bowen called later the same date and told her that he was being taken to a hospital for his injuries.

60.

Defendant Bowen became aware of the serious nature of Plaintiff's injuries resulting from the First Attack since at least 9:30 AM on May 11, 2023.

61.

After the Attack, in reference to sending Plaintiff to the hospital, Defendant Bowen said "let me see him before I send my money anywhere" in delaying sending Plaintiff to the hospital.

62.

After the First Attack, Defendant Bowen told Plaintiff "if its not serious, we aren't going to take you" in delaying taking Plaintiff to the hospital.

63.

However, due to the supervision and actions of Defendant Bowen, Plaintiff did not depart for the hospital until 10:22 AM on May 11, 2023.

64.

Defendant Hardy became aware of the serious nature of Plaintiff's injuries resulting from the First Attack since at least 9:30 AM on May 11, 2023.

65.

However, due to the supervision and actions of Defendant Hardy, Plaintiff did not depart for the hospital until 10:22 AM on May 11, 2023.

66.

Defendant Hardy and Defendant Bowen had the means and the authority to have Plaintiff taken to the hospital.

67.

Plaintiff was eventually transported to Dodge County Hospital by van due to lacerations and puncture wounds to the back of his neck, chest, left shoulder, and left thigh.

68.

Plaintiff arrived at Dodge County Hospital on May 11, 2023 at 10:50 AM.

69.

At Dodge County Hospital, Plaintiff was diagnosed with traumatic left pneumothorax, and his injuries were so severe that a left chest tube was placed.

70.

Upon discharge, the hospital providers noted that Plaintiff needed his dressings changed daily and as needed.

71.

Plaintiff was discharged back to the prison on or about May 15, 2023.

72.

At first, Plaintiff wasn't getting the medical care that he needed due to the negligent acts of GDC employees and officers, as he was denied medical care.

73.

Months after the First Attack, Plaintiff was attacked again on or before October 3, 2023. (Hereinafter referred to as "Second Attack").

74.

Even though Plaintiff was brutally attacked in the B-dorm during the First Attack, he was placed back in that very same dorm preceding the Second Attack.

75.

Furthermore, the Second Attack assailants possessed violent proclivities as evidenced by their criminal histories.

76.

All but one of the Second Attack assailants possessed a criminal history which included aggravated assault.

77.

The Second Attack assailant without an aggravated assault history had robbery on his record.

78.

Defendant Gooch placed Plaintiff into the dorm where he was attacked even though Defendant Gooch knew that Mr. Roberson was a likely target of attack due to the previous attack in the same location.

79.

Defendant Gooch placed Plaintiff into the dorm where he was attacked even though Defendant Gooch knew that Plaintiff would be surrounded by violent inmates who intended to hurt Plaintiff.

80.

On the day of the Second Attack, Plaintiff was stabbed multiple times and sustained blows to the head.

81.

During the Second Attack, Plaintiff, unarmed, was attacked by five inmates with homemade weapons.

82.

During the Second Attack, upon information and belief, all but two of the attackers were wearing black ski masks to conceal their identity.

83.

During the Second Attack, Plaintiff was stabbed in his neck, head, and face area approximately 10 times.

84.

Upon information and belief, no guards came to Plaintiff's aid during the Second Attack.

85.

Upon information and belief, there was minimal guard presence in Plaintiff's area during the Second Attack.

86.

During and after the Second Attack, Officer Green was supposed to be doing rounds in Plaintiff's area, but because of the understaffing, no officers did rounds in Plaintiff's area for a period of at least 24 hours.

87.

While the Second Attack occurred on or before October 3, 2023, it was not documented by the prison until October 4, 2023.

88.

Plaintiff was admitted to Dodge County Hospital on October 4, 2023 at 10:58.

89.

At the hospital, providers noted multiple superficial lacerations to Plaintiff's scalp, head, right ear, and left anterior and posterior chest.

90.

At the hospital, providers also noted parotitis- acute sialadenitis, a salivary gland infection, and signs of head trauma.

91.

At the hospital, providers performed a CT of the maxillofacial region which revealed that Plaintiff's right parotid gland was swollen due to a hemorrhage from the stab wounds.

92.

While cleaning and repairing Plaintiff's wounds, a provider averred that Plaintiff's wounds "had been open for nearly 24 hours".

93.

On October 4, 2023, at Dodge County Hospital, providers referred to Plaintiff's wounds being open for "24 hours" and noted that the Second Attack occurred "yesterday".

94.

Upon discharge, providers ordered Plaintiff to take all medications as directed, to take sutures out next week, to have follow up testing on Plaintiff's parotid gland on the right side to make sure that it was healing, to keep wounds clean and dry, and to come back to the hospital for any new worsening or worrisome symptoms.

95.

Plaintiff was then discharged on October 4, 2023.

96.

When Plaintiff came back to the prison, prison officials put him into solitary confinement.

97.

After the Second Attack, Plaintiff experienced immense difficulties eating due to his badly swollen jaw.

98.

Plaintiff's jaw injury is permanent in nature and necessitated further treatment at Augusta State Medical Prison.

99.

Plaintiff is currently at Wilcox State Prison, and he is still experiencing severe jaw pain and headaches.

100.

Furthermore, since February of 2024, Plaintiff has been denied medical treatment by GDC employees and officers. Prison officials were not taking him to the doctor's office and would not give him his asthma pump. It took days for Plaintiff to receive an asthma pump because correctional officers claimed that they didn't believe him.

101.

New injuries associated with the attacks continue to be discovered in later appointments, and the injuries described above by no means constitute an

exhaustive list. Plaintiff will continue to suffer additional injuries associated with the attacks in the future.

102.

Plaintiff incurred significant medical bills as a result of all of the incidents described above.

103.

The incidents described above caused Plaintiff to suffer physical and mental pain and suffering.

104.

Plaintiff will continue to suffer physical and mental pain and suffering from these incidents in the future.

105.

Plaintiff will likely require serious future medical care. He may require plastic surgery to correct his deformities and scars.

106.

As a result of the incidents described above, Plaintiff's capacity to earn has been greatly diminished.

## **Additional Facts Related to Count X, Count XI, and Count XII**

107.

Dodge State Prison is a medium security facility that can house more than 1,236 inmates.

108.

Defendant Bowen was the Warden at Dodge State Prison at all relevant times to this Complaint, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

109.

Defendant Bowen's unconstitutional management of Dodge State Prison, in part caused the constitutional violations and injuries described herein.

110.

Defendant Bowen had been with the Georgia Department of Corrections for 23 years, starting as a correctional officer.

111.

Defendant Bowen had been Warden at Dodge State Prison, since July of 2019.

112.

Plaintiff was put at constant risk of danger, serious personal injury, and death due to the Prison's crumbling infrastructure, which inmates use to craft

makeshift knives, called "shanks," for use as weapons. Such shanks were used in the attacks to harm and maim Plaintiff.

### 113.

At Dodge State Prison, weapons came off of lockers, off of walls, and off of beds.

### 114.

Gross deficiencies in Dodge State Prison's provision of medical care, caused by Defendant Bowen's supervision, exposed Plaintiff to an increased risk of injury, serious illness, pain and suffering, and death, as Plaintiff did not receive constitutionally adequate medical care for his injuries for an extended period of time after he was attacked.

### 115.

Defendant Bowen had actual and constructive knowledge of widespread, constitutional violations occurring at Dodge State Prison, including the persistent pattern of inmate-on-inmate violence at the Dodge State Prison.

### 116.

Defendant Bowen instituted a policy of widespread constitutional deprivations at Dodge State Prison resulting in unacceptable and unconstitutional levels of inmate-on-inmate violence.

### 117.

Defendant Bowen was aware of the substantial risk of danger the Dodge State Prison posed to inmates, but he had been deliberately indifferent to such risks.

118.

Violent acts by incarcerated people against other incarcerated people at Dodge State Prison were common and included homicides, stabbings, and sexual abuse.

119.

Killings, stabbings, and assaults were common at Dodge State Prison. Plaintiff was a victim of assault and stabbing at Dodge State Prison.

120.

Assaults and stabbings with man-made "shanks" were a feature of life at Dodge State Prison. Plaintiff was stabbed with a man-made shank at Dodge State Prison.

121.

Between April 30, 2023 and May 15, 2023, there were at least 12 reported incidents of inmate-on-inmate violence and/or hard contraband at Dodge State Prison.

122.

Between May 16, 2023 and June 15, 2023, there were at least 12 reported incidents of inmate-on-inmate violence and/or hard contraband at Dodge State Prison.

### 123.

Inadequate supervision by Defendant Bowen put incarcerated people, including Plaintiff, at substantial risks of serious harm from violence and violated his constitutional rights, especially when other conditions like easy access to weapons contribute to the danger.

### 124.

At relevant times herein, due to the supervision of Defendant Bowen, Dodge State Prison Correctional Officers were rarely present in the housing units and did not perform adequate security rounds or otherwise monitor people to prevent harm. These failures led to the attack onto Plaintiff as there was no guard present in the tower over Plaintiff's dorm during the First Attack, and there was a minimal guard presence during the Second Attack. Further, after the Second Attack, Plaintiff was not discovered in his injured condition for a period of at least 24 hours.

### 125.

As a result of the understaffing and inadequate supervision of Defendant Bowen, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents. These failures led to the attack

onto Plaintiff as there was no guard present in the tower over Plaintiff's dorm during the First Attack, and there was a minimal guard presence during the Second Attack. Further, after the Second Attack, Plaintiff was not discovered in his injured condition for a period of at least 24 hours.

126.

Defendant Bowen was aware of the violence in the Dodge State Prison. Yet he failed to take adequate action to address the stabbings and other violent acts which continued at dangerous levels.

127.

Dodge State Prison, due to the supervision, staffing, customs, and practices of Defendant Bowen, regularly operated without enough security staff to provide appropriate supervision and prevent violence. These failures led to the attack onto Plaintiff as there was no guard present in the tower over Plaintiff's dorm during the First Attack, and there was a minimal guard presence during the Second Attack. Further, after the Second Attack, Plaintiff was not discovered in his injured condition for a period of at least 24 hours.

128.

Violence occurs as a direct result of the understaffing, which was caused by Defendant Bowen.

129.

Properly conducted well-being checks, referred to as "security rounds", are critical to the safety and security of people incarcerated at Dodge State Prison.

130.

During security rounds, officers should verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

131.

Security rounds should occur at irregular intervals, with no more than 60 minutes between rounds.

132.

As a result of Defendant Bowen's supervision, security rounds were not properly being conducted at State Prison during and after Plaintiff's attacks.

133.

During the time of Plaintiff's attacks as well as the time following Plaintiff's attacks, as a result of the supervision, staffing, customs, and practices of Defendant Bowen, security rounds were not conducted sufficiently, and such rounds could have prevented Plaintiff's attacks and could have led to quicker medical attention to Plaintiff's injuries.

134.

Defendant Bowen was aware of chronic short staffing and failures to conduct security rounds during all relevant times to this Complaint.

135.

Poor maintenance and pervasive contraband, caused by the supervision, custom, and direction of Defendant Bowen contributed to the violence at Dodge State Prison, including the violence that Plaintiff was a victim of during the attacks.

136.

Poor supervision, prison maintenance, and security practices, caused by the supervision and actions of Defendant Bowen contributed to a large amount of contraband, including weapons and drugs, and unsafe facilities. These failures led to the attacks onto Plaintiff.

137.

Defendant Bowen was aware of the danger these conditions pose to incarcerated people but failed to take adequate action to make Dodge State Prison safe.

138.

Unmaintained parts of Dodge State Prison, caused by the supervision of Defendant Bowen, jeopardized inmate safety and provided the makeshift weapons for the attacks onto Plaintiff.

139.

Due to poor maintenance leadership by Defendant Bowen, Dodge State Prison itself was a source of dangerous weapons, exposed people to violence, and provided makeshift weapons for the attacks onto Plaintiff.

140.

Defendant Bowen did not take appropriate measures to prevent the movement of contraband, including shanks, into and around the prison. These failures led to the attacks onto Plaintiff.

141.

Defendant Bowen was aware of the dangers caused by the facility's poor condition, including providing materials for weapons.

142.

Poor security practices by Defendant Bowen contributed to the large amounts of contraband, including shanks, that moved into and about Dodge State Prison. These failures led to the attacks onto Plaintiff.

143.

Dodge State Prison staff, due to the supervision, staffing, customs, and practices of Defendant Bowen, did not conduct adequate security rounds to identify and remove contraband. These failures led to the attacks onto Plaintiff.

144.

Planned housing searches were not conducted with necessary frequency, and searches of incarcerated people, including pat searches, were not conducted appropriately. This custom, practice, and supervision by Defendant Bowen led to the attacks onto Plaintiff.

145.

Dodge State Prison, as a result of the supervision, custom, and practices of Defendant Bowen, had inadequate systems for identifying, investigating, and preventing violence. These failures led to the attacks onto Plaintiff.

146.

Given the amount of violence at Dodge State Prison, procedures to identify dangerous circumstances and investigate misconduct are critical.

147.

Dodge State Prison, as a result of the supervision, custom, and practices of Defendant Bowen did not meaningfully investigate the root causes of violence in the prison. These failures led to the attacks onto Plaintiff.

148.

Dodge State Prison, as a result of the supervision, custom, and practices of Defendant Bowen does not use quality investigations to identify dangerous situations and avoid violence. These failures led to the attacks onto Plaintiff.

149.

After an incident of serious violence occurs or when correctional staff are alerted to a potential for serious violence, sound correctional practice includes a thorough investigation to identify the source of the violence, determine what led to the violence or threats, and identify corrective actions.

150.

Corrective actions may include increasing staffing, addressing blind-spots, counseling staff to improve the quality of security rounds, re-balancing the mix of different gangs on a housing zone, and identifying the source of involved contraband.

151.

Without such investigations and corrective actions, staff cannot adequately identify or respond to patterns of violence and prevent it from recurring.

152.

Dodge State Prison fails to provide constitutionally adequate medical care to people at the prison. Plaintiff's medical care after the attacks as well as while he was in his cell was constitutionally deficient due to these issues.

153.

Gross deficiencies in the prison's provision of medical care, as a result of the supervision, custom, staffing, and practices of Defendant Bowen, exposed incarcerated people to an increased risk of injury, serious illness, pain and

suffering, and death. Plaintiff's medical care during and after the attacks was constitutionally deficient due to these issues as well as the lack of staff, and failures to discover Plaintiff in his injured condition for a period of at least 24 hours.

154.

Unsafe prison conditions, caused by Defendant Bowen's supervision, restricted access to medical care and led to constitutionally deficient care. Plaintiff's medical care during and after the attacks was constitutionally deficient due to these issues.

155.

Dodge State Prison, as a result of supervision, custom, staffing, and practices of Defendant Bowen, fails to provide appropriate medical aid in life-or-death situations. Plaintiff's medical care during and after the attacks was constitutionally deficient due to these issues.

156.

Correctional and medical staff have an obligation to respond to people experiencing medical emergencies in prisons.

157.

When correctional officers encounter an incarcerated person experiencing a medical emergency, they should notify medical staff and provide a basic first-responder level of care.

### 158.

This includes, as appropriate, starting CPR, applying bandages to wounds, using an automated external defibrillator (AED), administering naloxone, or placing the patient in a recovery position to open the airway. This also includes calling for an ambulance when the incarcerated person's injuries are serious enough.

### 159.

Security and staffing problems, caused by Defendant Bowen, affect all aspects of healthcare in Dodge State Prison, including Plaintiff's healthcare after the attacks.

### 160.

The conditions at Dodge State Prison—including high levels of violence, poor supervision, poor management, and an inadequately maintained facility—unreasonably impeded incarcerated people with serious medical needs from accessing necessary care. Plaintiff's medical care during and after the attacks was constitutionally deficient due to these issues.

### 161.

Defendant Bowen was aware of the inadequate medical care in the Dodge State Prison but failed to take reasonable measures to improve care.

162.

Many of these issues stem from Defendant Bowen's failure to provide a reasonably safe facility in which incarcerated people have appropriate access to care.

163.

The constitutional deprivations at Dodge State Prison described herein led directly to the attacks onto Plaintiff as well as the deficient medical care he received afterwards.

**Additional Facts Related to Count XI and Count XII**

164.

Georgia is the eighth most populous state in the United States and has the fourth-highest state prison population.

165.

The Georgia Department of Corrections (hereinafter referred to as "GDC") incarcerates almost 50,000 people in 34 state-operated prisons and 4 private prisons, ranging in capacity from fewer than 500 to more than 2,500 beds.

166.

More than 32,000 of GDC's population are classified as medium security and more than 11,600 are classified as close security. Dodge State Prison is one of GDC's Medium security prisons.

167.

The GDC operates on a $1.2 billion budget.

168.

The GDC's Commissioner is Tyrone Oliver, who took over the role in January 2023, after Timothy Ward, the previous Commissioner, retired.

169.

The Commissioner reports to the State Board of Corrections and the Governor.

170.

Defendant Oliver is responsible for managing a $1.3 billion budget, leading approximately 9,000 employees, and the supervision of nearly 50,000 state offenders. This includes staffing decisions and policies.

171.

At all relevant times, Defendant Clark was responsible for management and oversight of the ECS division, which is responsible for the design, construction, and maintenance of the Georgia prison's physical infrastructure.

172.

At all relevant times herein, Defendant Holt was responsible for Inmate Classification policies, procedures, and practices.

173.

At all relevant times, Defendant Holt was responsible for the oversight of 35 State Prisons, four Private Prisons, 23 County Prisons, seven Substance Abuse Treatment Centers, 15 Transitional Centers, seven Probation Detention Centers, 21 Fire Stations, the Special Operations Unit, Offender Administration, the Inmate Transportation Unit, and the Communications Center.

174.

At all relevant times, Defendant Holt was responsible for monitoring the overall supervision and safety of nearly 52,000 felony offenders.

175.

The incarcerated population in the Georgia prison system, which includes Dodge State Prison, faces a substantial risk of serious harm due to failing systems, particularly security staffing. Plaintiff suffered as a direct result of this as there was no guard present in the tower over Plaintiff's dorm during the First Attack, and there was a minimal guard presence during the Second Attack. Further, after the Second Attack, Plaintiff was not discovered in his injured condition for a period of at least 24 hours.

176.

Staffing levels vary across the prisons, which includes Dodge State Prison, with correctional officer (CO) vacancy rates around 50% systemwide and over 70% at ten of the largest facilities.

177.

The average CO vacancy rate at its Georgia prisons, which includes Dodge State Prison, was 49.3% in 2021, 56.3% in 2022, and 52.5% in 2023.

178.

At many of Georgia's close-and medium-security prisons, with high levels of violence, CO vacancy rates are even higher.

179.

By December 2023, 18 Georgia prisons had CO vacancy rates over 60%, and 10 of those were over 70%.

180.

The circumstances within Georgia's prisons, which includes Dodge State Prison, represent inaction by Defendant Oliver and Defendant Clark to address a growing and changing incarcerated population, aging infrastructure, and years of declining staffing rates. Plaintiff suffered as a direct result of this.

181.

With security staffing at such low levels, caused by Defendant Oliver's staffing practices, violence and criminal activity proliferate in the prisons. Plaintiff was a victim of such violence.

182.

Through the policies, supervision, and practices of Defendant Oliver and Defendant Holt, Georgia prisons fail to stop and to respond appropriately to homicides, life-threatening and other serious violence, and sexual abuse. Plaintiff was a victim of life-threatening and other serious violence.

183.

Over the six-year period from 2018 through 2023, the GDC reported a total of 142 homicides in its prisons, which includes Dodge State Prison, with 48 in the first three years and a 95.8% increase in the latter three years, with 94 homicides.

184.

The rate of homicides in Georgia prisons, which includes Dodge State Prison, significantly exceeds the most recent available national data on homicide rates in correctional facilities.

185.

The violence and dysfunction that plagues Georgia Prisons has met the threshold to draw attention from the federal government.

186.

In 2016, the Department of Justice (hereinafter referred to as "DOJ") launched a statewide investigation into whether the Georgia prison system adequately protects incarcerated persons who are LGBTI from sexual abuse by staff and by other incarcerated persons.

187.

In 2021, the DOJ expanded the investigation to include protection of all incarcerated persons at the medium-and close-security-level prisons, which includes Dodge State Prison, from violence by other incarcerated persons.

188.

The investigation was conducted jointly by the Special Litigation Section of the Civil Rights Division of the United States Department of Justice and the United States Attorney's Offices for the Northern, Middle, and Southern Districts of Georgia.

189.

As part of the investigation, between 2022 and 2023, DOJ visited 17 Georgia prisons, – about half of the state prisons – representing geographically and demographically diverse areas throughout the state and correctional populations that are the focus of this investigation.

190.

The DOJ conducted hundreds of private, one-on-one interviews with incarcerated persons and many more brief conversations while touring the facilities; conducted several dozen interviews with GDC facility staff, investigators, and executive leadership; conducted additional interviews with local coroners, first responders, prosecutors, and employees from other Georgia state agencies; and reviewed tens of thousands of records from GDC, other Georgia state agencies, and third-party entities such as local coroners, EMS providers, and community stakeholders.

191.

The DOJ also reviewed thousands of additional records, including documents from third parties and stakeholders, court records from third-party cases, historical sources, and public reports.

192.

The DOJ worked with four highly qualified expert consultants in conducting this investigation.

    a.  One was a former high-level state corrections official with decades of experience working in and running state prisons.

    b.  One was a former law enforcement official who served in a leadership role in a large county jail system, with expertise in data analysis, policy implementation, and staffing assessments.

c. Two were certified Prison Rape Elimination Act (PREA) auditors with specialized expertise in sexual safety in correctional environments, one of whom served as a former inspector general of a state prison system.

193.

As has Plaintiff, even the DOJ has been through significant difficulties in obtaining documents from the GDC regarding the relevant conditions and acts of violence at Georgia prisons:

a. Shortly after launching the expanded investigation in September 2021, DOJ issued a first request for documents to GDC.

b. The GDC refused to produce most of the requested materials until mid-2023, after DOJ issued an administrative subpoena and sought and obtained court enforcement of the subpoena.

c. The GDC also severely limited DOJ's access to its prison facilities and to staff interviews until the district court entered a protective order for the documents DOJ had subpoenaed.

d. Prior to the court's entry of the protective order, the GDC restricted DOJ's access to areas of the prisons accessible to incarcerated persons and facilitated interviews with incarcerated persons but not with staff.

e. Even after GDC began to produce the requested records, the DOJ encountered challenges in gathering documents.

f.  The GDC ultimately produced records sufficient for DOJ to make findings, but the agency delayed or objected to production of some of the material, including investigation records.

g.  The DOJ gave the GDC an opportunity to provide records that could have clarified, corrected, or disputed information from other sources, including interviews of staff and incarcerated persons.

h.  Although GDC eventually completed production of documents responsive to the DOJ's first subpoena, which was overseen by a federal court, as of the time of publication of this report, GDC still has not completed production of documents responsive to other requests, including a subsequent subpoena issued in mid-2022 for records related to each of the facilities visited by DOJ.

i.  Although GDC ultimately produced over 19,000 records, the process of obtaining records and information from GDC was unnecessarily contentious and lengthy.

194.

Throughout the investigation, the DOJ also sought and obtained information from state entities other than GDC, including the Peace Officer Standards and Training Council (POST), which trains and, in some cases, investigates GDC officers; the Georgia Bureau of Investigation (GBI), which conducts some criminal

investigations involving the prisons; the State Board of Pardons and Paroles, which serves as a reporting entity for sexual abuse allegations; and the Governor's Office of Planning and Budget.

195.

The DOJ also sought and obtained information from third-party sources, which included emergency response companies, local coroners, medical providers, community-based rape crisis centers, legal organizations and law firms representing people in GDC's custody or their survivors, and stakeholders such as community activists, currently and formerly incarcerated people, their loved ones, and current and former employees of GDC.

196.

Through these sources, the DOJ obtained thousands of pages of documents, some of them official GDC documents obtained by third parties via open records requests.

197.

The DOJ also conducted hundreds of interviews with stakeholders in the course of their investigation of Georgia prisons.

198.

The DOJ also received more than one thousand letters, emails, and other communications from people who are currently incarcerated in Georgia prisons, as well as their loved ones and grassroots advocates.

199.

On October 1, 2024, the DOJ released its findings for its Investigation of Georgia Prisons (hereinafter referred to as "Report").

200.

In the Report, the DOJ found that the Georgia prison system fails to protect incarcerated people from violence and harm by other incarcerated people in violation of the Eighth Amendment

201.

According to the DOJ in the Report, "The State is deliberately indifferent to these unsafe conditions", and "The State has known about the unsafe conditions for years and has failed to take reasonable measures to address them."

202.

The constitutional violations are exacerbated by serious deficiencies in staffing and supervision caused by Defendant Oliver, physical condition and security of the facilities caused by Defendant Clark, classification and housing caused by Defendant Holt, control of weapons and other contraband, and incident reporting, response, and investigations.

203.

According to the DOJ in the Report, "The State of Georgia Fails to Reasonably Protect Incarcerated Persons from Violence".

204.

According to the DOJ in the Report, "GDC allows frequent, pervasive violence in the prisons, resulting in serious bodily harm and, in some cases, death".

205.

According to the DOJ in the Report, "The State continues to run its prisons as it has for years, without taking reasonable measures to change course and improve conditions".

206.

According to the DOJ in the Report, "GDC prisons are unsafe due to aging and inadequately maintained facilities and failure to ensure adequate lock, tool, and key controls."

207.

According to the DOJ in the Report, "GDC's ineffective classification and housing systems expose incarcerated persons to an unreasonable risk of violence".

208.

According to the DOJ in the Report, "GDC fails to control weapons, drugs, and other dangerous contraband in its prisons".

209.

According to the DOJ in the Report, "GDC fails to report and investigate serious incidents of harm and dangerous activities".

210.

According to the DOJ in the Report, "The State is Deliberately Indifferent to the Risk of Harm to Incarcerated Persons".

211.

According to the DOJ in the Report, "After an extensive investigation in Georgia's prisons housing people at the medium- and close-security levels, the Department of Justice (the Department or DOJ) concludes that there is reasonable cause to believe that the State of Georgia and the Georgia Department of Corrections (GDC) violate the Eighth Amendment of the United States Constitution".

212.

According to the DOJ in the report, "GDC fails to provide incarcerated persons housed at the medium-and close-security levels with the constitutionally required minimum of reasonable physical safety."

213.

The DOJ's investigation identified hundreds of serious incidents that highlight the systemic violence and chaos in Georgia prisons, and Georgia's failure to control it.

214.

For example, in one month in 2023, Georgia prisons experienced five homicides at four different prisons, and serious incidents at other facilities.

215.

Violent incidents occur across the Georgia prison system, placing thousands of incarcerated people at substantial risk of serious harm on an ongoing basis.

216.

Within a span of just four days in one case in 2023, two brutal assaults occurred in the same facility, one resulting in a man's death. They include:

a. An incarcerated man at Smith was discovered dead, possibly strangled to death by his roommate in a segregated housing unit. The local coroner noted the body was badly decomposed, and the man likely had been dead for over two days.

b. Four days prior, another person was assaulted by multiple incarcerated people inside another housing unit at Smith. A video of the assault was uploaded onto social media, where the victim's family saw it several days later. The video showed an incarcerated man sitting on the floor with his hands tied behind his back before a group of men around him punched, kicked, and stabbed him.

217.

The Georgia prison system has become a hub for known criminal activity, endangering other incarcerated persons and the public.

218.

District Attorneys from around the state told DOJ that the proportion of violent crimes originating in the prisons, including homicides, has increased in recent years, straining prosecutorial resources.

219.

Plaintiff was put at constant risk of danger, serious personal injury, and death due to the Dodge State Prison's crumbling infrastructure, caused by Defendant Clark's maintenance practices, which inmates use to craft makeshift knives, called "shanks," for use as weapons. Such shanks were used in the Attacks to harm and maim Plaintiff.

220.

Plaintiff was at constant risk of danger, serious personal injury, and death due to Defendant Holt's failure to use correctional practices such as classification and assessment of the likelihood of victimization to reduce the risk of violence. Such failures led to Plaintiff's Second Attack, he was placed in the same dorm he was attacked in during the First Attack with inmates who possessed violent criminal histories.

221.

Gross deficiencies in Dodge State Prison's provision of medical care, caused by Defendant Oliver's understaffing exposed Plaintiff to an increased risk of injury, serious illness, pain and suffering, and death, as Plaintiff did not receive constitutionally adequate medical care for his injuries for after his attacks.

222.

Violence in the Georgia prisons, which includes Dodge State Prison, has reached a crisis level. Defendant Oliver, Defendant Holt, and Defendant Clark are aware of this.

223.

Violent acts by incarcerated people against other incarcerated people at Georgia Prisons, which includes Dodge State Prison, include homicides, stabbings, and sexual abuse. Plaintiff was a victim of stabbing.

224.

Killings, stabbings, and assaults are common at Georgia Prisons, which includes Dodge State Prison. Plaintiff was a victim of assault and stabbing at Dodge State Prison.

225.

Assaults and stabbings with man-made "shanks" are a feature of life at Georgia Prisons, which includes Dodge State Prison. Plaintiff was stabbed with a man-made shank at the Dodge State Prison.

226.

Defendant Oliver and Defendant Holt fail to take appropriate steps to provide reasonable protection from harm to the incarcerated people in its custody.

227.

Those incarcerated in Georgia prisons, as well as GDC employees, faced an ongoing substantial risk of serious harm due to the lack of controls and violent conditions in Georgia's prisons, which includes Dodge State Prison.

228.

At all relevant times herein, Defendant Oliver failed to provide incarcerated persons, including Plaintiff, housed at the medium-and close-security levels with the constitutionally required minimum of reasonable physical safety.

229.

Defendant Oliver's failure to provide adequate staffing and supervision, to maintain basic correctional operations, and to adequately deter, report, and investigate incidents has created an environment of fear and complacency.

230.

Violence, including sexual assaults, stabbings, beatings, and other brutal violence, is a systemic problem in prisons across the state, which includes Dodge State Prison.

231.

As a result of Defendant Oliver's actions, staffing levels at prisons housing people at the medium-and close-security levels, which includes Dodge State Prison, are inadequate to protect incarcerated people from harm.

232.

Contraband weapons, illicit drugs, and cellphones are commonplace across Georgia's prisons, which includes Dodge State Prison.

233.

Defendant Oliver, the GDC commissioner, acknowledged that contraband is the "driving force" for the violence inside the state's prisons, as well as the violence that spills over into the outside world.

234.

Georgia prison officials allow frequent, pervasive violence in the prisons, including Dodge State Prison, resulting in serious bodily harm and, in some cases, death.

235.

The consequences reflect systemic breakdowns in basic correctional practices, including staffing and supervision, security systems, contraband control, physical plant, and housing, which are a result of Defendant Oliver's understaffing practices and Defendant Clark's maintenance failures.

236.

A loss of control over the prisons has set in, with near-constant, life-threatening violence functioning as the norm.

237.

According to the GDC, from 2018 through 2023, 142 people have been killed in Georgia prisons, on the State's watch.

238.

According to GDC mortality reports, in 2018, there were 7 homicides systemwide; in 2019, that number jumped to 13 homicides.

239.

Since then, there have been well over 20 homicides in Georgia prisons every year, with 28 in 2020, 28 in 2021, 31 in 2022, and 35 in 2023, according to GDC data.

240.

The rate of homicides in Georgia prisons significantly exceeds the national average.

241.

The national average homicide rate in state prisons across the country for 2019 was 12 per 100,000 people.

242.

Georgia's rate in 2019 was almost triple, at 34 per 100,000 people, and the numbers of homicides have increased precipitously since then.

243.

Georgia prisons saw an unprecedented 38 homicides in 2023, topping the previous record of 31 the year before.

244.

In addition to deaths due to violence in the prisons, including Dodge State Prison, other serious and life-threatening incidents are exponentially more frequent.

245.

Assaults with weapons, fights, sexual assaults, and other violent incidents are common at Georgia Prisons, including Dodge State Prison.

246.

In interviews at 16 of the 17 Georgia prisons the DOJ visited in 2022 and 2023, incarcerated people consistently reported that they have witnessed life-threatening violence, including stabbings, and that weapons are widespread in the prisons.

247.

While GDC incident reports document a longstanding pattern of serious violence inside the prisons, many violent incidents often go unreported when they occur in unsupervised housing units or other areas with inadequate staff supervision.

248.

Based on GDC's records, the levels of reported incidents of violence within the GDC system are consistently high.

249.

From January 2022 through April 2023, there were more than 1,400 reported incidents of violence, including fights, assaults, hostage incidents, and homicides, across the close-security prisons and most of the medium-security prisons, which includes Dodge State Prison. Of these incidents, 19.7% involved a weapon, 45.1% resulted in serious injury, and 30.5% resulted in offsite medical treatment

250.

From January 2022 through April 2023, the overall incidence of violence gradually increased across the close-security prisons and most of the medium-security prisons, which includes Dodge State Prison.

251.

The numbers in the above two allegations do not capture the full scope of violence within the system because:

    a. First, violent incidents are consistently underreported due to a lack of staff supervision and other factors, causing some incidents never to be reported at all

b. Second, violent incidents are often mischaracterized using inappropriate incident-type categories, resulting in under-counting of violent incidents such as assaults and fights.

252.

Examples of homicides at Georgia facilities, which includes Dodge State Prison, include, but are not limited to:

a. Eddie Gosier, 39; May 2, 2020, ligature strangulation. He died just hours after an inmate with a particularly violent history was moved by guards into his cell. Gosier's killer, Daniel Luke Ferguson, had previously strangled to death an inmate at Hays State Prison after being sentenced to life in prison when he was 18 for the shooting death of a neighbor in Walton County.

b. Terry Lee Bennett II, 43; Jan. 10, 2021, blunt impact to the head

c. Ali Lamont Tanner, 45; July 2, 2021, stabbed

d. William Taylor Bodge, 61; Feb. 5, 2022, delayed complications of blunt force injuries

e. Raphael Zachery Milligan, 41; July 21, 2022, blunt force injuries and strangulation

f. Joshua Emanuel Williams, 22; July 3, 2020, multiple sharp-force injuries

g.  Jose Martin Ibarra Garcia, 41; June 15, 2021, multiple stab wounds to the head

h.  Edward Jamar McCloud, 40; July 23, 2021, sharp-force injury to the neck

i.  Jamari McClinton, 21; Aug. 11, 2021, stabbed. He was slain just five days after being transferred from Phillips State Prison, where he had been in protective custody after threats from gang members. Protection was removed when he was transferred.

j.  Bedarius Clark, 26; Aug. 21, 2021, homicide. He was found unresponsive in the prison's segregation unit. The GDC described the death as an assault

k.  Kion E. Parks, 31; Sept. 14, 2021, stabbed. Incident report shows five other inmates were involved in the incident.

l.  Rufus Ramon Lee, 27; Dec. 14, 2021, stab wound of the chest. Incident report shows four other inmates were involved in the incident.

m.  Kendall Ja'Mal Cromer, 31; Nov. 30, 2020, stab wound of the neck and chest. Incident report shows four other inmates were involved.

n.  Hendricks Riley Gunn, 42; Jan. 1, 2022, blunt force injuries of head and neck

o. Douglas Anthony Forts, 57; June 2, 2022, acute traumatic amputation of finger during fight

p. Hezekiah Sha'Nard Cuyler, 21; Sept. 14, 2022, stabbing

q. Dimitri Merci Jackson, 36; Jan. 3, 2023, stab wound of the chest

r. Daniel Charriez, 46; Feb. 23, 2022, delayed complications of traumatic brain injury, four months interval

s. Boyd Henry Williams, 64; Oct. 3, 2022, manual strangulation, blunt force trauma to head

t. Raul Bailon Garcia, 39; April 21, 2020, positional asphyxia and suffocation due to assault, blunt trauma to soft tissues

u. Joctavious Artez Newsome, 25; Nov. 4, 2020, stab wound

v. Demetrius Stubbins, 38; Dec. 21, 2020, stab wound to the chest

w. Christopher Dewayne Mathis, 37; Feb. 26, 2021, blunt force trauma to head

x. Fabian Garcia-Mata, 27; Sept. 10, 2021, multiple stab wounds

y. Troy Donald Harvey, 34; Sept. 12, 2021, stab wound of the chest

z. Cesar Arnold Pastrana Morales, 33; March 13, 2020, stab wound of the chest. Incident report shows five other inmates involved in the incident.

aa. Rashad Bolton, 29; Jan. 4, 2021, puncture wound to the chest with sharp object

bb. Dwayne Zackery Jr., 22; Feb. 12, 2021, stab wound to the chest with homemade knife

cc. Charles Tristen James McKee, 24; May 23, 2022, stabbed. Incident report shows five other inmates directly involved. A lawsuit alleges he was placed in a dorm with known gang members who were hostile to LGBTQ inmates.

dd. Terry Lee Bishop, 49; Oct. 18, 2022, blunt force trauma, acute toxicity of methamphetamine, acute toxicity of cannabinoids

ee. Anthony L. McGhee Jr., 34; March 29, 2020, complications of blunt-force head trauma and sharp-force trauma of torso and extremities

ff. Jorge Renberto Ventura-Cabrera, 35; June 5, 2021, stab wounds of neck, torso and upper extremities. Incident report shows two other inmates involved.

gg. Quintez Smith, 25; Aug. 29, 2022, multiple sharp-force injuries

hh. Jerry Lee Brown, 61; Nov. 12, 2020, stab wounds to the head, blunt-force injury to face

ii. David Lamar Henegar, 44; Oct. 16, 2021, manual strangulation and blunt-force injuries of the head, torso and extremities

jj. Angela Anderson, 39; Sept. 11, 2022, asphyxia due to neck and chest compression

kk. Johnny Eugene Young, 24; Jan. 27, 2020, sharp-force injury of mouth/tongue

ll. Rafael Blas Becerra, 36; March 7, 2020, stab wounds to the upper torso. Incident report shows seven other inmates involved, with six injured.

mm. Carrington Juwon Frye, 23; March 20, 2020, stab wounds of the neck and chest. Incident report shows two other inmates involved.

nn. David Travis Alexander Dennis, 35; May 13, 2020, multiple sharp-force injuries

oo. Coty Dustin Silvers, 39; May 23, 2020, asphyxia

pp. Bobby Edward Lee Jr., 38; July 13, 2020, ligature strangulation. A federal lawsuit alleges he died from gang violence, understaffing, and indifference by prison officials.

qq. Robbie B. Brower, 58; Oct. 4, 2020, blunt and sharp-force injuries to the head and neck

rr. Raul Villegas, 37; Dec. 13, 2020, stab wound to the torso. Incident report shows three other inmates involved.

ss. Carlos Maurice Fisher Jr., 30; May 10, 2021, multiple sharp-force injuries

tt. Ryan Weston Darville, 37; Dec. 29, 2021, stab wounds of the chest

uu. Joseph Walter Brown, 36; July 26, 2022, multiple stab wounds

vv. Dan Brooks, 50; Aug. 21, 2022, stab wound of the neck

ww.     Kendrick Malik Brown, 25; Oct. 16, 2022, blunt-force head injury

xx. James Cornelius McLeroy III, 26; Dec. 19, 2022, stab wounds of the torso

yy. Norman Samples, 59; Dec. 27, 2022, blunt force injuries of the head and torso

zz. Dave Stone, 61; Nov. 20, 2021, closed head trauma, delayed effects

aaa.     Jamal Cymonne Johnson, 32; June 11, 2022, stab wounds of the head

bbb.     Sidney Sanchez Nealey, 22; July 18, 2022, stab wounds of the torso

ccc.     Jacob Kendall Daniels, 18; Aug. 13, 2022, stab wound of the neck, shoulder and arm

ddd.     Quafabian Melik McBride, 19; Sept. 30, 2022, stab wound of chest, injuring heart; sharp-force injuries of head, torso and upper extremities. Stabbing occurred during a gang-related fight in the lockdown unit. McBride was housed elsewhere in the prison and had been brought to lockdown that day through the arrangements of officers.

eee.    Alim Rasheed Lovett, 33; Dec. 8, 2022, stab wounds of the back, injuring right lung. Also sharp-force injuries of the head, torso and right thigh. Incident report shows four other offenders involved.

fff. Curtis Mincey, 74; July 22, 2021, blunt-force trauma of the head, neck, torso and extremities

ggg.    Taylor Harrison Brooks, 26; April 10, 2020, multiple stab wounds

hhh.    John Bretleir Reyes Cardona, 24; April 20, 2020, exsanguination (severe loss of blood) from stab wound to neck

iii. Justin Nathaniel Wilkerson, 25; Jan. 5, 2021, asphyxia, neck compression

jjj. Desmond Hill, 35; April 9, 2021, strangulation

kkk.    Hiwatha Abdulcah Hakeem Jr., 26; April 12, 2021, multiple stab wounds. Incident report shows four other offenders involved.

lll. Derrick Dionte Deshun Harvey, 26; June 25, 2021, stab wound to the chest

mmm.    Christopher Ray Reynolds, 38; July 1, 2021, blunt- and sharp-force injuries of the head and neck

nnn.    Christopher Michael Redwine, 45; Sept. 27, 2021, asphyxia due to manual strangulation

ooo.    Nathan Michael Mahan, 37; Oct. 23, 2022, stab wounds

ppp.    Randy O'Neal Wynn, 54; March 1, 2023, homicide. Lawsuit alleges supervisory liability claims against Smith State Prison and GDC officials.

qqq.    Cedric La'Troy Johnson Sr., 35; March 13, 2020, strangulation

rrr. Aldrich Norval Cain, 26; April 23, 2020, multiple stab wounds. Incident report shows four other inmates involved.

sss.    Marcus Derrelle Pearson Jr., 28; May 29, 2020, multiple stab wounds. Incident report shows two other inmates involved.

ttt. Luis Garcia Palacio, 41; July 28, 2020, blunt impact injuries of the head

uuu.    Juan Carlos Arguelles-Reveles, 37; May 7, 2021, stabbing. Incident report shows 11 other inmates involved.

vvv.    Xavier LaMar Warren, 32; Dec. 28, 2022, stab wound of the torso. Incident report shows four other inmates involved.

www.    Logan Todd Peterson, 27; Dec. 27, 2021, post-traumatic subarachnoid hemorrhage (bleeding in the space around the brain), assault

xxx.    Prince Leonard Blige, 54; Feb. 12, 2020, stab wound to torso

yyy.    Orvonta Tillman, 36; June 16, 2020, multiple sharp-force penetrating trauma to thorax

zzz.    Bobby Carpenter, 31; Sept. 9, 2020, stab wound to the chest

aaaa.    Hakeem Olajuwon Williams, 27; Feb. 28, 2022, stab wound to the chest

bbbb.    Dexter Jarrod Burnett, 35; Sept. 16, 2022, stab wound of the torso

cccc.    Robert Lee Wilson III, 31; July 17, 2020, multiple stab wounds. Incident report shows 16 other inmates involved, seven of whom were injured.

dddd.    Christopher Arnett Rawls, 32; Sept. 5, 2020, strangulation

eeee.    Christopher Eli Gresham, 39; Sept. 30, 2021, stab wounds of back and lower extremities. A Sept. 30, 2021, incident report of a homicide says three other inmates were involved.

ffff.    Kyle Anthony Strother, 31; June 5, 2022, stab wound of the chest

gggg.    Va'Darian LaVianta Carr, 26; Sept. 18, 2022, stab wound of the chest and back

hhhh.    Marquis Reshawn Jefferson, 26; May 12, 2022, stab wounds of torso and arm. A May 11, 2022, incident report of a homicide says four other inmates were involved.

iiii.    DaQuavious Cachone Lackey, 21; May 16, 2022, stab wound of the neck and multiple blunt-force injuries

jjjj.    Michael Lee Jackson, 60; Aug. 17, 2022, multiple blunt-force injuries in the setting of hypertensive cardiovascular disease. Incident report shows two other inmates were involved.

kkkk.    James Forest Williams, 43; Oct. 3, 2022, blunt and sharp force injuries of head, torso and extremities

llll.    Amos Bennett Huff Jr., 60; March, 2023, strangled

mmmm.    Sabino Carlos Ramos, 34; March, 2023, multiple stab wounds

nnnn.    Arthur James Wimbush Jr., 46; April 2, 2023. Blunt-force trauma with fracture of thyroid cartilage

oooo.    Anthony Zino, 71; April 5, 2023, asphyxia, neck compression inflicted by other

pppp.    LaParrish Dawayne London, 30; March 21, 2023, stab wound of the chest

qqqq.    Fredrick Louis Spears Jr., 27; May 2, 2023, stab wound of the torso

rrrr.    Johnny Vaughn, 39; Oct. 4, 2023, cause not reported. Certificate not in. GDC said he died after a fight involving multiple inmates.

ssss.    Martel Dorsey, 34; Oct. 4, 2023. Homicide.

tttt.    Elmer Pless, 65; May 15, 2023, strangulation

uuuu.    Carrell Beontae Johnson, 32; June 6, 2023, chopping injuries of the head and sharp-force injuries of the torso

vvvv.    Roland Lamont Phillips, 33; June 28, 2023, multiple sharp-force injuries

wwww.    Francisco Melgar-Saldivar, 23; Aug. 12, 2023, strangulation and blunt force injuries

xxxx.    Michael Page, 53; June 29, 2023, homicide.

yyyy.    Sabino Carlos Ramos, 34; March 22, 2023, multiple stab wounds

zzzz.    Kevin Deshawn Lamar, 44; Aug. 10, 2023, sharp force chest trauma

aaaaa.    Shaquan Jahrel Boykins, 31; May 11, 2023, blunt impact injuries of the head

bbbbb.    Justin Tyler Smith, 37; July 28, 2023, epidural hematoma, blunt force injury of the head. The medical examiner said he was punched and fell to the ground, striking his head

ccccc.    Quenton Mayo, 30; Aug. 14, 2023, stab wounds of the neck

ddddd.    Correctional officer Robert Danford Clark, 42; Oct. 1, 2023, multiple stab wounds. He was attacked by an inmate

eeeee.    DyLance Montex Lampkin, 41; July 30, 2023, multiple stab wounds to the torso

fffff.     Quoesent Lamont Bostwick, 35; July 31, 2023, homicide.

ggggg.     Alfonso Marquez Moore, 30; June 19, 2023, blunt impact injuries of the head

253.

In 2020, there was a major riot at Ware State prison, in which incarcerated persons obtained facility keys, let scores of other incarcerated persons out of their housing units, held officers hostage and stabbed officers, set fires inside a housing unit office and burned a GDC transport cart, and broke into an office and obtained officers' weapons and defensive gear. The riot resulted in several hospital transports, including four officers, one via helicopter life-flight.

254.

In October 2020, at Georgia State Prison, an incarcerated man was taken to the hospital by ambulance for a cut to his forehead and dark ligature marks around his neck. (Hereinafter referred to as "2020 GA SP Incident")

255.

In the 2020 GA SP Incident, the incarcerated man reported that his bunkmate had tried to kill him by wrapping a sheet around his neck. Less than five months later, an ambulance returned to GSP to pick up the same man. This time, he had yellow and purple bruising on the entire right side of his face, a deformity indicating a possible jaw fracture and multiple human bite marks all over his body.

256.

In the 2020 GA SP Incident the man was so malnourished that every bone in his spine was bruised. He reported that he had been kicked in the face, people had been stealing his food for months, his bunkmate had been sexually assaulting and raping him, and nobody was helping him

257.

On August 3, 2020, an officer at Phillips State Prison was conducting rounds in a housing unit when an incarcerated person handed him a note stating that an incarcerated person in another cell had been held hostage for days, was yelling for help, and might be injured. In May 2023, DOJ interviewed the victim, who reported that he had been held and tortured for almost four days, he had been stabbed from behind and his eye was pierced and he suffered a traumatic brain injury.

258.

Almost exactly a year later from the incident in the above allegation, on August 12, 2021, the same assailant assaulted another incarcerated person at the same prison; the victim of the second assault required outside medical treatment at a hospital.

259.

At Smith State Prison, in May 2020, GDC staff informed emergency services responders that an incarcerated person had been tied up, beaten, and waterboarded by his cellmate. (hereinafter referred to as "2020 Smith Incident")

260.

In the 2020 Smith Incident, the cellmate also inserted multiple bars of soap into the victim's rectum. One bar of soap, covered in stool and blood, had already fallen out. The victim suffered multiple contusions to his face and chest and was bleeding heavily from his nose and mouth. He had ligature marks on his neck and still had makeshift binding around his wrist. He was transported to a local hospital; while he was being moved to an emergency-room bed, two more bars of soap fell out of his rectum. The hospital found that most of his upper teeth had been broken during the assault. One hundred-fifty milliliters of blood was suctioned from his airway.

261.

On May 22, 2022, at Hancock Prison, an incarcerated person was severely injured while attempting to stop an assault on another inmate

262.

Defendant Oliver's grossly inadequate staffing of prisons, including Dodge State Prison, leaves incarcerated persons unsupervised and hampers staff's ability to respond to violence. Plaintiff suffered as a direct result of this as there was no guard

present in the tower over Plaintiff's dorm during the First Attack, and there was a minimal guard presence during the Second Attack.

263.

Incarcerated people in custody at Georgia prisons, including Plaintiff, were put at substantial risks of serious harm due to severe understaffing in Georgia prisons caused by Defendant Oliver's actions.

264.

In the past several years, staffing in Georgia prisons has been too low to provide reasonable supervision. Vacancies and turnover are high, especially among security staff who are directly responsible for supervising incarcerated persons.

265.

Defendant Oliver has failed to improve the dire staffing problems at Georgia's prisons.

266.

Maintaining adequate staffing levels and ensuring supervision of the population are critical components of a safe and secure prison facility, particularly protection from harm including from violence.

267.

GDC leadership has long presided over a system with severe staffing shortages, with systemwide CO vacancy rates over 50% since mid-2021 – too low to operate reasonably safe and functional facilities.

268.

Beginning in the mid-2010's, a downward trend in staffing numbers already had begun.

269.

From 2014 to 2018, annual average CO vacancy rate at Georgia prisons climbed from almost 11% to over 18%.

270.

Between 2018 and 2023, Georgia prison staffing levels fell precipitously, reaching a systemwide CO vacancy rate of 60% in April 2023, with over 2,800 vacant officer positions.

271.

In April 2023, the vacancy rate was over 60% at 20 medium-and close-security prisons; twelve of these prisons had vacancy rates above 70%.

272.

By the end of 2023, CO vacancy rates remained in the same range at Georgia's most dangerous prisons.

273.

In December 2023, the vacancy rate was over 60% at 18 medium-and close-security prisons; ten of these prisons had vacancy rates above 70%.

274.

The reality of these high vacancy rates is that Georgia was operating most of its close- and medium-security prisons with more officer posts vacant than filled, resulting in inadequate security and supervision.

275.

Between October 2022 and the end of 2023, more than 15 state prisons housing individuals at the medium- and close-security levels saw a net loss in filled CO positions, while several others saw increases only in the single digits.

276.

In interviews with DOJ in 2023, staff at large men's prisons housing incarcerated people at the close-security level reported that high CO vacancy rates over 60%, as well as significant vacancies among supervisory security staff persisted.

277.

With a systemwide CO vacancy rate over 50%, Defendant Oliver did not staff the most critical posts or conduct other basic correctional operations in GDC prisons, including Dodge State Prison. Plaintiff suffered as a direct result of this as there was no guard present in the tower over Plaintiff's dorm during the First Attack, and there

was a minimal guard presence during the Second Attack. Further, after the Second Attack, Plaintiff was not discovered in his injured condition for a period of at least 24 hours.

278.

According to GDC policy, for a prison to maintain normal operations, allotted posts at the Priority 1, 2, and 3 levels must be filled; of these, Priority 1 posts are considered critical.

279.

For example, at the prisons that house incarcerated persons at the medium- and close-security levels, it is generally required that each housing unit be staffed by two or more officers in 24/7 Priority 1 (or otherwise designated as mandatory) posts, with additional Priority 1 posts assigned around the facility, including those stationed at the front entrance and patrolling the perimeter.

280.

According to the GDC, all incarcerated persons classified as close security – over 11,000 incarcerated people, about 23% of GDC's total population – always require supervision by a CO.

281.

Yet GDC leadership and facility staff acknowledged to the DOJ, and the DOJ's review of staffing documents confirms, that, at several prisons, Priority 1

posts are consistently and frequently vacant, leaving officers unable to conduct required rounds and other duties, let alone directly supervise the population.

282.

Facility staffing records document deviations from mandatory staffing requirements, acknowledging that, due to CO staffing shortages, the minimum requirement of CO coverage cannot be met, and that sergeants and unit managers need to assist with basic housing unit coverage.

283.

In practice, however, Georgia prisons do not have enough staff, even including supervisory staff, to cover its Priority 1 posts at many of the prisons the DOJ visited.

284.

Properly conducted well-being checks, referred to as "security rounds" in the prison, are critical to the safety and security of people incarcerated at the prison.

285.

Properly conducted security rounds cannot be effectuated with the dire understaffing problems which occur at Georgia prisons, including Dodge State Prison.

286.

During security rounds, officers should verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

287.

With the severe understaffing at Georgia prisons, officers are unable to verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

288.

Defendant Oliver is aware of chronic short staffing in the prison system but has failed to correct it.

289.

GDC documents and the DOJ's interviews with prison staff illustrate the staffing triage that has become common across the system.

290.

Staff at several Georgia prisons have adopted a practice of assigning one CO to single-handedly supervise two buildings at a time, each comprising two or more housing units and hundreds of incarcerated people, for an entire 12-hour shift.

291.

At a large close-security men's prison known for gang problems and violence, a sampling of staffing rosters from day and night, weekday, and weekend shifts in mid-2023 confirmed that the prison is consistently staffed with well under half the security staff needed to ensure coverage of Priority 1 posts.

292.

On every shift roster the DOJ reviewed at that large close-security men's prison known for gang problems and violence, there was at least one, and sometimes up to four, officers assigned to two buildings at a time; in other words, each of those officers was single-handedly responsible for nearly 400 beds.

293.

The Regional Director responsible for the large close-security men's prison known for gang problems and violence acknowledged that, in practice, the staff assigned to multiple posts are required to switch posts every 30 minutes to check on incarcerated persons in multiple buildings, leaving units and entire buildings unsupervised during those times.

294.

At another large men's prison, a sampling of staffing rosters from 2023 showed that facility leadership consistently assigned officers to cover multiple housing units on the same shift, and that on some shifts supervisory security staff were assigned to cover officer posts in housing units.

295.

A medical employee who worked at the other large men's prison reported there have been times when only two officers were available to cover the entire compound. At times, this employee reported, the perimeter officer would need to vacate the perimeter post to cover security posts inside the facility.

296.

A shift supervisor at a large medium-security men's prison, whom the DOJ interviewed in mid-2023, reported that in a given month, there is unlikely to be a single day on which each building in the prison is covered by at least one officer.

297.

GDC's investigations make clear that staffing shortages place security staff in an untenable position and have contributed to homicides and other serious assaults.

298.

For example, an investigation of a homicide at a GDC men's prison in 2021 found that no staff checks had been done after 9:20 p.m. the night before the death; the body was found next morning around 9:00 a.m.

299.

In 2022, at a close-security men's prison, an incarcerated man was killed after being assaulted while handcuffed. The investigation found that the officer on duty

was single-handedly supervising a control center as well as both sides of the housing unit building where the homicide took place.

300.

Other incidents reveal that when security staff is stretched this thin, incarcerated people are at greater risk of harm.

301.

During DOJ's 17 facility site inspections, the DOJ's experts observed GDC's short staffing in person.

302.

While the DOJ's teams were accompanied by several Special Operations officers brought in to facilitate the DOJ's visits, generally a smaller number of facility-based staff were present.

303.

It was not uncommon on the DOJ's tours for the GDC to temporarily assign dozens of Special Operations staff to the facility, to allow the DOJ's group to tour the facility and to facilitate incarcerated people's movement to participate in interviews with DOJ.

304.

The GDC insisted on setting all of DOJ's site visits several weeks or months in advance to facilitate preparations, and repeatedly informed the DOJ that its group

could not split up while on-site, due to the security challenges multiple escorts would pose.

### 305.

As a result, the GDC did not permit DOJ to tour spontaneously and observe normal operations in the prisons.

### 306.

However, the DOJ still observed evidence of inadequate staff supervision.

### 307.

For example, in most of the 17 prisons the DOJ toured, the DOJ's experts repeatedly noted that control centers in housing units appeared to be unmanned and found little evidence that they were consistently occupied (e.g., officers' personal belongings, computer equipment such as a mouse or working monitor).

### 308.

Similarly, GDC records confirmed that, day-to-day, across the close-and medium-security prisons, staffing shortages were a constant challenge for the officers who are working.

### 309.

The security staff tasked with running a prison with insufficient backup are forced to cut corners on important prison functions including rounds and wellness checks, as well as proper documentation and recordkeeping.

310.

For example, in a sampling of internal GDC audits from 2023, in 12 out of 13 prison audits, staff failed to properly document required 30-minute cell checks in segregated housing units, with auditors noting that there were lengthy periods of time with no documented checks, or evidence that the checks had been documented before or after the fact, instead of contemporaneously.

311.

As a result of the understaffing caused by Defendant Oliver, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents.

312.

Defendant Oliver and Defendant Holt are aware of the violence in the prison. Yet they have failed to take adequate action to address the crisis, and homicides, stabbings, and other violent acts which continue at dangerous levels. Such led directly to the attack on Plaintiff.

313.

Georgia prisons, due to the supervision, direction, and custom of Defendant Oliver, regularly operates without enough security staff to provide appropriate supervision and prevent violence. Plaintiff suffered as a direct result of this as there was no guard present in the tower over Plaintiff's dorm during the First Attack, and

there was a minimal guard presence during the Second Attack. Further, after the Second Attack, Plaintiff was not discovered in his injured condition for a period of at least 24 hours.

314.

Inadequate supervision and staffing by Defendant Oliver puts incarcerated people at substantial risk of serious harm from violence and can violate their constitutional rights, especially when other conditions like easy access to weapons contribute to the danger.

315.

Without adequate supervision, incarcerated people are at greater risk of violence and other harm due to unchecked gang activity, assaults, extortion, and access to weapons and drugs.

316.

Not only do Georgia prisons fail to adequately staff its prisons, but they also fail to take reasonable steps to mitigate its staffing shortages.

317.

One way to attempt to mitigate the danger posed by housing units with minimal or infrequent officer presence on the ground is to monitor video in the housing units.

318.

Yet at multiple facilities, security and leadership staff reported to the DOJ that surveillance video in the housing units is not monitored in the housing unit control centers or from central control.

319.

While the warden generally has access to housing-unit surveillance video, the shift supervisor and lower-level security staff do not.

320.

The result of these practices is that nobody is supervising the population in real time.

321.

Defendant Oliver's consistent failure to ensure that even minimum staffing levels are met leads to unsafe prisons.

322.

With housing units left unsupervised for sustained periods of time, incarcerated persons can engage in illicit activities, including exchanging contraband, abusing drugs, making homemade weapons, fetching contraband via drone drops, and engaging in violent assaults.

323.

Gangs and other threat groups tend to step in to fill the void in leadership, telling people where they can or can't sleep and exerting control over prison life.

324.

When security staff are not present to report incidents, perpetrators may not be held accountable and can continue to cause harm to others.

325.

Appropriate follow-up, such as reassigning someone to another housing unit for protection or reclassifying someone who perpetrated an assault, may not occur.

326.

Defendant Oliver's failure to ensure staff presence, supervision, and enforcement of rules and policy in the Georgia prisons contributes to an unsafe environment.

327.

Efforts to enforce prison rules and ensure incarcerated people are where they are supposed to be also falter without adequate staff.

328.

In hundreds of interviews, incarcerated persons reported to DOJ that officers and other staff are in the housing units infrequently and that housing units and entire buildings often are completely unsupervised.

329.

This results in the proliferation of contraband and violence, as well as other rule violations that impede orderly and safe correctional operations.

330.

For example, incarcerated persons and staff consistently reported that it is common for incarcerated persons to sleep in beds other than those to which they are assigned, often because other incarcerated persons who have more power in the housing units tell people where to sleep, and officers do not notice or fail to correct the relocation. This practice illustrates how GDC staff are not in control of the population.

331.

In the event of an emergency, without adequate staffing, the ability to respond in a timely manner is severely hindered. If an assault or other violent or medically urgent incident occurs while staff are not present, the delivery of critical medical treatment to the injured person or persons may be significantly delayed.

332.

For example, in 2023, an incarcerated man at a large men's prison died after he was badly injured in a fight with another incarcerated person in a housing unit. A supervisory member of the medical staff recounted that a nurse who responded to the incident was "distraught" after the man died, because, in the immediate aftermath of the assault, medical personnel were not permitted to enter the housing unit due to insufficient security staff to escort them.

333.

As another example, in 2023, Inmate Randy Wynn was killed by his cellmate overnight at Smith State Prison, and he remained undiscovered by staff until the morning. Furthermore, once discovered, it took hours to take his barely alive body to the hospital.

334.

Conditions in Georgia Prisons, which include Dodge State prison, obstruct the delivery of medical care. Plaintiff's medical care was constitutionally deficient as Plaintiff did not receive constitutionally adequate medical care after the Attacks.

335.

Security and staffing problems, caused by Defendant Oliver, affect all aspects of healthcare in the prison system.

336.

Many medical care issues stem from Defendant Oliver's failure to provide a reasonably safe facility in which incarcerated people have appropriate access to care.

337.

Constitutionally inadequate medical care already has led to serious injury and death, and it continues to pose a substantial risk of serious harm to people incarcerated in Georgia prisons.

338.

GDC records and EMS reports demonstrate how understaffing causes avoidable delays in providing medical care in emergencies.

339.

For example, GDC records on four deaths of incarcerated persons in 2021 describe bodies that were discovered by staff after the onset of rigor mortis, indicating that hours had likely passed since the individual had died.

340.

In interviews with DOJ, multiple EMS directors identified delays in reaching patients in the prisons, which were apparently due to GDC staffing inadequacies.

341.

The EMS director also said that overnight staffing appears to be a significant issue, noting that there have been instances where it appeared that an emergency had occurred during the night shift, but prison staff had not requested EMS until the next day.

342.

The EMS director also described difficulties in obtaining security escorts for EMS hospital transports due to security staff shortages. Such applies as well to non-emergent medical transports.

343.

Numerous incidents from across the system highlight how understaffing has contributed to delays in necessary medical care reaching incarcerated persons who have been harmed in violent incidents.

344.

For example, in June 2022, emergency services responded to Coastal State Prison for an unresponsive person. When they arrived, after some delay, they were taken to a cell where an incarcerated man lay dead on the ground. The body had rigor mortis, and was "pale and cool to the touch." GDC staff informed emergency responders that the man was in rigor when they got to him and that they found a syringe near his bed. The cause of death was an overdose

345.

On August 20, 2021, emergency services responded to Georgia State Prison for a stab wound. An incarcerated person reported that he was hog tied all night, stabbed, and then released in the morning after being tied up for over eight hours. Emergency responders noted indentations on the incarcerated person's arms and legs where he was tied. He was airlifted to a hospital.

346.

On December 8, 2020, emergency services responded to Georgia State Prison for an incarcerated person suffering burns to 90% or more of his body. The incarcerated person reported that he was using the phone, laid it down onto the metal

flap of his door, and then it caught fire. The fire ignited his clothes and then burned his body. Emergency responders observed burns on his chest, abdomen, back, armpits, left hand, groin, penis, testicles, buttocks, legs, and feet. The man was in extreme pain. Staff reported that the incident was suspected to have happened around 4:00 p.m. to 5:00 p.m., but the incarcerated person was not brought to the medical unit until around 10:24 p.m., just prior to calling emergency services. Transport to the hospital was delayed because prison security staff did not have an officer ready to go. The incarcerated person was eventually airlifted to a hospital.

347.

An incarcerated person was stabbed multiple times on May 23, 2022, at Ware State Prison. There was no security staff in the dorm, so other incarcerated people beat on the window to draw the attention of staff. It took half an hour for someone to respond. The victim was taken to the hospital, where he was diagnosed with a collapsed lung from a stab wound. After five days in the hospital, he returned to Ware and was locked down in isolation. He was never interviewed about the incident.

348.

Understaffing also can lead to infrequent security and wellness checks and failures to properly document security rounds and other central functions of correctional security staff.

349.

GDC's internal facility audits confirm serious failures in security-related documentation and recordkeeping in multiple operational components that directly affect safety.

350.

For example, the audits found evidence that supervisors had cleared counts despite discrepancies, and that count packets, count slips, and other documentation related to counts were inaccurate.

351.

The 2023 facility audits also identified delays in submitting incident reports; inaccuracies and discrepancies in documentation related to contraband control; incomplete documentation and logs for visitor records and facility entry; inconsistent implementation of required checks and documentation thereof in segregated housing areas; failure to maintain appropriate lists and other records of chemicals, tools, and other materials that could be used for illicit purposes; and inadequate inspection procedures, resulting in irregular performance of required tests.

352.

The audits also indicate that wellness checks are not conducted as required by policy.

353.

For example, 2023 internal compliance audits of operations in segregated housing units in several GDC prisons found evidence of improper documentation of thirty-minute checks in administrative segregation: instead of documenting thirty-minute checks next to each cell door when they occur as required for the safety of individuals in these units, officers likely had back-filled the check logs at the end of a shift.

354.

Adequate security staffing and supervision are essential to a minimally safe and secure prison. Defendant Oliver's failure to ensure adequate staffing in the prisons contributes to harm from violence and to unsafe facilities across the state.

355.

Georgia prisons are unsafe due to aging and inadequately maintained facilities. Defendant Clark through his supervision, failed to maintain Georgia prisons, including Dodge State Prison.

356.

Adequate preventive maintenance are essential components of prison security.

357.

Damage to facility hardware and infrastructure poses risks to incarcerated persons' physical safety, as furniture and fixtures can be dismantled to make weapons, holes in ceilings and walls can be used to gain access to unauthorized areas

or to hide contraband, and dilapidated and unsanitary conditions can lead to internal tension. Such led to the attack of Plaintiff.

358.

Defendant Clark failed to maintain Georgia prisons, including Dodge State Prison, in reasonably safe and secure conditions, placing incarcerated people and others inside and outside the facilities at unacceptable risk.

359.

GDC's internal facility audits, as well as information DOJ obtained from facility site inspections and interviews with staff and incarcerated people, establish that GDC does not take the steps necessary to maintain secure prisons, including timely preventive and corrective maintenance.

360.

Leadership has acknowledged that aging facilities raise challenges across the system, with the average GDC prison over 30 years old and reaching "end of life," according to a recent public presentation by the Commissioner.

361.

Poor maintenance and pervasive contraband, caused by the supervision, direction, custom, and policy of Defendant Clark and Defendant Oliver, contribute to the violence at Georgia prisons, including the violence that Plaintiff was a victim of during the attacks.

362.

Defendant Clark and Defendant Oliver are aware of the danger these conditions pose to incarcerated people but have failed to take adequate action to make the facility safe.

363.

Unmaintained parts of Georgia prisons, caused by the supervision, custom, and policy of Defendant Clark and Defendant Oliver jeopardize inmate safety and provided the makeshift weapons for the attacks onto Plaintiff.

364.

Due to poor maintenance by Defendant Clark, Georgia prisons are a source of dangerous weapons and expose people to violence.

365.

Frequently, Georgia prisons, through the leadership of Defendant Clark, fail to promptly fix things that break in its facilities – even when the thing that is broken is as central to prison operations as a lock or key.

366.

A 2023 GDC facility audit found that staff failed to submit maintenance requests for broken keys.

367.

Staff at the same prison explained in an interview with DOJ that the officer designated to perform lock-and-key duties is frequently pulled from that assignment to cover security posts, and therefore is unable to maintain the lock-and key system at the prison.

368.

Staff from Georgia prisons said that getting broken locks fixed is a perennial challenge due to issues including short staffing, not having a locksmith on staff at the prison, or challenges obtaining parts to fix old locks.

369.

Additionally, Georgia prisons, as a result of the understaffing by Defendant Oliver, does not have sufficient security and maintenance staff to maintain facilities after fixing broken fixtures, windows, walls, ceilings, and other components of facilities.

370.

The DOJ was told repeatedly by incarcerated people, including those who work maintenance details and are responsible for facility repairs, and some staff that an enormous amount of repair work was undertaken prior to DOJ's site visits to each prison. Despite these efforts, during site visits, the DOJ's experts observed physical building and maintenance issues that affect security, including broken or exposed

electrical outlets and wiring, metal fixtures, large holes or patched areas in ceilings and walls, and small holes and cracks in walls and windows.

371.

Georgia prisons, under the leadership of Defendant Clark, also fail to comply with their own policies to regularly evaluate, test, and document the condition of its security infrastructure and systems.

372.

Internal audits confirm that Georgia prisons fail to take necessary steps to ensure its prisons are secure.

373.

For example, several 2023 facility audits found that Georgia prisons fail to perform required checks of windows and doors to ensure they have not been cut or modified.

374.

Several facility audits also found that Georgia prisons fail to maintain accurate key and tool inventories and to document key counts and checks.

375.

For example, one 2023 facility audit of a close-security men's prison noted inconsistencies in accounting for and inventorying tools, and a lack of consistent control and documentation regarding chemical agents, weapons, and inventory.

376.

Defendant Clark's failure to maintain control of such sensitive equipment as keys and tools exposes the population (and staff) to an unreasonable risk of harm, because discrepancies and failures to follow policies in these areas can compromise the physical security of the facilities' doors and gates and can facilitate the use of weapons and other contraband.

377.

Georgia prisons, as a result of Defendant Holt's actions, have ineffective classification and housing systems that expose incarcerated persons to an unreasonable risk of violence.

378.

Georgia prisons, as a result of Defendant Holt's actions, have classification and housing systems that do not function properly. Georgia prisons do not conduct timely and accurate classification and segregation reviews due to staffing shortages and the incomplete data in GDC's automated systems.

379.

Georgia prisons have a computerized classification system, the "Next Generation Assessment" (NGA) tool.

380.

GDC officials explained that the NGA tool was developed for GDC, and that it uses data entered into GDC's correctional management database to calculate a security-level score for each incarcerated person.

381.

Thus, individuals' security scores should be updated based on new STG information, incident reports, disciplinary reports, and other inputs as they are entered into the system.

382.

A computerized system like this can be an effective tool, but it must be combined with individual classification and re-classification reviews by staff, and the system must receive relevant updated information such as serious incident occurrences.

383.

Defendant Holt fails to ensure that classification reviews are conducted by qualified staff.

384.

The DOJ found that staff do not consistently implement the agency's own classification timelines and procedures, such as those that mandate classification and segregation reviews and counselor meetings.

385.

Internal audits from several Georgia prisons in 2023 found delayed initial counseling sessions, inconsistent or inadequate scheduling and completion of counseling sessions, and incomplete classification documentation.

386.

These shortcomings may in part be due to understaffing of counselors by Defendant Oliver, who are tasked with conducting classification reviews.

387.

In a review of data from 16 Georgia prisons from January 2022 to August 2023, the DOJ found that most of the prisons reviewed failed to fully staff allotted counselor positions, and several had counselor staffing rates in the 50% range or lower.

388.

Without adequate counselor staffing, Georgia prisons cannot ensure that incarcerated persons are classified and reclassified properly and that their housing assignments are reasonably safe and appropriate for their security level and other housing needs.

389.

Even if Georgia prisons had the staff to effectuate classification and reclassification, the GDC's computerized system is only as good as the data upon which it relies. The NGA tool relies on information from the State's incident

reporting and records databases, which have significant data reliability issues. The State's staffing problems and operational issues with incident reporting and follow-up mean that serious incidents often are unreported, misreported, or inadequately investigated.

390.

In May 2022, a 21-year-old man was killed by his cellmate at Calhoun State Prison following multiple failures in GDC's classification and housing systems.

391.

The homicide occurred after staff moved the assailant out of segregation, to general population, and then back to segregation without following classification and housing assignment procedures.

392.

When staff moved the individual back to segregation, he requested to be placed in a particular cell, and staff housed him there with a cellmate.

393.

The next day, the two cellmates told an orderly that they wanted to be separated, which the orderly communicated to an officer.

394.

One day later, an orderly saw the individual being beaten by his cellmate. The man died. The autopsy revealed blunt force trauma injuries and a stab wound to the neck.

395.

The GDC closed its criminal investigation without a thorough administrative review into a breakdown of its classification process.

396.

An administrative review should have addressed the staff errors, as well as errors in housing records, and indications of personal connections between a staff member and gangs

397.

There was no evidence of discipline or counseling in the personnel files of three employees whose errors were identified in the investigation as relevant to the man's death.

398.

Georgia prisons fail to control weapons, drugs, and other dangerous contraband in its prisons.

399.

Georgia prison contraband controls fail to address the scope and complexity of the problem of contraband in the prisons, particularly weapons, illicit drugs, and unauthorized electronics (e.g., cellphones).

400.

Inadequate staffing and supervision, caused by Defendant Oliver, combined with ready access to contraband sources, allow incarcerated people to easily purchase, manufacture, possess, openly display, and use weapons, cellphones, and drugs.

401.

As a result, the volume of contraband in the prisons remains high, and the existence of weapons cellphones, and drugs, and the marketplace surrounding these items, places incarcerated persons at risk.

402.

Between November 2021 and August 2023, Georgia prisons recovered 27,425 weapons, 12,483 cellphones, and 2,016 illegal drug items; during the same time period, GDC documented 262 drone sightings and 346 fence-line throw overs.

403.

GDC officials acknowledged that the agency's problems with contraband are extensive in scope and that the prevalence of contraband places the population at risk.

404.

Contraband can be smuggled into prisons in various ways; staff have been caught bringing contraband in through standard entry points, throw packages of contraband over exterior fences or using remote-controlled aerial devices to perform "drone drops".

405.

Contraband weapons can be smuggled in, or, given the opportunity, incarcerated persons can make "shanks" – homemade knives – and other weapons by dismantling and sharpening metal objects and other materials found inside the prisons.

406.

Serious deficiencies in day-to-day prison operations contribute to the ongoing prevalence of contraband.

407.

At the most basic level, prison staff are not conducting routine, day-today searches of individuals and areas.

408.

Searches should include routine and surprise searches of housing units, random pat-downs of incarcerated persons moving between areas, and careful inspections for physical security breaches.

409.

Searches also should be sufficiently thorough to identify and remove contraband from searched areas.

410.

GDC's own policies require such safeguards, but in practice facility staff do not comply with the policies with the consistency required to address the problem.

411.

However, without adequate staffing, searches cannot occur as needed in Georgia prisons.

412.

In 2023, GDC internal audits of several prisons found inadequate or incomplete facility-wide searches, failures in reporting procedures for incidents involving contraband, incomplete documentation of searches, irregular handling of discovered contraband, and inconsistency in inspecting packages for contraband.

413.

GDC policy requires regular full prison searches; the audits indicate that such searches and inspections are not conducted as frequently as required by policy, and are not taking place regularly or according to appropriate procedures.

414.

After a major incident, or as part of a special operation, GDC may call in a tactical team to conduct a search, but afterwards, staff go back to their regular practices. The lack of routine attention to security searches is a serious flaw. The types of searches the State publicizes are too infrequent and belated for a problem of such scope.

415.

GDC's staffing, supervision, and management deficiencies caused by Defendant Oliver, contribute to the failure to adequately control contraband.

416.

Georgia prisons does not have the number of staff needed to implement a system of regular searches and security checks.

417.

With large portions of the population unsupervised for long periods of time, incarcerated people have opportunities to make weapons, abuse drugs, and engage in a black market for contraband.

418.

Additionally, the DOJ review of staffing rosters and interviews with prison staff showed that officers working perimeter posts are sometimes assigned to other Priority 1 posts on the same shift, or fully re-assigned to interior duties for periods

of time or entire shifts, leaving the perimeter more vulnerable to contraband introduction.

419.

The severe staffing shortages also contribute to staff vulnerability to criminal schemes involving incarcerated persons and STGs; Georgia prisons routinely places staff in stressful, challenging environments without sufficient support from other officers and supervisors.

420.

For years, the State has wrestled with staff corruption related to contraband.

421.

Hundreds of employees have been arrested, including the warden of Smith State Prison in 2023, for crimes related to contraband.

422.

The DOJ also identified problems with employee background-check and screening processes in GDC employee personnel files.

423.

For example, concerns about criminal histories, financial problems, and possibly gang-affiliated associates were identified in the background-check process, but the individual had been hired without any documentation in their file of

mitigating circumstances or why their hiring was appropriate despite the identified concerns.

424.

Because housing units in prisons across the system often are completely unsupervised, violent incidents and other incidents, such as property destruction and illicit drug use, occur without any staff observation.

425.

Defendant Oliver, Defendant Clark, and Defendant Holt have been aware, for a long time, of the violence in Georgia's prisons, and of the operational and management problems that contribute to the high levels of violence, including chronic understaffing, and easily accessible contraband.

426.

Defendant Oliver, Defendant Clark, and Defendant Holt have been aware, for a long time, that Georgia prisons had staffing issues and a growing incarcerated population that, if not properly addressed, would lead to a crisis.

427.

Adequate staffing is critical to providing essential supervision and security in prisons.

428.

As early as 1985, the GDC Commissioner represented that there were not enough COs and that salaries were too low.

429.

In 1999, officials at the GDC again noted the mounting issue: "While the number of GDC employees remains steady, the total number of offenders continues to rise."

430.

By 2006, GDC's annual report acknowledged staffing had continued to decline: Staffing numbers are lower today than they were in 1999, even though the population has increased by around 12,300 people, or 31%.

431.

In 2019, officials at the GDC emphasized that, "Retention of Correctional Officers (COs) continues to be a challenge" and "[b]etween FY 2017 and FY 2019, CO turnover increased from 27.2% to 42.1%."

432.

While there have been some fluctuations over the years, for several years officials at the GDC have failed to hire and retain enough staff to keep the population safe.

433.

Several recent lawsuits against officials at Georgia prisons have alleged constitutional violations, including failure to protect incarcerated people from harm.

434.

Reportedly, the GDC has spent almost $20 million since 2018 to settle claims involving death or injury to people incarcerated in its prisons.

435.

In 2023, the GDC settled a lawsuit brought by an incarcerated man's family, after he was strangled to death by his cellmate at Macon State Prison in 2020, a consequence, the family alleged, of GDC's deliberate indifference.

436.

In a state-court lawsuit against GDC, GDC's former medical contractor alleged in its pleadings that GDC's failure to control violence in the prisons led to extraordinarily high medical costs for trauma care.

437.

Defendant Oliver, Defendant Holt, and Defendant Clark are aware of the facts in the above allegations.

438.

Moreover, Defendant Oliver, Defendant Holt, and Defendant Clark are aware, through GDC data, that violence and threats of violence are widespread in the prisons.

439.

GDC leadership officials, such as Defendant Oliver, Defendant Holt, and Defendant Clark are sent a selected portion of the data that facilities collect in incident reports and other documentation.

440.

For each facility, a monthly report containing statistics, including those related to violent incidents, is generated for review by the warden and regional manager. Defendant Oliver, Defendant Holt, and Defendant Clark read over these reports.

441.

Defendant Oliver, Defendant Holt, and Defendant Clark receive reports of emergencies and serious incidents across the system.

442.

For example, from 2022 through April 2023, these reports available to GDC leadership, such as Defendant Oliver, Defendant Holt, and Defendant Clark included 1,045 incidents of violence, including assaults, fights, and homicides.

443.

Georgia prisons also produce comprehensive reports of statistics monthly, including the number of assaults, deaths, and uses of force. Defendant Oliver, Defendant Holt, and Defendant Clark read these reports.

444.

Defendant Oliver, Defendant Holt, and Defendant Clark are likewise aware of factors that increase the risk of violence in GDC facilities.

445.

Defendant Oliver, Defendant Holt, and Defendant Clark likewise have been on notice of systemic deficiencies that contribute to harm in its prisons.

446.

Year after year, the prisons continue to collect enormous amounts of contraband, including weapons, drugs, and electronics, from within prisons across the system. Defendant Oliver and Defendant Clark are aware of this.

447.

GDC officials also have acknowledged its facilities are in dire need of repair.

448.

The State of Georgia has closed some facilities and undertaken renovations in others.

449.

For example, in early 2022, GDC closed Georgia State Prison, a notoriously violent and dilapidated prison.

450.

In 2023, GDC announced plans to close or repurpose Lee Arrendale State Prison, and began to implement plans to open a larger, renovated women's prison in McRae, Georgia, to which most of the Lee Arrendale population would be moved.

451.

The State also recently allocated funds for a new state prison in Washington County, to replace the current Washington State Prison, as well as some increased funding for facility maintenance and repairs statewide.

452.

The GDC also temporarily closed Autry State Prison for renovations, and has undertaken renovation projects, including lock "hardening" and other improvements, at other prisons.

453.

Through their own data and public attention, Defendant Oliver and Defendant Clark have been aware that systemic deficiencies within the Georgia prison system increase the risk of harm to the people in its custody.

454.

Defendant Oliver's, Defendant Holt's and Defendant Clark's efforts have been inadequate, as evidenced by the ongoing harm and significant risk of serious harm in the prisons.

455.

It is plainly evident, from not only the staffing levels and crime in the prisons but also by the prevalence of harm, that Georgia prisons expose the people it incarcerates to a substantial risk of serious harm, and that Defendant Oliver's, Defendant Holt's, and Defendant Clark's, policies and practices have failed to address the pervasive problems.

456.

Defendant Oliver, Defendant Holt, and Defendant Clark have known of the substantial risk of serious harm presented by widespread violence in Georgia prisons, but rather than address the violence, they have failed to take reasonable steps to address those unconstitutional conditions.

457.

The constitutional deprivations caused by Defendant Oliver, Defendant Holt, and Defendant Clark led directly to the attack, injury, deficient medical care, and pain and suffering of Plaintiff.

**COUNT I**
**Section 1983 Claims under Eighth Amendment: Cruel and Unusual Punishment; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Protect; Failure to Take Reasonable Measures to Guarantee Safety**
**(Against Defendant Brown, Individually)**

458.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

459.

There was a substantial risk of serious harm to Plaintiff as there was an
excessive risk of inmate-on-inmate violence at Dodge State Prison where violence
and terror reign. Inmate-on-inmate violence was the norm or something close to it
as evidenced by the numerous stabbings at Dodge State Prison.

460.

There was a substantial risk of serious harm to Plaintiff leading up to the
First Attack, as he was housed in an environment with a widespread makeshift
knife problem, was placed in a dorm with violent gang members, was in a dorm
where inmates were roaming freely and popping locks, and there were inmates
wielding homemade weapons intending to hurt and maim Plaintiff before
Defendant Brown "popped the lock" to allow them into Plaintiff's dorm.

461.

Defendant Brown actually knew of the risks of serious harm because she
could see the attacking inmates wielding homemade weapons intending to hurt and
maim Plaintiff before she "popped the lock" to allow them into Plaintiff's dorm.

462.

Defendant Brown, individually, was deliberately indifferent to the
substantial risks of serious harm posed to Plaintiff leading up to and during the

First Attack and failed to keep Plaintiff reasonably safe by "popping the lock" to allow the assaulting inmates to attack Plaintiff and walking off as they entered Plaintiff's dorm.

463.

Defendant Brown knowingly failed to take reasonable steps to protect Plaintiff from violence at the hands of other inmates who posed a substantial risk of serious harm to Plaintiff leading up to the attack because, among other things, she "popped the lock" to allow the assaulting inmates to attack Plaintiff and she walked off as they entered Plaintiff's dorm and as the attack occurred.

464.

Leading up to the First Attack, Defendant Brown possessed subjective knowledge that by "popping the lock" to allow the assaulting inmates to attack Plaintiff and walking off as they entered Plaintiff's dorm, she was placing Plaintiff at a substantial risk of serious harm.

465.

As indicated above, Defendant Brown had subjective knowledge of the risks of serious harm to Plaintiff leading up to and during the First Attack.

466.

As indicated above, Defendant Brown disregarded the substantial risk of serious harm to Plaintiff leading up to and during the First Attack.

467.

Plaintiff was attacked, stabbed, and maimed by multiple inmates as a result of Defendant Brown's deliberate indifference described herein.

468.

As indicated above, Defendant Brown's conduct was more than mere negligence.

469.

There is an affirmative causal connection between Defendant Brown's conduct and the constitutional deprivations described herein. Defendant Brown's failure to protect as described herein caused Plaintiff's injuries and pain and suffering, and Plaintiff's injuries and attack were a foreseeable consequence of Defendant Brown's failure to protect.

470.

Defendant Brown's failures to take reasonable action to protect Plaintiff from known risks of serious harm amounted to deliberate indifference and a failure to protect in violation of the Eighth Amendment and proximately caused Plaintiff

physical and mental pain and suffering, extreme mental distress, serious bodily injury, disfigurement, violations of constitutionally protected rights, medical bills, lost capacity to earn, and other general and special damages.

471.

Defendant Brown is not entitled to qualified immunity because her conduct violated the basic legal principle that "A prison official violates the Eighth Amendment "when a substantial risk of serious harm, *of which the official is subjectively aware,* exists and the official does not respond reasonably to the risk.". *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014).

472.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT II**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Personal Participation Supervisory Liability Over Deliberate Indifference to a Serious Risk of Harm and Failure to Protect**
**(Against Defendant Brown, Individually)**

473.

Plaintiff hereby incorporates by reference the allegations set forth in

Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

474.

Defendant Brown is liable to Plaintiff for her failures to adequately

supervise prison staff regarding their duties to keep Plaintiff safe from violence at

the hands of other prisoners.

475.

Defendant Brown was subjectively aware of the actions and omissions of her

subordinates when she allowed Plaintiff to be attacked by multiple other inmates.

This is supported by the fact that Defendant Brown was directly involved in

opening the doors for the inmates to come and attack Plaintiff during the First

Attack.

476.

Defendant Brown ratified the actions and omissions of her subordinates

when she "popped the lock" to allow the assaulting inmates to attack Plaintiff and

walked off as they entered Plaintiff's dorm.

477.

Defendant Brown refused to take action to supervise her staff to protect

Plaintiff from violence at the hands of other prisoners, which resulted in Plaintiff's

injury, disfigurement, pain and suffering, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

478.

Defendant Brown's refusal to take action to supervise her staff to protect Plaintiff from violence at the hands of other Prisoners caused Plaintiff's constitutional deprivations, injuries, and damages as described herein.

479.

Defendant Brown's personal participation as described herein caused Plaintiff to be ganged up on and stabbed by multiple inmates.

480.

Defendant Brown is not entitled to qualified immunity for her conduct in failing to supervise prison staff to protect Plaintiff from violence at the hands of other prisoners.

481.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## **COUNT III**
## **Section 1983 Claims under Eighth Amendment:**

Page **117** of **186**

## Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment
### (Against Defendant Brown, Individually)

482.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

483.

Plaintiff suffered from and was going to suffer from an objectively serious medical need after the First Attack, as multiple inmates were wielding sharpened weapons and stabbed Plaintiff with these weapons during the First Attack.

484.

Defendant Brown was deliberately indifferent to Plaintiff's serious medical needs from the First Attack, and Defendant Brown's response to Plaintiff's injuries was objectively insufficient because Defendant Brown walked off as the First Attack was occurring and did not provide Plaintiff with medical aid, even though it was certain that Plaintiff was about to be and/or was being stabbed by makeshift knives.

485.

Upon learning that Plaintiff was being and/or was about to be stabbed by multiple inmates with sharpened knives, Defendant Brown had subjective awareness of the facts signaling the need for medical attention by Plaintiff.

486.

Required action by Defendant Brown upon learning that Plaintiff was being stabbed would be to radio prison transport to take Plaintiff to the hospital or call for an ambulance to take Plaintiff to the hospital.

487.

Defendant Brown's refusal and failure to provide medical attention or call for medical attention for Plaintiff upon discovering Plaintiff caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

488.

Defendant Brown is not entitled to qualified immunity for her conduct because she had more than fair warning that her conduct was unconstitutional in not calling for medical help after Plaintiff was being stabbed, as indicated in *Aldridge v. Montgome*ry, 753 F.2d 970 (11th Cir. 1985) and more.

489.

Defendant Brown is not entitled to qualified immunity for her conduct as her deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the

nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

490.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## COUNT IV
## Section 1983 Claims under Eighth Amendment:
## Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Personal Participation Supervisory Liability Over Deliberate Indifference to Serious Medical Needs
## (Against Defendant Brown, Individually)

491.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

492.

Defendant Brown is liable to Plaintiff for her failures to adequately supervise prison staff regarding the provision of medical treatment during and after the First Attack.

493.

Defendant Brown was subjectively aware of the actions and omissions of her subordinates when Plaintiff was being stabbed and after Plaintiff stabbed and left to die. This is supported by the fact that Defendant Brown was directly involved in failing to protect Plaintiff from the stabbing and walked off as Plaintiff was being stabbed.

494.

Defendant Brown ratified the actions and omissions of her subordinates when Plaintiff was being stabbed and after Plaintiff was stabbed and left to die. This is supported by the fact that Defendant Brown was directly involved in failing to protect Plaintiff from the stabbing and walked off as Plaintiff was being stabbed.

495.

Defendant Brown refused to take action to supervise her staff to reasonably respond to Plaintiff's serious medical needs, which resulted in Plaintiff's injury, disfigurement, pain and suffering, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

496.

Defendant Brown's refusal to take action to supervise her staff to reasonably respond to Plaintiff's serious medical needs caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

497.

Defendant Brown's personal participation as described herein caused

Plaintiff to not be taken to the hospital for at least an hour even though Plaintiff

suffered from life threatening injuries.

498.

Defendant Brown is not entitled to qualified immunity for her conduct in

failing to inform other prison staff that Plaintiff was suffering from life-threatening

injuries and failing to direct prison staff to provide medical attention to Plaintiff.

499.

As a result of the wrongful conduct described above, Plaintiff suffered from

permanent injuries, disfiguring injuries, physical and mental pain and suffering,

extreme mental and emotional distress, humiliation, shock, and fright, medical

bills, violations of constitutionally protected rights, lost capacity to earn, and other

general and special damages.

**COUNT V**
**Section 1983 Claims under Eighth Amendment:**
**Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable**
**Measures to Guarantee Safety; Cruel and Unusual Punishment**
**(Against Defendant Bowen, Individually)**

500.

Plaintiff hereby incorporates by reference the allegations set forth in

Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

501.

Plaintiff suffered from an objectively serious medical need after the First Attack, as he suffered from pneumothorax and multiple stab wounds, among other things.

502.

Defendant Bowen was deliberately indifferent to Plaintiff's serious medical needs from the First Attack and Defendant Bowen's response to Plaintiff's injuries was objectively insufficient, as indicated by the following list of non-exhaustive facts:

    a. Ms. Roberson then contacted the prison immediately and told them her son had been attacked and he needed medical attention.

    b. Ms. Roberson was eventually contacted by Defendant Bowen, who told her that he wasn't a doctor but that her son looked fine.

    c. Defendant Bowen called later the same date and told her that he was being taken to a hospital for his injuries.

    d. After the Attack, in reference to sending Plaintiff to the hospital, Defendant Bowen said "let me see him before I send my money anywhere" in delaying sending Plaintiff to the hospital.

e. After the First Attack, Defendant Bowen told Plaintiff "if its not serious, we aren't going to take you" in delaying taking Plaintiff to the hospital.

f. Defendant Bowen became aware of the serious nature of Plaintiff's injuries resulting from the First Attack since at least 9:30 AM, likely earlier, on May 11, 2023.

g. However, due to the supervision and actions of Defendant Bowen, Plaintiff did not depart for the hospital until 10:22 AM on May 11, 2023.

h. Defendant Bowen had the means and authority to have Plaintiff taken to the hospital.

503.

Upon finding learning of Plaintiff's condition in the early morning of May 11, 2023, Defendant Bowen had subjective awareness of the facts signaling the need for medical attention as Plaintiff suffered from bleeding open wounds and had been stabbed multiple times.

504.

Required action by Defendant Bowen upon finding Plaintiff either in the early morning of May 11, 2023 would be to radio prison transport to take Plaintiff to the hospital immediately or call for an ambulance to take Plaintiff to the

hospital. However, Plaintiff's transport to the hospital had not left the Prison until at least 52 minutes after the First Attack.

505.

Defendant Bowen's refusal and failure to provide medical attention or call for medical attention for Plaintiff upon discovering Plaintiff caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

506.

Defendant Bowen is not entitled to qualified immunity for his conduct upon discovering Plaintiff because he had more than fair warning that his conduct was unconstitutional in waiting at least 52 minutes to have Plaintiff taken to the hospital or to call for an ambulance after Plaintiff presented with bleeding open wounds and with obvious signs of a lung puncture, as indicated in *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985) and more.

507.

Defendant Bowen is not entitled to qualified immunity for his conduct as his deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the

nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

508.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT VI**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and**
**Unusual Punishment; Personal Participation Supervisory Liability Over**
**Deliberate Indifference to Serious Medical Needs**
**(Against Defendant Bowen, Individually)**

509.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

510.

Defendant Bowen is liable to Plaintiff for his failures to adequately supervise prison staff regarding the provision of medical treatment after the First Attack.

511.

Defendant Bowen was subjectively aware of the actions and omissions of his subordinates when Plaintiff was found bleeding and suffering from obvious signs of a lung puncture. This is supported by the fact that Defendant Bowen was directly involved in handling Plaintiff's crisis.

512.

Defendant Bowen ratified the actions and omissions of his subordinates when Plaintiff was found by delaying the calling of an ambulance or the taking of Plaintiff to a hospital for at least 52 minutes even though Plaintiff had recently been brutally beaten, was suffering from a punctured lung , and was suffering from open wounds.

513.

Defendant Bowen refused to take action to supervise his staff to reasonably respond to Plaintiff's serious medical needs, which resulted in Plaintiff's injury, disfigurement, pain and suffering, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

514.

Defendant Bowen's refusal to take action to supervise his staff to reasonably respond to Plaintiff's serious medical needs caused Plaintiff's constitutional

deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

515.

Defendant Bowen's personal participation as described herein caused Plaintiff to not be taken to the hospital for at least 52 minutes even though Plaintiff suffered from life threatening injuries.

516.

Defendant Bowen is not entitled to qualified immunity for his conduct in failing to supervise prison staff when Plaintiff was found brutally beaten, bleeding, and with a punctured lung.

517.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## <u>COUNT VII</u>
## <u>Section 1983 Claims under Eighth Amendment:</u>
## <u>Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment</u>

**(Against Defendant Hardy, Individually)**

518.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

519.

Plaintiff suffered from an objectively serious medical need after the First Attack, as he suffered from pneumothorax and multiple stab wounds, among other things.

520.

Defendant Hardy was deliberately indifferent to Plaintiff's serious medical needs from the First Attack and Defendant Hardy's response to Plaintiff's injuries was objectively insufficient, as indicated by the following list of non-exhaustive facts:

    a.  Ms. Roberson then contacted the prison immediately and told them her son had been attacked and he needed medical attention.

    b.  Defendant Hardy became aware of the serious nature of Plaintiff's injuries resulting from the First Attack since at least 9:30 AM, likely earlier, on May 11, 2023.

   c. However, due to the supervision and actions of Defendant Hardy,

      Plaintiff did not depart for the hospital until 10:22 AM on May 11,

      2023.

   d. Defendant Hardy had the means and authority to have Plaintiff taken

      to the hospital.

### 521.

Upon finding learning of Plaintiff's condition in the early morning of May 11,

2023, Defendant Hardy had subjective awareness of the facts signaling the need for

medical attention as Plaintiff suffered from bleeding open wounds and had been

stabbed multiple times.

### 522.

Required action by Defendant Hardy upon finding Plaintiff either in the early

morning of May 11, 2023 would be to radio prison transport to take Plaintiff to the

hospital immediately or call for an ambulance to take Plaintiff to the hospital.

However, Plaintiff's transport to the hospital had not left the Prison until at least 52

minutes after the First Attack.

### 523.

Defendant Hardy's refusal and failure to provide medical attention or call for

medical attention for Plaintiff upon discovering Plaintiff caused Plaintiff's

constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

524.

Defendant Hardy is not entitled to qualified immunity for his conduct upon discovering Plaintiff because he had more than fair warning that his conduct was unconstitutional in waiting at least 52 minutes to have Plaintiff taken to the hospital or to call for an ambulance after Plaintiff presented with bleeding open wounds and with obvious signs of a lung puncture, as indicated in *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985) and more.

525.

Defendant Hardy is not entitled to qualified immunity for his conduct as his deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

526.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering,

extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

### COUNT VIII
### Section 1983 Claims under Eighth Amendment:
### Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Personal Participation Supervisory Liability Over Deliberate Indifference to Serious Medical Needs
**(Against Defendant Hardy, Individually)**

527.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

528.

Defendant Hardy is liable to Plaintiff for his failures to adequately supervise prison staff regarding the provision of medical treatment after the First Attack.

529.

Defendant Hardy was subjectively aware of the actions and omissions of his subordinates when Plaintiff was found bleeding and suffering from obvious signs of a lung puncture. This is supported by the fact that Defendant Hardy was directly involved in handling Plaintiff's crisis, and Defendant Hardy was the reporting official after the First Attack.

530.

Defendant Hardy ratified the actions and omissions of his subordinates when Plaintiff was found by delaying the calling of an ambulance or the taking of Plaintiff to a hospital for at least 52 minutes even though Plaintiff had recently been brutally beaten, was suffering from a punctured lung, and was suffering from open wounds.

531.

Defendant Hardy refused to take action to supervise his staff to reasonably respond to Plaintiff's serious medical needs, which resulted in Plaintiff's injury, disfigurement, pain and suffering, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

532.

Defendant Hardy's refusal to take action to supervise his staff to reasonably respond to Plaintiff's serious medical needs caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

533.

Defendant Hardy's personal participation as described herein caused Plaintiff to not be taken to the hospital for at least 52 minutes even though Plaintiff suffered from life threatening injuries.

534.

Defendant Hardy is not entitled to qualified immunity for his conduct in failing to supervise prison staff when Plaintiff was found brutally beaten, bleeding, and with a punctured lung.

535.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## COUNT IX
### Section 1983 Claims under Eighth Amendment: Cruel and Unusual Punishment; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Protect; Failure to Take Reasonable Measures to Guarantee Safety (Against Defendant Gooch, Individually)

536.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

537.

There was a substantial risk of serious harm to Plaintiff as there was an excessive risk of inmate-on-inmate violence at Dodge State Prison where violence

and terror reign. Inmate-on-inmate violence was the norm or something close to it as evidenced by the numerous stabbings at Dodge State Prison.

538.

There was a substantial risk of serious harm to Plaintiff leading up to the Second Attack, as he was housed in an environment with a widespread makeshift knife problem, was placed in a dorm with violent gang members, was in a dorm where inmates were roaming freely and popping locks, was previously and recently ganged up on and attacked in the same dorm he was being placed into, and was being placed in a dorm with violent inmates who wanted to harm Plaintiff..

539.

Defendant Gooch actually knew of the risks of serious harm because he had been at the prison long enough to know of Plaintiff's First Attack, Plaintiff's First Attack would have been in Plaintiff's institutional file, he would have known of the numerous contraband reports and incidents of inmate-on-inmate violence, and would have known the violent proclivities and histories of the inmates who attacked Plaintiff.

540.

Defendant Gooch, individually, was deliberately indifferent to the substantial risks of serious harm posed to Plaintiff leading up to and during the Second Attack and failed to keep Plaintiff reasonably safe by placing Plaintiff in the same dorm

which he was previously attacked knowing that this dorm housed inmates with violent proclivities and histories and that there was a homemade knife problem.

541.

Defendant Gooch knowingly failed to take reasonable steps to protect Plaintiff from violence at the hands of other inmates who posed a substantial risk of serious harm to Plaintiff leading up to the Second Attack because, among other things, he placed Plaintiff in the same dorm which he was previously attacked knowing that this dorm housed inmates with violent proclivities and histories and that there was a homemade knife problem.

542.

Leading up to the Second Attack, Defendant Gooch possessed subjective knowledge that by placing Plaintiff in the same dorm which he was previously attacked knowing that this dorm housed inmates with violent proclivities and histories and that there was a homemade knife problem, he was placing Plaintiff at a substantial risk of serious harm.

543.

As indicated above, Defendant Gooch had subjective knowledge of the risks of serious harm to Plaintiff leading up to the Second Attack.

544.

As indicated above, Defendant Gooch disregarded the substantial risk of serious harm to Plaintiff leading up to the Second Attack.

545.

Plaintiff was attacked, stabbed, and maimed by multiple inmates as a result of Defendant Gooch's deliberate indifference described herein.

546.

As indicated above, Defendant Gooch's conduct was more than mere negligence.

547.

There is an affirmative causal connection between Defendant Gooch's conduct and the constitutional deprivations described herein. Defendant Gooch's failure to protect as described herein caused Plaintiff's injuries and pain and suffering, and Plaintiff's injuries and attack were a foreseeable consequence of Defendant Gooch's failure to protect.

548.

Defendant Gooch's failures to take reasonable action to protect Plaintiff from known risks of serious harm amounted to deliberate indifference and a failure to protect in violation of the Eighth Amendment and proximately caused Plaintiff physical and mental pain and suffering, extreme mental distress, serious bodily

injury, disfigurement, violations of constitutionally protected rights, medical bills, lost capacity to earn, and other general and special damages.

549.

Defendant Gooch is not entitled to qualified immunity because her conduct violated the basic legal principle that "A prison official violates the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk.". *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014).

550.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT X**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and**
**Unusual Punishment; Supervisory Claims**
**(Against Defendant Bowen, Individually)**

551.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-163 of the instant Complaint as if fully set forth herein verbatim.

552.

Defendant Bowen was the Warden at Dodge State Prison at all relevant times, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

553.

Defendant Bowen's unconstitutional management of Dodge State Prison, in part caused the constitutional violations and injuries described herein.

554.

Defendant Bowen is sued for his policy making, failures to maintain security policies, failures to supervise prison staff, failures to investigate incidents of violence as well as failing to keep the prison safe, secure, and properly staffed in order to prevent inmate-on-inmate violence and the free flow of contraband, failures to prevent the free-flow of contraband by inmates and guards, failures to ensure safe and efficient delivery of medical care, failures to ensure rounds were being conducted properly and effectively, and supervisory conduct in the operation and management of Dodge State Prison.

555.

Plaintiff had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm.  The Eighth Amendment prevented Defendant Bowen,

as well as those under their supervision, from exercising deliberate indifference toward Plaintiff's safety, security, and constitutional rights.

556.

Plaintiff's constitutional rights were violated by Defendant Bowen's subordinates, which included Defendant Brown, Defendant Hardy, Defendant Gooch, and other correctional officers on duty who were responsible for conducting rounds, investigating contraband and incidents of violence, and maintaining the facilities, as he was subjected to the unconstitutional conditions described in this complaint, the attacks which injured and maimed him, and the constitutionally deficient medical care he received afterwards.

557.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of the facility, insufficient medical care, deficient classification systems, inadequate systems for preventing and investigating violence, poor supervision of staff, severe understaffing, and insufficient security rounds, among other things, that put Defendant Bowen on notice of the need to take action and he failed to do so.

558.

Defendant Bowen is liable to Plaintiff for his failures to adequately supervise prison staff, including Defendant Brown, Defendant Hardy, Defendant Gooch, and other correctional officers on duty, regarding the prevention of the attacks onto Plaintiff, the discovery of Plaintiff while and after he was attacked, conducting rounds, dilapidation of facilities, the free flow of contraband and smuggling which provided the weapons used to harm and injure Plaintiff, and the constitutionally deficient medical care Plaintiff received afterwards.

559.

Defendant Bowen was subjectively aware of the actions and omissions of Defendant Brown, Defendant Hardy, Defendant Gooch, and other correctional officers on duty as well as the systematic violence and free flow of contraband at Dodge State Prison. This is supported by the fact that Defendant Bowen had seen and signed off on the incidents of violence, incidents of deficient medical care, and findings of contraband.

560.

Defendant Bowen ratified the actions and omissions of his subordinates by failing to enforce and enact security practices such as the performance of security rounds, failing to control the free-flow of contraband, and failing to respond to and investigate incidents and complaints of violence, among other things.

561.

Defendant Bowen refused to take action to supervise his staff, to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, to restrict the free flow of contraband, and to adequately staff the facility, which resulted in Plaintiff's injury, disfigurement, physical and emotional pain and suffering, extreme emotional distress, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

562.

Defendant Bowen fostered an unreasonable environment of violence which motivated and encouraged inmates to commit violence against each other and which resulted in Plaintiff's injury, disfigurement, physical and emotional pain and suffering, extreme emotional distress, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

563.

Defendant Bowen's personal participation as described herein caused Plaintiff to be attacked, injured, and maimed.

564.

Violence and terror reign at Dodge State Prison to such an extent that the attacks and stabbings of Plaintiff is actionable under clearly established federal law.

565.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

566.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

567.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

568.

Defendant Bowen is not entitled to qualified immunity for his conduct in failing to supervise his staff, failing to investigate and prevent incidents and complaints of violence, failing to actively intervene, deter, reasonably respond to

and protect inmates from violence at the hands of other prisoners, failing to restrict the free flow of contraband, failing to ensure proper security practices and adequate security rounds, failing to adequately staff the facility, and failing to take action despite a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

569.

The unconstitutional policies and practices related to the handling of inmates at Dodge State Prison, failures to create adequate local security policies, inadequate security practices relating to performing rounds and investigating acts of violence, failures to adopt adequate local prison policies on maintaining prison structures and facilities, inadequate practices on investigating incidents of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate staffing practices, inadequate practices on medical care in emergency situations, and others which were created and effectuated by Defendant Bowen are described in thorough detail in allegations 107-163 and are incorporated herein. In

those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.[1]

570.

Such policies and practices resulted in Defendant Brown, Officer Green, Defendant Gooch, and other correctional officers on duty who were responsible for conducting rounds, investigating contraband and incidents of violence, and maintaining the facilities acting with deliberate indifference to Plaintiff's constitutional rights

571.

Defendant Bowen carried out and put such policies into place, and such unconstitutional policies were persistent and wide-spread. Factual support for this contention is detailed thoroughly in allegations 107-163.

572.

Defendant Bowen had authority and responsibility over the governing of the Dodge State Prison and its operations and has the authority and responsibility of implementing some policies and procedures for the Prison. Defendant Bowen also implemented practices which were followed by his subordinates.

---

[1] The Eleventh Circuit has described four main types or categories of shotgun pleadings. The first type is a complaint containing "multiple counts where each count adopts the allegations of all preceding **counts**, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015) (emphasis added). Here, however, Plaintiff has not incorporated the entire complaint—nor has Plaintiff incorporated prior counts—into each count of the Complaint; instead, Plaintiff has incorporated only specifically enumerated facts that are specifically relevant to that count.

573.

Defendant Bowen had supervisory responsibility as well as some final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the Dodge State Prison local policies, procedures, and practices related to inmate-on-inmate violence, contraband prevention and removal, maintenance of the facility, investigations into violence, the conducting of rounds, and the provision of medical care, among other things.

574.

Defendant Bowen implemented and carried out Dodge State Prison local policies, procedures, and practices that constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. Such policies, procedures, and practices are described in great detail in allegations 107-163 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

575.

Defendant Bowen's supervision at Dodge State Prison constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. Such supervision is described in great detail in allegations 107-163 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

576.

Defendant Bowen disregarded the known or obvious consequences of his actions. Facts supporting this contention are thoroughly described in allegations 107-163.

577.

Defendant Bowen's unconstitutional policies, procedures, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and injured by the makeshift weapons, was attacked because staff did not respond appropriately to incidents of prior violence, suffered from delayed medical care as a result of short staffing and a failure to conduct sufficient security rounds, was attacked because of a lack of guard presence, and suffered from delayed medical care, among other things.

578.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Bowen related to the handling of inmates at Dodge State Prison, failures to supervise prison staff, inadequate practices on maintaining facility structures and facilities, inadequate security practices relating to performing rounds and investigating acts of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate practices in providing

**Page 147 of 186**

medical care in emergency situations and others are laid out in great detail in allegations 107-163.  In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

579.

Such customs, practices, and supervision created and carried out by Defendant Bowen constituted a persistent and wide-spread practice. Facts supporting this contention are thoroughly discussed in allegations 107-163.

580.

Such customs, practices, and supervision created and carried out by Defendant Bowen constituted a deliberate indifference to the safety, security, and rights of Plaintiff and exposed Plaintiff to unreasonable risks of harm. Such customs, practices, and supervision are described in great detail in allegations 107-163 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the customs, practices, and supervision are thoroughly explained.

581.

Defendant Bowen disregarded the known or obvious consequences of his actions. Facts supporting this contention are thoroughly described in allegations 107-163.

582.

Such customs, practices, and supervision resulted in Defendant Brown, Defendant Hardy, and other correctional officers on duty who were responsible for conducting rounds, investigating contraband and incidents of violence, and maintaining the facilities acting with deliberate indifference to Plaintiff's constitutional rights

583.

Defendant Bowen's unconstitutional customs, practices, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and injured by the makeshift weapons, was attacked because staff did not respond appropriately to incidents of prior violence, suffered from delayed medical care as a result of short staffing and a failure to conduct sufficient security rounds, was attacked because of a lack of guard presence, and suffered from delayed medical care, among other things.

584.

Defendant Bowen's above failures amount to deliberate indifference to the safety of inmates in violation of the Eighth Amendment.

585.

Defendant Bowen had actual and constructive knowledge of widespread, persistent patterns of inmate-on-inmate violence as well as of the other constitutional violations described herein.

586.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

587.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

588.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

589.

Defendant Bowen is not entitled to qualified immunity for his conduct in failing to supervise his staff, failing to investigate and prevent incidents and complaints of violence, failing to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, failing to restrict the free flow of contraband, failing to ensure proper security practices and adequate security rounds, failing to adequately staff the facility, and failing to take

action despite a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration, as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995), and others.

590.

Wherefore, Plaintiff is entitled to recover under Section 1983 against Defendant Bowen.

591.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT XI**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Supervisory Liability**
**(Against Defendant Oliver in his individual capacity, Defendant Clark in his individual capacity, and Defendant Holt in his individual Capacity)**

592.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-457 of the instant Complaint as if fully set forth herein verbatim.

Page **151** of **186**

593.

Defendant Oliver was the Commissioner of the Georgia Department of Corrections and was responsible for managing a $1.3 billion budget, leading approximately 9,000 employees, and the supervision of nearly 50,000 state offenders. This includes staffing decisions and policies.

594.

At all relevant times herein, Defendant Holt was the Assistant Commissioner of Facilities Division and was responsible for Inmate Classification policies, procedures, and practices.

595.

At all relevant times, Defendant Holt was responsible for monitoring the overall supervision and safety of nearly 52,000 felony offenders.

596.

At all relevant times, Defendant Clark was the Director of Engineering & Construction Services for the Georgia Department of Corrections and was responsible for management and oversight of the ECS division, which is responsible for the design, construction, and maintenance of the Georgia prison's physical infrastructure.

597.

Defendant Oliver is sued for his policy making, customs, staffing and supervisory conduct in the operation and management of Georgia prisons, which include Dodge State Prison.

598.

Defendant Holt is sued for his policy making, customs, and supervisory conduct related to inmate classification systems and practices at Georgia prisons, which include Dodge State Prison.

599.

Defendant Clark is sued for his policy making, customs, and supervisory conduct related to maintenance and repair practices at Georgia prisons, which include Dodge State Prison.

600.

Plaintiff had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm.  The Eighth Amendment prevented the Defendants from exercising deliberate indifference toward Plaintiff's safety, security, and constitutional rights.

601.

Plaintiff's constitutional rights were violated by Defendant Oliver's, Defendant Holt's and Defendant Clark's subordinates as he was subjected to the attack which injured and maimed him, suffered as a result of understaffing and failures to conduct security rounds, was stabbed with a makeshift weapon, was attacked due to inadequate classification policies, was attacked because of a lack of guard presence, and suffered as a result of constitutionally deficient medical care.

602.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, failures to conduct security rounds, and severe understaffing, among other things, that put Defendant Oliver on notice of the need to take action and he failed to do so.

603.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, inadequate systems for preventing and investigating

violence, poor supervision of staff, and inadequate classification systems, among other things, that put Defendant Holt on notice of the need to take action and he failed to do so.

604.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, the unconstitutional living conditions, poor supervision of staff, and severe understaffing, among other things, that put Defendant Clark on notice of the need to take action and he failed to do so.

605.

Violence and terror reign at Georgia prisons, including Dodge State Prison to such an extent that the attack onto Plaintiff is actionable under clearly established federal law.

606.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

607.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

608.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (citing *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga*., 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

609.

Defendant Oliver is not entitled to qualified immunity for his failure to take action in the face of a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, failures to conduct security rounds, and severe understaffing, as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

610.

**Page 156 of 186**

Defendant Holt is not entitled to qualified immunity for his failure to take action in the face of a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, inadequate systems for preventing and investigating violence, poor supervision of staff, and inadequate classification systems as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others

611.

Defendant Clark is not entitled to qualified immunity for his failure to take action in the face of a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, the unconstitutional living conditions, poor supervision of staff, and severe understaffing as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

612.

The unconstitutional policies related to the handling of inmates at Georgia prisons, including Dodge State Prison, inadequate policies on investigating incidents of violence, inadequate practices to prevent inmate-on-inmate violence

and the free flow of contraband, inadequate staffing policies and practices,

inadequate staffing for medical care, and others which were created and effectuated

by Defendant Oliver are described in thorough detail in allegations 164-457 and

are incorporated herein. In those allegations, the wrongful acts of each defendant

are attributable, and the policies are thoroughly explained.

613.

The unconstitutional policies related to the handling of inmates at Georgia

prisons, including Dodge State Prison, inadequate classification systems, policies,

and practices, inadequate practices to prevent inmate-on-inmate violence, and

others which were created and effectuated by Defendant Holt are described in

thorough detail in allegations 164-457 and are incorporated herein. In those

allegations, the wrongful acts of each defendant are attributable, and the policies

are thoroughly explained.

614.

The unconstitutional policies related to the handling of inmates at Georgia

prisons, including Dodge State Prison, practices leading to unclean, unsafe, and

unconstitutional living conditions, failures to adopt adequate policies on

maintaining prison structures and facilities, inadequate practices regarding the

maintenance of prison structures and facilities, inadequate practices to prevent the

**Page 158 of 186**

creation of contraband, and others which were created and effectuated by

Defendant Clark are described in thorough detail in allegations 164-457 and are

incorporated herein. In those allegations, the wrongful acts of each defendant are

attributable, and the policies are thoroughly explained.

615.

Such policies resulted in Defendant Oliver's, Defendant Holt's and

Defendant Clark's subordinates acting with deliberate indifference to Plaintiff's

constitutional rights.

616.

Defendant Oliver, Defendant Holt, and Defendant Clark carried out and put

such policies into place, and such unconstitutional policies were persistent and

wide-spread. Factual support for this contention is detailed thoroughly in

allegations 164-457.

617.

Defendant Oliver had authority and responsibility over staffing Georgia

prisons and had the authority and responsibility of implementing policies and

procedures for the Georgia prisons.

618.

Defendant Holt had the authority and responsibility for carrying out the policies and procedures related to inmate classifications at Georgia prisons and was responsible for supervising and making policies and practices for inmate classifications at Georgia prisons.

619.

Defendant Clark had the authority and responsibility for carrying out the policies and procedures related to maintenance of Georgia prisons and was responsible for supervising and making policies and practices for the maintenance of Georgia prisons.

620.

Defendant Oliver had the final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the policies and procedures related to inmate-on-inmate violence, contraband prevention and removal, facility staffing, budget allocation decisions, and the provision of medical care, among other things.

621.

Defendant Holt had supervisory responsibility as well as policy making authority for the unconstitutional conditions from which Plaintiff suffered as well

as for the policies and procedures related to inmate-on-inmate violence and classification systems, among other things.

## 622.

Defendant Clark had supervisory responsibility as well as policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the maintenance and repair of Georgia prisons, which includes Dodge State Prison.

## 623.

Defendant Oliver, Defendant Holt, and Defendant Clark implemented and carried out policies and procedures that constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. They also exposed Plaintiff to unreasonable risks of harm. Such policies and procedures are described in great detail in allegations 164-457 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

## 624.

Defendant Oliver, Defendant Holt, and Defendant Clark disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 164-457.

625.

Defendant Oliver's, Defendant Holt's, and Defendant Clark's unconstitutional policies, procedures, practices, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and stabbed by the makeshift weapons, suffered as a result of short staffing and a failure to conduct sufficient security rounds, was attacked because of a lack of guard presence, was attacked by inmates due to deficient classification, and suffered as a result of delayed medical treatment, among other things.

626.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Oliver related to the handling of inmates at Georgia Prisons, including Dodge State Prison, the institution of unclean, unsafe, and unconstitutional living conditions, severe understaffing leading to failures to conduct security rounds and discover medical emergencies, severe understaffing, failures to prevent inmate-on-inmate violence and the free flow of contraband, failures to provide adequate medical services, and others are laid out in great detail in allegations 164-457. In

those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

627.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Holt related to the handling of inmates at Georgia Prisons, including Dodge State Prison, inadequate classification systems, customs, and practices, failures to prevent inmate-on-inmate violence, and others are laid out in great detail in allegations 164-457. In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

628.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Clark related to the handling of inmates at Georgia Prisons, including Dodge State Prison, the institution of unclean, unsafe, and unconstitutional living conditions, failures to maintain prison structures and facilities to prevent the creation of makeshift weapons, and others are laid out in great detail in allegations 164-457. In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

629.

Such customs, practices, courses of conduct, and supervision created and carried out by Defendant Oliver, Defendant Holt, and Defendant Clark constitute a persistent and wide-spread practice. Facts supporting this contention are thoroughly discussed in allegations 164-457.

630.

Such customs, practices, courses of conduct and supervision created and carried out by Defendant Oliver, Defendant Holt, and Defendant Clark constituted a deliberate indifference to the safety, security, and rights of Plaintiff and exposed Plaintiff to unreasonable risks of harm. Such customs, practices, and supervision are described in great detail in allegations 164-457 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the customs, practices, and supervision are thoroughly explained.

631.

Such customs, practices, courses of conduct and supervision resulted in Defendant Oliver's, Defendant Holt's, and Defendant Clark's subordinates acting with deliberate indifference to Plaintiff's constitutional rights.

632.

Defendant Oliver, Defendant Holt, and Defendant Clark disregarded the
known or obvious consequences of their actions. Facts supporting this contention
are thoroughly described in allegations 164-457.

633.

Defendant Oliver's, Defendant Holt's, and Defendant Clark's
unconstitutional customs, practices, courses of conduct and supervision caused and
were a moving force behind Plaintiff's constitutional deprivations, injuries, and
pain and suffering, as Plaintiff was attacked, maimed, and stabbed by the makeshift
weapons, suffered as a result of short staffing and a failure to conduct sufficient
security rounds, was attacked because of a lack of guard presence, was attacked by
inmates due to deficient classification, and suffered as a result of delayed medical
treatment, among other things.

634.

The U.S. Constitution imposes duties on prison officials, who must take
reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,*
511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

635.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

636.

It is well established that "confinement in a prison where violence and terror reign is actionable*." Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (citing *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

637.

Defendant Oliver, Defendant Holt, and Defendant Clark are not entitled to qualified immunity for their conduct in failing to properly staff facilities in order to prevent inmate-on-inmate violence and the free flow of contraband, failing to ensure properly conducted security rounds and wellbeing rounds, insufficient classification systems, and failing to maintain facilities causing a proliferation of makeshift weapons as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995), and others.

638.

Wherefore, Plaintiff is entitled to recover under Section 1983 against Defendant Oliver, Defendant Holt, and Defendant Clark.

639.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## COUNT XII
## Punitive Damages
## (Against Defendant Oliver, individually, Defendant Clark, individually, Defendant Holt, individually, Defendant Bowen, individually, Defendant Brown, individually, Defendant Hardy, individually, and Defendant Gooch, individually)

640.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-457 of the instant Complaint as if fully set forth herein verbatim.

641.

Defendant Oliver's, Defendant Clark's, Defendant Holt's, Defendant Bowen's, Defendant Brown's, Defendant Hardy's, and Defendant Gooch's actions showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle

Plaintiff to recover punitive damages against said Defendants in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

642.

Defendant Oliver's actions in enforcing and employing unconstitutional staffing policies, customs, supervision and practices with knowledge of the horrible consequences, including death, assaults, violence, and inadequate medical care which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Oliver in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

643.

Defendant Clark's actions in enforcing and employing unconstitutional policies, customs, supervision and practices related to the maintenance of prison facilities with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to

entitle Plaintiff to recover punitive damages against Defendant Clark in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

644.

Defendant Holt's actions in enforcing and employing unconstitutional policies, customs, supervision, and practices related to classification of inmates with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Holt in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

645.

Defendant Bowen's actions in enforcing and employing unconstitutional policies, customs, supervision, and practices related to the free flow of contraband and investigations into violence, staffing, medical care, and security practices with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the

presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Bowen in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

646.

Defendant Bowen's actions in being deliberately indifferent to Plaintiff's serious medical needs after the First Attack as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Bowen in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

647.

Defendant Bowen's actions in supervising and ratifying staff and officers on duty, including Defendant Hardy, in being deliberately indifferent to Plaintiff's serious medical needs after the First Attack as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Bowen in an amount to be

determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

648.

Defendant Brown's actions in showing deliberate indifference to Plaintiff's safety and in failing to protect Plaintiff as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Brown in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

649.

Defendant Brown's actions in being deliberately indifferent to Plaintiff's serious medical needs during and after the First Attack as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Brown in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

650.

Defendant Brown's actions in supervising and ratifying staff and officers on duty in being deliberately indifferent to Plaintiff's serious medical needs during and after the First Attack as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Brown in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

651.

Defendant Hardy's actions in being deliberately indifferent to Plaintiff's serious medical needs after the First Attack as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Hardy in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

652.

Defendant Hardy's actions in supervising and ratifying staff and officers on duty in being deliberately indifferent to Plaintiff's medical needs after the First Attack as described in this Complaint showed willful misconduct, wantonness, and

the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Hardy in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

653.

Defendant Gooch's actions in showing deliberate indifference to Plaintiff's safety and in failing to protect Plaintiff as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Gooch in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

654.

Defendant Oliver, Defendant Clark, Defendant Holt, Defendant Bowen, Defendant Brown, Defendant Hardy, and Defendant Gooch acted with the specific intent to cause harm in that said Defendants desired to cause the consequences of their actions and/or knew that the consequences of their actions were substantially certain to result.

655.

Wherefore, Plaintiff is entitled to recover punitive damages against Defendant Oliver, Defendant Clark, Defendant Holt, Defendant Bowen, Defendant Brown, Defendant Hardy, and Defendant Gooch as determined by the enlightened conscience of impartial jurors.

## COUNT XIII
## Negligence And Gross Negligence
## Liability Pursuant to O.C.G.A. § 50-21-20 et. seq
## (Against Defendant Georgia Department of Corrections)

656.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-106 of the instant Complaint as if fully set forth herein verbatim.

657.

Warden Tommy Bowen, Lieutenant Kevin Hardy and other officers and employees owed a duty to Plaintiff not to expose him to unreasonable risks of harm, and not to violate the written policies of the Dodge State Prison and the Georgia Department of Corrections with reckless disregard.

658.

Warden Tommy Bowen, Lieutenant Kevin Hardy, and other officers and employees owed a duty to Plaintiff to treat him humanely, provide him with necessary medical care, and ensure his safety and health.

659.

Warden Tommy Bowen, Lieutenant Kevin Hardy, and other officers and employees breached their duties to Plaintiff when they exposed Plaintiff to unreasonable risks of harm and violated the written policies of Dodge State Prison as well as the GDC with reckless disregard and were negligent in the performance of their ministerial duties. Such negligence includes but is not limited to:

a. Waiting at least 52 minutes to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint.

b. Failing to follow the GDC policies and procedures on the provision of medical care including but not limited to Evaluation Services for Urgent and Emergent Healthcare Requests (507.04.39) and Urgent and Emergent Care Services (507.04.37).

660.

Warden Tommy Bowen, Lieutenant Kevin Hardy, and other officers and employees failed to exercise even a slight degree of care and had such a lack of diligence that even careless people are accustomed to exercise when they waited at least 52 minutes to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint when Plaintiff was bleeding out of open wounds and displaying obvious signs of a punctured lung.

661.

Warden Tommy Bowen's, Lieutenant Kevin's, and other officers' and employees' negligence and gross negligence proximately and in fact caused Plaintiff to suffer from worse medical injuries due to delayed medical treatment, suffer from prolonged physical and mental pain and suffering, and suffer from delayed recovery, among other things.

662.

Warden Tommy Bowen is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because his tortious acts were ministerial in nature, and Warden Tommy Bowen performed them negligently.

663.

Lieutenant Kevin Hardy is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because his tortious acts were ministerial in nature, and Lieutenant Kevin Hardy performed them negligently.

664.

The other officers and employees who failed to provide medical care to Plaintiff after the First Attack are not entitled to official immunity as public officers or employees with respect to the negligence and gross negligence

described herein because their tortious acts were ministerial in nature, and those

officers and employees performed them negligently.

665.

Defendant GDC and the State of Georgia are liable to Plaintiff for the

negligence and gross negligence of Warden Tommy Bowen, Lieutenant Kevin

Hardy, and other officers and employees, which were committed in in the course

and scope of their employment and in the course and scope of their official duties,

and are liable for such torts in the same manner as a private individual or entity

would be liable under like circumstances pursuant to the Georgia Tort Claims Act.

666.

GDC employees and officers responsible for providing medical care to

Plaintiff when Plaintiff returned from the hospital after the First Attack owed a

duty to Plaintiff to not to expose him to unreasonable risks of harm, and not to

violate the written policies of the Dodge State Prison and the Georgia Department

of Corrections with reckless disregard.

667.

GDC employees and officers responsible for providing medical care to

Plaintiff when Plaintiff returned from the hospital after the First Attack owed a

duty to Plaintiff to treat him humanely, provide him with necessary medical care,

and ensure his safety and health.

668.

GDC employees and officers responsible for providing medical care to Plaintiff when Plaintiff returned from the hospital after the First Attack breached their duties to Plaintiff when they exposed Plaintiff to unreasonable risks of harm and violated the written policies of Dodge State Prison as well as the GDC with reckless disregard and were negligent in the performance of their ministerial duties. Such negligence includes but is not limited to:

    a. Refusing to provide medical treatment to Plaintiff while he was in his cell.

    b. Failing to follow the GDC policies and procedures on the provision of medical care.

669.

GDC employees and officers responsible for providing medical care to Plaintiff when Plaintiff returned from the hospital after the First Attack failed to exercise even a slight degree of care and had such a lack of diligence that even careless people are accustomed to exercise when they refused to provide medical treatment to Plaintiff while he was in his cell as described in this Complaint.

670.

GDC employees' and officers', who were responsible for providing medical care to Plaintiff when Plaintiff returned from the hospital after the First Attack,

negligence and gross negligence proximately and in fact caused Plaintiff to suffer from worse medical injuries due to delayed medical treatment, suffer from prolonged physical and mental pain and suffering, and suffer from delayed recovery, among other things.

671.

GDC employees and officers responsible for providing medical care to Plaintiff when Plaintiff returned from the hospital after the First Attack are not entitled to official immunity as public officers or employees with respect to the negligence and gross negligence described herein because their tortious acts were ministerial in nature, and they performed them negligently.

672.

Defendant GDC and the State of Georgia are liable to Plaintiff for the negligence and gross negligence of GDC employees and officers responsible for providing medical care to Plaintiff when Plaintiff returned from the hospital after the First Attack, which were committed in in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances pursuant to the Georgia Tort Claims Act.

673.

The GDC and Dodge State Prison officers and employees who discovered Plaintiff after the Second Attack owed a duty to Plaintiff to not to expose him to unreasonable risks of harm, and not to violate the written policies of the Dodge State Prison and the Georgia Department of Corrections with reckless disregard.

674.

The GDC and Dodge State Prison officers and employees who discovered Plaintiff after the Second Attack owed a duty to Plaintiff to treat him humanely, provide him with necessary medical care, and ensure his safety and health.

675.

The GDC and Dodge State Prison officers and employees who discovered Plaintiff after the Second Attack breached their duties to Plaintiff when they exposed Plaintiff to unreasonable risks of harm and violated the written policies of Dodge State Prison as well as the GDC with reckless disregard and were negligent in the performance of their ministerial duties. Such negligence includes but is not limited to:

    a.  Leaving Plaintiff's wounds open and untreated for a period of at least 24 hours.

    b.  Failing to follow the GDC policies and procedures on the provision of medical care including but not limited to Evaluation Services for

Urgent and Emergent Healthcare Requests (507.04.39) and Urgent

and Emergent Care Services (507.04.37).

676.

The GDC and Dodge State Prison officers and employees who discovered

Plaintiff after the Second Attack failed to exercise even a slight degree of care and

had such a lack of diligence that even careless people are accustomed to exercise

when they left Plaintiff's stab wounds open and untreated for a period of at least 24

hours.

677.

The GDC and Dodge State Prison officers' and employees', who discovered

Plaintiff after the Second Attack, negligence and gross negligence proximately and

in fact caused Plaintiff to suffer from worse medical injuries due to delayed

medical treatment, suffer from prolonged physical and mental pain and suffering,

and suffer from delayed recovery, among other things.

678.

The GDC and Dodge State Prison officers and employees who discovered

Plaintiff after the Second Attack are not entitled to official immunity as public

officers or employees with respect to the negligence and gross negligence

described herein because their tortious acts were ministerial in nature, and those

officers and employees performed them negligently.

679.

Defendant GDC and the State of Georgia are liable to Plaintiff for the

negligence and gross negligence of The GDC and Dodge State Prison officers and

employees who discovered Plaintiff after the Second Attack, which were

committed in in the course and scope of their employment and in the course and

scope of their official duties, and are liable for such torts in the same manner as a

private individual or entity would be liable under like circumstances pursuant to

the Georgia Tort Claims Act.

680.

GDC employees and officers responsible for providing medical care to

Plaintiff at Wilcox State Prison owed a duty to Plaintiff not to expose him to

unreasonable risks of harm, and not to violate the written policies of the Wilcox

State Prison and the Georgia Department of Corrections with reckless disregard.

681.

GDC employees and officers responsible for providing medical care to

Plaintiff at Wilcox State Prison owed a duty to Plaintiff to treat him humanely,

provide him with necessary medical care, and ensure his safety and health.

682.

GDC employees and officers responsible for providing medical care to

Plaintiff at Wilcox State Prison breached their duties to Plaintiff when they

exposed Plaintiff to unreasonable risks of harm and violated the written policies of
Wilcox State Prison as well as the GDC with reckless disregard and were negligent
in the performance of their ministerial duties. Such negligence includes but is not
limited to:

    a.  Refusing to provide medical treatment to Plaintiff while he was in his
        cell.

    b.  Not taking Plaintiff to the doctor's office and not giving Plaintiff his
        asthma pump when he needed it.

    c.  Failing to follow the GDC policies and procedures on the provision of
        medical care.

## 683.

GDC employees and officers responsible for providing medical care to
Plaintiff at Wilcox State Prison failed to exercise even a slight degree of care and
had such a lack of diligence that even careless people are accustomed to exercise
when they refused to provide medical treatment to Plaintiff while he was in his cell
as described in this Complaint.

## 684.

GDC employees' and officers', who were responsible for providing medical
care to Plaintiff at Wilcox State Prison, negligence and gross negligence
proximately and in fact caused Plaintiff to suffer from worse medical injuries due

to delayed medical treatment, suffer from prolonged physical and mental pain and suffering, and suffer from delayed recovery, among other things.

685.

GDC employees and officers responsible for providing medical care to Plaintiff at Wilcox State Prison are not entitled to official immunity as public officers or employees with respect to the negligence and gross negligence described herein because their tortious acts were ministerial in nature, and they performed them negligently.

686.

Defendant GDC and the State of Georgia are liable to Plaintiff for the negligence and gross negligence of GDC employees and officers responsible for providing medical care to Plaintiff at Wilcox State Prison, which were committed in in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances pursuant to the Georgia Tort Claims Act.

687.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills,

violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for damages and request from the Court:

a. That summons and process issue as required by law;

b. To allow a trial by jury on all issues so triable;

c. That judgment issue in favor of Plaintiff and against Defendants on all counts of Plaintiff's Complaint;

d. To award Plaintiff compensatory damages against all Defendants;

e. To grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

f. That judgment issue in favor of Plaintiff and against Defendants awarding the Plaintiff general, special, and compensatory damages, including but not limited to physical and mental pain and suffering, extreme mental distress, medical bills, lost capacity to earn, and other necessary expenses in an amount to be proven at trial;

g. That judgment issue in favor of Plaintiff and against Defendant Oliver, Defendant Clark, Defendant Holt, Defendant Bowen, Defendant Brown, Defendant Hardy, and Defendant Gooch awarding Plaintiff

punitive damages in an amount determined at trial by the enlightened

conscience of a fair and impartial jury; and;

h.  To award further relief as the Court deems equitable, proper, and just.


Respectfully submitted this 9th day of May, 2025.


**ERIC J. HERTZ, P.C.**

By:    */s/ Eric J. Hertz*
ERIC J. HERTZ
GA State Bar No. 349501
*hertz@hertz-law.com*
ALEX S. HERTZ
Georgia Bar No. 420971
*alex@hertz-law.com*

*Counsel for Plaintiff*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Tel: (404) 577-8111
Fax: (404) 577-8116

EXHIBIT A

# ERIC J. HERTZ, P.C.

*Trial Lawyers*

May 7, 2024

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**5255**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 4056 2233**
Risk Management Division
Department of Administrative Services
200 Piedmont Avenue, SE, Suite 1804
West Tower, Atlanta, Georgia 30334
**Attention: Susan Setterstrom**
Assistant Director and Claims Counsel
And sent via
Email: Susan.Setterstrom@doas.ga.gov

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**5231**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 4056 2255**
Georgia Department of Corrections
Upshaw Hall, 300 Patrol Road
Forsyth, GA 31029

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**5248**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 4056 2244**
Georgia Department of Corrections
**Department Headquarters**
7 MLK Jr Drive, Suite 543
Atlanta, Georgia 30334

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**5224**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 4056 2266**
Warden Micheal Thomas
Dodge State Prison
PO Box 276
Chester, GA 31012

RE: **NOTICE OF CLAIM /ANTE-LITEM NOTICE & SETTLEMENT DEMAND**
**PURSUANT TO O.C.G.A. § 50-21-26**
**Our Clients:**

| | |
|---|---|
| **Defendants/Entities:** | **Georgia Department of Corrections; State of Georgia; Dodge State Prison; Warden Kendric Jackon in his Official Capacity** |
| **Incident Date:** | **May 11, 2023** |
| **Loss Date:** | **May 11, 2023** |
| **Amount of Loss:** | **$1,000,000.00** |
| **Location:** | **Dodge State Prison** |
| **Extent of Injury:** | **Physical Injury, Mental and Physical Pain & Suffering, general & special damages, and Deprivation of Constitutional Rights** |
| **Legal Claims:** | **Violations of 42 U.S.C. § 1983, deliberate indifference, violations of Americans with Disability Act, *Monell* and *Canton* claims for training, discipline, supervision, federal and state-law claims for personal injuries, negligence, mental and physical pain and suffering, wrongful death, survival action, punitive damages, attorney's fees, and costs of litigation.** |

Page **1** of **3**

Dear Sir or Madam:

Our law firm, along with Benjamin Crump, PLLC, represents Represent Neqwaun O'Neal Roberson. Mr. Roberson was incarcerated at Dodge State Prison on May 11, 2023, when he he was attacked by several inmates during breakfast and stabbed 20 to 25 times all over his body. Mr. Roberson was stabbed in his heart area and his lungs collapsed, and he suffered multiple lacerations. Our investigation suggests that a female correctional officer, LT. Brown, was seen speaking briefly to one of the inmates and popped the lock of the B2 dorm to let the attackers come in from outside of the B2 dorm. Lt. Brown walked off as the attack occurred and there were no guards in the watchtower at that time. After the attack, Mr. Roberson was found by his cellmate, and he was initially denied appropriate medical treatment.

Defendants knew that Mr. Roberson was in danger of suffering violent physical harm, yet Defendants were deliberately indifferent to this serious risk. Additionally, this incident forms part of a pattern and practice of allowing such injuries to occur at Dodge State Prison. The policies, customs and actions taken by Defendants as shown above caused Mr. Roberson to suffer Serious Physical Injury, Mental and Physical Pain and Suffering, General and Special damages, and Deprivation of Constitutional Rights. Finally, our investigation suggests that LT. Brown acted intentionally and maliciously in allowing this attack.

In view of the foregoing, notice is hereby provided for the following claims:

- **42 USC § 1983 CLAIM FOR VIOLATING MR. ROBERSON'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT;**

- **42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE AND FAILURE TO PROTECT;**

- **42 USC § 1983 CLAIM FOR FAILURE TO INTERVENE TO PREVENT CIVIL RIGHTS VIOLATIONS;**

- **42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS;**

- **42 U.S.C. § 1983 (Monell Liability) CLAIM;**

- **42 USC § 1983 CLAIM FOR WRONGFUL DEATH AS A RESULT OF DEPRIVATIONS OF CONSTITUTIONAL RIGHTS;**

- **DEFENDANTS HAVE ENGAGED IN A CUSTOM AND POLICY THAT OBSCURES THE LEVEL OF HARM EXISTENT BY IGNORING VIOLENCE AND OR INACCURATELY CLASSIFYING VIOLENT ACTS AND CAUSES OF DEATH THAT OCCUR IN SMITH STATE PRISON;**

- **SUPERVISORY LIABILITY (Canton Liability) CLAIM; and**

- **STATE-LAW CLAIMS FOR NEGLIGENCE, PERSONAL INJURY, PAIN AND SUFFERING, and otherwise tortious activity.**

### OFFER TO COMPROMISE CLAIMS

This is a one-time, time-limited offer to settle this matter. In exchange for the tender of One-Million Dollars ($1 million), Plaintiff will release all claims against the above-named Defendants. This is a straightforward case of clear liability with wanton and indifferent conscious-shocking conduct for which a jury will no doubt determine requires severe financial penalty. You have ninety (90) days to accept this offer. If this offer is not timely accepted, our clients will file suit and seek a judgment for these claims in an amount that far exceeds this demand.

Very truly yours,

**ERIC J. HERTZ, P.C.**

Jesse A. Van Sant, Esq.

JVS/jdh



# Terms and Conditions Summary

For the current FedEx Service Guide, which contains the complete Terms and Conditions, go to fedex.com.

**Definitions**   On this Airbill, "we," "our," "us," and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents.

**Agreement To Terms**   By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at fedex.com or at a FedEx location. You also agree to those terms on behalf of any third party with an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill** You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment**   Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card must be tendered at a staffed shipping location, and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to US$100. You may pay an additional charge for each additional US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits.

- We won't be liable:

  - for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package.

  - if your recipient violates any of the terms of our Agreement.

  - for loss of or damage to shipments of prohibited items.

  - for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the US$500, US$1,000, or US$50,000 per package limit described above. (Example: 5 packages can have a total declared value of up to US$250,000.) In that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim**   YOU MUST MAKE ALL CLAIMS IN WRITING or online at fedex.com and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to report a claim; however, you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from those charges.

If the recipient accepts your package without noting any damage on the delivery record, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect**   We may, at our option, open and inspect your packages before or after you give them to us to deliver.

**Right Of Rejection**   We reserve the right to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel; or if the shipment is prohibited by law; or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services**   C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please use a FedEx C.O.D. Airbill.

**Air Transportation Tax Included**   A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee**   In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 163134 • Rev. Date 4/22

 Sign Up or Log In  

**Tracking ID:** 818240562233 

Local Scan Time 

  This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818240562233 |
| **Delivered** | Wednesday, 5/8/24, 10:42 AM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | ATLANTA, GA, US |
| **Ship date** | Tuesday, 5/7/24 |
| **Service** | FedEx Standard Overnight |
| **Special handling** | Deliver Weekday |

↓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

**FOLLOW FEDEX**      

© FedEx 1995-2025

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818240562233

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | |
| **Signed for by:** | J.SPENCER | **Delivery Location:** | 200 PIEDMONT AVE SE |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday | | ATLANTA, GA, 30334 |
| | | **Delivery date:** | May 8, 2024 10:42 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 818240562233 | **Ship Date:** | May 7, 2024 |
| | | **Weight:** | |

**Recipient:**
ATNT SUANE SETTESTOTN, DPERTAMTE OF AIMENSIRCAIENSIE
200 POEIDMANSTAVESE STE 104
ATLANTA, GA, US, 30334

**Shipper:**
JSAMIEN EHLWI, ERIC J HERTZ PC
8300 DUNWOODY PL STE 210
ATLANTA, GA, US, 303503323

**Reference**                     RONEOSNE



Thank you for choosing FedEx



**FedEx Express**
Package
US Airbill

FedEx Tracking Number  8182 4056 2244

**1 From** Please print and press hard.

Date 5/7/24

Sender's FedEx Account Number  4312-0368-5
SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name  Jasmine Hewlett    Phone 404 577-8111

Company  ERIC J HERTZ PC

Address  3300 DUNWOODY PL STE 210    Dept./Floor/Suite/Room

City ATLANTA    State GA    ZIP 30350-3323

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.

Robertson. N

**3 To**

Recipient's Name  Georgia Department Of Corrections    Phone (        )

Company  Georgia Department Of Corrections

Address  7 MLK Jr. Drive Suite 543    Dept./Floor/Suite/Room
We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address
Use this line for the HOLD location address or for continuation of your shipping address.

City Atlanta    State GA    ZIP 30334

0141103103

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com.

## Terms and Conditions Summary

For the current FedEx Service Guide, which contains the complete *Terms and Conditions, go to fedex.com.*

**Definitions** On this Airbill, "we," "our," "us," and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents.

**Agreement To Terms** By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at fedex.com or at a FedEx location. You also agree to those terms on behalf of any third party who has an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill** You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment** Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card must be tendered at a staffed shipping location and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to US$100. You may pay an additional charge for each additional US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits

- We won't be liable:

  – for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package.

  – if you or the recipient violates any of the terms of our Agreement.

  – for loss of or damage to shipments of prohibited items.

  – for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the US$500, US$1,000, or US$50,000 per package limit described above. (Example: 5 packages can have a total declared value of up to US$250,000.) In that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim** YOU MUST MAKE ALL CLAIMS IN WRITING or online at fedex.com and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to report a claim; however, you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from those charges.

If the recipient accepts your package without noting any damage on the delivery record, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect** We may, at our option, open and inspect your packages before or after you give them to us to deliver.

**Right of Rejection** We reserve the right to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel; or if the shipment is prohibited by law; or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services** – C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please see a FedEx C.O.D. Airbill.

**Air Transportation Tax Included** A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee** In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 163134 • Rev Date 4/22

 Sign Up or Log In  

**Tracking ID:** 818240562244  

Local Scan Time ⌄

   This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818240562244 |
| **Delivered** | Wednesday, 5/8/24, 1:50 PM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | ATLANTA, GA, US |
| **Ship date** | Tuesday, 5/7/24 |
| **Service** | FedEx Standard Overnight |
| **Special handling** | Deliver Weekday |

↓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

FOLLOW FEDEX       

© FedEx 1995-2025

Site Map  |  Terms of Use  |  Privacy & Security  |  Ad Choices

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818240562244

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | |
| Signed for by: | | Delivery Location: | 7 MKL KR DESTE 543 |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday | | ATLANTA, GA, 30334 |
| | | Delivery date: | May 8, 2024 13:50 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 818240562244 | Ship Date: | May 7, 2024 |
| | | Weight: | |

Recipient:
ATNT DEPARTMMET HEADIU EI, GEORGEI DEPARTMNET FO CORTRER
7 MKL KR DESTE 543
ATLANTA, GA, US, 30334

Shipper:
JASMIEN HEWHWTW, ERIC J HERTZ PC
8300 DUNWOODY PL STE 210
ATLANTA, GA, US, 303503323

Reference                    ROBERSIE ANE

Proof-of-delivery details appear below; however, no signature is available for this FedEx Express shipment because a signature was not required.

Thank you for choosing FedEx



**FedEx** Express

**Package**
**US Airbill**

FedEx Tracking Number: **8182 4056 2255**

**1 From** *Please print and press hard.*

Date **5/7/24**

Sender's FedEx Account Number **4312-0368-5**
SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name **Jasmine Hewlett**    Phone **404 577-8111**

Company **ERIC J HERTZ PC**

Address **6300 DUNWOODY PL STE 210**    Dept./Floor/Suite/Room

City **ATLANTA**    State **GA**    ZIP **30350-3333**

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.

**3 To**

Recipient's Name **Robertson N**    Phone ( )

Company **Georgia Department Of Corrections**

Address **300 Patrol Road, W Snow Hall**
We cannot deliver to P.O. boxes or P.O. ZIP codes.    Dept./Floor/Suite/Room

☐ Hold Weekday FedEx location address. REQUIRED. NOT available for FedEx First Overnight.
☐ Hold Saturday FedEx location address. REQUIRED. NOT available for FedEx Priority Overnight and FedEx 2Day to select locations.

Address
Use this line for the HOLD location address or for continuation of your shipping address.

City **Forsyth**    State **GA**    ZIP **31029**

0141103103

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com

**4 Express Package Service** *To most locations.*

Form 0215

**Next Business Day**

☐ FedEx First Overnight Earliest next-business-morning delivery to select locations. Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Priority Overnight Next business morning.* Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☒ FedEx Standard Overnight Next business afternoon.* Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M. Second business morning.* Saturday Delivery NOT available.

☐ FedEx 2Day Second business afternoon.* Thursday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Express Saver Third business day.* Saturday Delivery NOT available.

**5 Packaging** *Declared value limit $500.*

☒ FedEx Envelope*    ☐ FedEx Pak*    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6 Special Handling and Delivery Signature Options** Fees may apply. See the FedEx Service Guide.

☐ Saturday Delivery NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

**No Signature Required** Package may be left without obtaining a signature for delivery.

☐ Direct Signature Someone at recipient's address may sign for delivery.

☐ Indirect Signature If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only.

**Does this shipment contain dangerous goods?** One box must be checked.

☒ No    ☐ Yes As per attached Shipper's Declaration.    ☐ Yes Shipper's Declaration not required.    ☐ Dry Ice Dry Ice, 9, UN 1845, ___ kg    ☐ Cargo Aircraft Only

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging.

**7 Payment** *Bill to:*

☒ Sender Acct. No. in Section 1 will be billed.    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Enter FedEx Acct. No. or Credit Card No. below.

FedEx Acct. No. ___

Total Packages    Total Weight ___ lbs.    Total Declared Value† $ ___ .00

Sender's Copy

Packages up to 150 lbs. For packages over 150 lbs., use the FedEx Express Freight US Airbill.

MUR3

611

## Terms and Conditions Summary

*For the current FedEx Service Guide, which contains the complete Terms and Conditions, go to fedex.com.*

**Definitions**   On this Airbill, "we," "our," and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents

**Agreement To Terms**   By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at **fedex.com** or at a FedEx location. You also agree to those terms on behalf of any third party with an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill**   You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment**   Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card must be tendered at a staffed shipping location, and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to US$100. You may pay an additional charge for each additional US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits.

- We won't be liable:
  - for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package.
  - If you or the recipient violates any of the terms of our Agreement.
  - for loss of or damage to shipments of prohibited items.
  - for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the US$500, US$1,000, or US$50,000 per package limit described above. (Example: 5 packages can have a total declared value of up to US$250,000.) In that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim**   YOU MUST MAKE ALL CLAIMS IN WRITING or online at **fedex.com** and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to report a claim; however, you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from these charges.

If the recipient accepts your package without noting any damage on the delivery record, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect**   We may, at our option, open and inspect your packages before or after you give them to us to deliver.

**Right Of Rejection**   We reserve the right to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel; or if the shipment is prohibited by law; or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services**   C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please use a FedEx C.O.D. Airbill.

**Air Transportation Tax Included**   A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee**   In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 163134 • Rev. Date 4/22

 Sign Up or Log In 

**Tracking ID:** 818240562255

Local Scan Time ⌄

 This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818240562255 |
| **Delivered** | Wednesday, 5/8/24, 1:33 PM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | FORSYTH, GA, US |
| **Ship date** | Tuesday, 5/7/24 |
| **Service** | FedEx Standard Overnight |
| **Special handling** | Deliver Weekday |

⤓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

**FOLLOW FEDEX** 

© FedEx 1995-2025

Site Map  |  Terms of Use  |  Privacy & Security  |  Ad Choices

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818240562255

---

**Delivery Information:**

---

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | |
| **Signed for by:** | C.KINGWALKER | **Delivery Location:** | 300PATROL RD IP SH HALL |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday | | FORSYTH, GA, 31029 |
| | | **Delivery date:** | May 8, 2024 13:33 |

**Shipping Information:**

---

| | | | |
|---|---|---|---|
| **Tracking number:** | 818240562255 | **Ship Date:** | May 7, 2024 |
| | | **Weight:** | |

**Recipient:**
GERFEIDEPART OF CORRECTIONS
300PATROL RD IP SH HALL
FORSYTH, GA, US, 31029

**Shipper:**
JSAMIEN HEWLTE, ERIC J HERTZ PC
8300 DUNWOODY PL STE 210
ATLANTA, GA, US, 303503323

**Reference**                    RIBERTSIENN

Signature Proof of Delivery is not currently available for this Tracking Number.  Availability of signature
images may take up to 5 days after delivery date. Please try later, or contact Customer Service at
1.800.Go.FedEx(R) 800.463.3339.

Thank you for choosing FedEx



**FedEx Express** Package *US Airbill*

**1 From** *Please print and press hard.*

Date 5/7/24

Sender's FedEx Account Number 4312-0368-5

FedEx Tracking Number 8182 4056 2266

SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name Jasmine Hewlett    Phone 404 577-8111

Company ERIC J HERTZ PC

Address 8300 DUNWOODY PL STE 210

Dept./Floor/Suite/Room

City ATLANTA    State GA    ZIP 30350-3323

**2 Your Internal Billing Reference** Roberson, N

**3 To**

Recipient's Name Warden, Micheal Thomas    Phone

Company Dodge State Prison

Address P.O. Box 276    Dept./Floor/Suite/Room

Address Chester    State GA    ZIP 31012

0141103103

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com

---

Form 0304 0215    MUR3

**Sender's Copy**

**4 Express Package Service** *To most locations.*

**Next Business Day**

☐ FedEx First Overnight

☐ FedEx Priority Overnight

☒ FedEx Standard Overnight

**Packages up to 150 lbs.**
*For packages over 150 lbs, use the FedEx Express Freight US Airbill.*

**2 or 3 Business Days**

☐ FedEx 2Day A.M.

☐ FedEx 2Day

☐ FedEx Express Saver

**5 Packaging** *Declared value limit $500.*

☐ FedEx Envelope*  ☐ FedEx Pak*  ☐ FedEx Box  ☐ FedEx Tube  ☐ Other

**6 Special Handling and Delivery Signature Options**

☐ No Signature Required

**Does this shipment contain dangerous goods?**

☐ No    ☐ Yes    ☐ Yes Dry Ice

☐ Direct Signature    ☐ Indirect Signature

**7 Payment** *Bill to:*

☒ Sender    ☐ Recipient    ☐ Third Party

FedEx Acct. No.

Total Packages    Total Weight    Total Declared Value†

611

# Terms and Conditions Summary

For the current FedEx Service Guide, which contains the complete Terms and Conditions, go to fedex.com.

**Definitions** On this Airbill, "we," "our," "us," and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents.

**Agreement To Terms** By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at **fedex.com** or at a FedEx location. You also agree to those terms on behalf of any third party with an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill** You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment** Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card may be tendered at a staffed shipping location, and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to US$100. You may pay an additional charge for each declared value over US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits.

- We won't be liable:
  - for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package.
  - If you or the recipient violates any of the terms of our Agreement.
  - for loss of or damage to shipments of prohibited items.
  - for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the US$500, US$1,000, or US$50,000 per package limit described above. (Example: 5 packages can have a total declared value of up to US$250,000.) In that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim** YOU MUST MAKE ALL CLAIMS IN WRITING or online at **fedex.com** and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to report a claim; however, you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from those charges.

If the recipient accepts your package without noting any damage on the delivery record, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect** We may, at our option, open and inspect your packages before or after you give them to us to deliver.

**Right Of Rejection** We reserve the right to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel; or if the shipment is prohibited by law; or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services** C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please use a FedEx C.O.D. Airbill.

**Air Transportation Tax Included** A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee** In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 163134 • Rev. Date 4/22



Sign Up or Log In  

**Tracking ID:** 818240562266 

Local Scan Time ∨

 This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818240562266 |
| **Delivered** | Wednesday, 5/8/24, 11:50 AM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | CHESTER, GA, US |
| **Ship date** | Tuesday, 5/7/24 |
| **Service** | FedEx Standard Overnight |
| **Special handling** | Deliver Weekday |

↓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

**FOLLOW FEDEX**      

© FedEx 1995-2025        Site Map | Terms of Use | Privacy & Security | Ad Choices

FedEx

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818240562266

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | |
| Signed for by: | J.ROZIER | Delivery Location: | PO BOX 276 |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday | | CHESTER, GA, 31012 |
| | | Delivery date: | May 8, 2024 11:50 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 818240562266 | Ship Date: | May 7, 2024 |
| | | Weight: | |

| Recipient: | Shipper: |
|---|---|
| WARDBNE MCIAHE RJIAE, DOGE STATEVPRICE | JASMINEBHEWLETET, ERIC J HERTZ PC |
| PO BOX 276 | 8300 DUNWOODY PL STE 210 |
| CHESTER, GA, US, 31012 | ATLANTA, GA, US, 303503323 |

| Reference | ROBRTE SONAN |
|---|---|

Signature Proof of Delivery is not currently available for this Tracking Number.  Availability of signature
images may take up to 5 days after delivery date. Please try later, or contact Customer Service at
1.800.Go.FedEx(R) 800.463.3339.

Thank you for choosing FedEx

# ERIC J. HERTZ, P.C.

## *Trial Lawyers*

September 24, 2024

**VIA Certified U.S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6863**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8184 0432 5013**
Risk Management Division
Department of Administrative Services
200 Piedmont Avenue, SE, Suite 1804
West Tower, Atlanta, Georgia 30334
**Attention: Susan Setterstrom**
Assistant Director and Claims Counsel
And sent via
Email: Susan.Setterstrom@doas.ga.gov

**VIA Certified U.S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6856**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8184 0432 5024**
Georgia Department of Corrections
Upshaw Hall, 300 Patrol Road
Forsyth, GA 31029

**VIA Certified U.S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6849**

**Fed Ex Overnight Delivery**
**Return Receipt No.: 8184 0432 5035**
Georgia Department of Corrections
**Department Headquarters**
7 MLK Jr Drive, Suite 543
Atlanta, Georgia 30334

**VIA Certified U.S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 8184 0432 5046**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6832**
Warden Micheal Thomas
Dodge State Prison
PO Box 276
Chester, GA 31012

**VIA Certified U.S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6825**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8184 0432 5057**
Wilcox State Prison
Warden Charles Mims
P.O. Box 397
Abbeville, GA 31001

RE:    **NOTICE OF CLAIM /ANTE-LITEM NOTICE & SETTLEMENT DEMAND**
**PURSUANT TO O.C.G.A. § 50-21-26**

| | |
|---|---|
| **Our Client:** | Neqwaun O'Neal Roberson |
| **Defendants/Entities:** | **Georgia Department of Corrections; State of Georgia; Dodge State Prison; Wilcox State Prison; Warden Kendric Jackon in his Official Capacity, Lieutenant Brandon Watson in his Official Capacity, Warden Tommy Bowen in his Official capacity, Warden Charles Mims in his Official capacity, and Officers unknown to Plaintiff at this time in their Official capacities.** |
| **Second Incident Date:** | **October 3, 2023** |
| **Third Incident Dates:** | **February 2024-Present** |

Page **1** of 7

| | |
|---|---|
| **Second Loss Date:** | **October 3, 2023 &** |
| **Third Loss Date:** | **February 2024-Present** |
| **Amount of Loss:** | **$1,000,000.00** |
| **Second Incident Location:** | **Dodge State Prison** |
| **Third Incident Location:** | **Wilcox State Prison** |
| **Extent of Injury:** | **Physical Injury, Mental and Physical Pain & Suffering, General & Special Damages, Disfigurement, and Deprivation of Constitutional Rights** |
| **Legal Claims:** | **Violations of 42 U.S.C. § 1983, deliberate indifference, violations of Americans with Disability Act, *Monell* and *Canton* claims for training, discipline, and supervision, federal and state-law claims for personal injuries, negligence, state-law torts mental and physical pain and suffering, punitive damages, attorney's fees, and costs of litigation.** |

Dear Sir or Madam:

Our law firm, along with Benjamin Crump, PLLC, represents Neqwaun O'Neal Roberson for his claims against the above Defendants. Mr. Roberson was an inmate at Dodge State Prison when he was attacked and maimed by five armed assailants. Because Mr. Roberson's attack is subject to an open investigation, Open Records Requests have yielded very limited information about the circumstances surrounding this incident. However, through communications with witnesses, medical records, a limited incident report, and the surrounding controversies publicized about Dodge State Prison as well as the Georgia Department of Corrections, it is clear that Mr. Roberson suffered pain and suffering and deprivations of constitutional rights as a result of the wrongful conduct of the defendants. Furthermore, during Mr. Roberson's residency at Wilcox State Prison, he has been denied appropriate medical treatment. This letter hereby serves as Notice of Claim pursuant to O.C.G.A. § 50-21-26 for the injuries and disfigurement Mr. Roberson suffered due to the negligence, constitutional violations, and other tortious conduct described herein. This letter constitutes a statement made in the course of efforts to settle or compromise claims and will only be admissible following judgment in Plaintiff's favor as to attorney fees.

### First Incident

Just prior to the attack which is the subject of this ante-litem notice, on May 11, 2023, Mr. Roberson was attacked by several inmates during breakfast and stabbed 20 to 25 times all over his body[1]. Mr. Roberson was stabbed in his heart area and his lungs collapsed, and he suffered multiple lacerations. Our investigation suggests that a female correctional officer, LT. Brown, was seen speaking briefly to one of the inmates and popped the lock of the B2 dorm to let the attackers come in from outside of the B2 dorm. Lt. Brown walked off as the May 11th attack occurred and there were no guards in the watchtower at that time. After the May 11th attack, Mr. Roberson was found by his cellmate, and he was initially denied appropriate medical treatment. He was eventually transported to Dodge County Hospital by van due to lacerations and puncture wounds to the back of his neck, chest, left shoulder, and left thigh. At the hospital, Mr. Roberson was diagnosed with

---

[1] An ante-litem notice was sent for this attack on May 7, 2024.

traumatic pneumothorax and emphysema among other things. His injuries were so serious that he required a left chest tube placement. Mr. Roberson was discharged back to the prison on May 14, 2023.

## Second Incident

Months after the May 11th attack, Mr. Roberson was attacked again on October 3, 2023. While the incident report declares that the incident occurred on October 4th, the Dodge County Hospital employees refer to wounds being open for "24 hours" and note that the incident occurred "yesterday". On the day of the attack, Mr. Roberson was stabbed multiple times and sustained blows to the head. According to the incident report, Mr. Roberson, unarmed, was attacked by five inmates with homemade weapons. Upon information and belief, all but two of the attackers were wearing black ski masks to conceal their identity. Mr. Roberson was stabbed in his neck, head, and face area approximately 10 times. Upon information and belief, no guards came to Mr. Roberson's aid during the attack.

On or about October 4, 2023, Mr. Roberson was transported to Dodge County Hospital where he was diagnosed with multiple superficial lacerations to the scalp, head, right ear, and left anterior and posterior chest. Providers also noted that Mr. Roberson suffered from parotitis and acute sialadenitis. Providers performed a CT of the maxillofacial region which revealed that the right parotid gland was swollen due to a hemorrhage from the stab wounds. While cleaning and repairing Mr. Roberson's wounds, a provider averred that his wounds "had been open for nearly 24 hours". Mr. Roberson was then discharged on October 4, 2023. When Mr. Roberson came back to the prison, prison officials put him into solitary confinement. Mr. Roberson experienced immense difficulties eating due to his badly swollen jaw. Mr. Roberson's jaw injury is permanent in nature and necessitated further treatment at Augusta State Medical Prison.

Even though Mr. Roberson was brutally attacked in the B-dorm on May 11th, he was placed back in that very same dorm preceding the October 3rd attack. Furthermore, the October assailants possessed violent proclivities as evidenced by their criminal histories. All but one of the attackers possessed a criminal history which included aggravated assault. The attacker without an aggravated assault history had robbery on his record. Defendants knew that Mr. Roberson was a likely target of attack due to his previous May 11th victimhood. However, in spite of this knowledge, Defendants were deliberately indifferent to Mr. Roberson's safety.

## Third Incident

Mr. Roberson is currently at Wilcox State Prison and he is still experiencing severe jaw pain and headaches. Furthermore, Mr. Roberson has been denied medical treatment. Prison officials are not taking him to the doctor's office and will not give him his asthma pump. Because of this, Mr. Roberson has suffered unnecessary and additional pain and suffering, worsening of his condition, and deprivations of his constitutional rights. Such unconstitutional and/or tortious conduct is continuing in nature and began on or about February of 2024. Such conduct is ongoing and this demand/ante-litem is intended to cover such conduct up until the present.

## Institutional Issues

Leading up to the brutal attack of Mr. Roberson, Dodge State Prison as well as the Georgia Department of Corrections were engulfed in controversy for mismanagement of the prison system. Around September 2021, the United States Department of Justice launched a formal investigation into the Georgia Department of Corrections with a focus on inmate-on-inmate violence. The DOJ is investigating the GDC for potential constitutional violations committed against inmates.

Violence is the norm or something close to it in Georgia Prisons across the State. By the end of 2023, at least 37 men were victims of homicides in the prison system. That is up from the previous year's record of 31 homicides. And it brings the tally of the homicides in the past three years to 98, more than triple the number who died from 2017 through 2019. But, the count may not be complete. The deaths of 10 other prisoners last year are still pending investigation by medical examiners. Many of the 37 deaths were gang-related, according to Georgia Department of Corrections incident data. Furthermore, attaining information about the deaths of inmates and the GDC facilities in general has become only harder. The GDC's decision to stop including manner of death information in its monthly reports came as the prison system had at least nine homicides in the first quarter of 2024, according to an examination by The Atlanta Journal-Constitution. That compares to five for the first three months of last year, which ended with a record 36 prisoners and one correctional officer slain. The 2024 toll may be the highest the system has ever recorded for the first quarter, topping homicide counts back to at least 2015.

Mr. Roberson's brutal assault was just one of many at prisons across Georgia. See below:

• Eddie Gosier, 39; May 2, 2020, ligature strangulation. He died just hours after an inmate with a particularly violent history was moved by guards into his cell. Gosier's killer, Daniel Luke Ferguson, had previously strangled to death an inmate at Hays State Prison after being sentenced to life in prison when he was 18 for the shooting death of a neighbor in Walton County.

• Charles Tristen James McKee, 24; May 23, 2022, stabbed. Incident report shows five other inmates directly involved. A lawsuit alleges he was placed in a dorm with known gang members who were hostile to LGBTQ inmates.

• Jamari McClinton, 21; Aug. 11, 2021, stabbed. He was slain just five days after being transferred from Phillips State Prison, where he had been in protective custody after threats from gang members. Protection was removed when he was transferred.

• Quafabian Melik McBride, 19; Sept. 30, 2022, stab wound of chest, injuring heart; sharp-force injuries of head, torso and upper extremities. Stabbing occurred during a gang-related fight in the lockdown unit. McBride was housed elsewhere in the prison and had been brought to lockdown that day through the arrangements of officers.

• Bobby Edward Lee Jr., 38; July 13, 2020, ligature strangulation. A federal lawsuit alleges he died from gang violence, understaffing, and indifference by prison officials.

• And many others.

Inside Georgia's prisons, wave after wave of prison employees have become criminals themselves, smuggling in contraband or allowing others to do it and at times pocketing payoffs in the thousands. The Georgia Department of Corrections (GDC) has had more than 425 cases in which their employees have been arrested since 2018 for crimes on the job. Some were charged with brutality, extortion or sexual assault. At least 360 of those cases involved contraband. Some of those employees were paid thousands of dollars before they were caught in schemes that went on for months and even years. Prisoners have run elaborate drug-trafficking networks and cybercrime schemes as well as extortion and other criminal enterprises, all with the help of the contraband supplied by dirty guards, nurses, cooks, and even high-ranking officers. The widespread corruption has fueled violence inside the prisons and at times enabled stunning crimes victimizing people on the outside. An overwhelming dynamic facing the Department of Corrections is that as fast as dirty officers are arrested, new ones take their places.

Furthermore, GDC prisons have experienced severe understaffing. The Georgia Department of Corrections is short nearly half of its corrections officers due to a high job-turnover rate, Commissioner Tyrone Oliver told state lawmakers during budget hearings.

The GDC has also been subject to numerous lawsuits by prisoners for the unconstitutional conditions occurring in the GDC prison system. Many of these lawsuits allege the unconstitutional use of excessive force, deliberate indifference to serious injury, and deliberate indifference to serious medical needs.

A different type of lawsuit has also been filed on behalf of the GDC's medical contracting company, WellPath. Wellpath, the Nashville-based company that has provided health care for the department since 2021, asserts that it was blind-sided by the out-of-control violence in Georgia prisons, resulting in trauma costs that far exceeded what the firm has incurred in the other state prison health care systems it manages. According to the complaint, the state's own descriptions of prison conditions in 2021, which bidders used to formulate their proposals, didn't come close to capturing the reality inside the prison system. In an affidavit, Sam Britton, Wellpath's president for state and federal operations, said the levels of inmate-on-inmate assaults in Georgia's prisons were "exponentially higher" than those in other prisons where Wellpath provides health care in the South, Northeast and Midwest. Britton said that trauma care in 2023 for Georgia's 38,997 prisoners covered by Wellpath cost $16.4 million. That compares to trauma costs of $9.25 million for 111,403 inmates housed in prisons in eight other state prison systems served by Wellpath, he said in the affidavit. Britton said Wellpath also had trouble recruiting qualified staff to provide medical care in Georgia's prisons because of the widespread violence, leading to additional costs to run the health care program. In another affidavit, Gregg Bennett, Wellpath's vice president of operations for Georgia, said understaffing in Georgia's prisons was much worse than in other states in which the company operates, leading to an "imbalance" that caused a higher rate of violence. Consequently, he said, the company experienced a 40% annual turnover rate among its employees working in GDC facilities.

Defendants knew that Mr. Roberson was in danger of suffering violent physical harm, yet Defendants were deliberately indifferent to this serious risk. Additionally, this incident forms part of a pattern and practice of allowing such injuries to occur at Dodge State Prison as well as in

prisons across Georgia. The policies, customs and actions taken by Defendants as shown above caused Mr. Roberson to suffer serious physical injury, mental and physical pain and suffering, general and special damages, and deprivation of constitutional rights.

In view of the foregoing, notice is hereby provided for the following claims:

- **42 USC § 1983 CLAIM FOR VIOLATING MR. ROBERSON'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT;**

- **42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE AND FAILURE TO PROTECT;**

- **42 USC § 1983 CLAIM FOR FAILURE TO INTERVENE TO PREVENT CIVIL RIGHTS VIOLATIONS;**

- **42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS;**

- **42 U.S.C. § 1983 (Monell Liability) CLAIM;**

- **DEFENDANTS HAVE ENGAGED IN A CUSTOM AND POLICY THAT OBSCURES THE LEVEL OF HARM EXISTENT BY IGNORING VIOLENCE AND OR INACCURATELY CLASSIFYING VIOLENT ACTS AND CAUSES OF DEATH THAT OCCUR IN DODGE STATE PRISON;**

- **SUPERVISORY LIABILITY (Canton Liability) CLAIM; and**

- **STATE-LAW CLAIMS FOR NEGLIGENCE, PERSONAL INJURY, PAIN AND SUFFERING, AND OTHERWISE TORTIOUS ACTIVITY.**

## OFFER TO COMPROMISE CLAIMS

This is a one-time, time-limited offer to settle this matter. In exchange for the tender of One-Million Dollars ($1 million), Plaintiff will release all claims related to this incident against the state of Georgia and the above-named Defendants in their Official Capacities. This is a straightforward case of clear liability with wanton and indifferent conscious-shocking conduct for which a jury will no doubt determine requires severe financial penalty. You have ninety (90) days to accept this offer. If this offer is not timely accepted, our clients will file suit and seek a judgment for these claims in an amount that far exceeds this demand.

Very truly yours,

ERIC J. HERTZ, P.C.

_____
Jesse A. Van Sant, Esq.

JVS/jdh

**FedEx Express**

**Package**
**US Airbill**

FedEx Tracking Number: 8184 0432 5057

MUR 3

## 1 From Please print and press hard.

Date 9/24/24

Sender's FedEx Account Number: 4312-0368-5

SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name: Yasmin Hewlett   Phone 404 577-8111

Company: ERIC J HERTZ PC

Address: 8300 DUNWOODY PL

Dept./Floor/Suite/Room

City ATLANTA   State GA   ZIP 30350-3323

## 2 Your Internal Billing Reference
First 24 characters will appear on invoice.

Roberson

## 3 To

Recipient's Name: Warden, Charles Mims   Phone (   )

Company: Wilcox State Prison

Address: P.O. Box 397

Dept./Floor/Suite/Room

We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address: Use this line for the HOLD location address or for continuation of your shipping address.

Abbeville   State GA   ZIP 31001

0141375BQ7

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com

---

Form 0215

**Sender's Copy**

## 4 Express Package Service  *To most locations.

**Next Business Day**

☒ FedEx First Overnight
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**Packages up to 150 lbs.**
For packages over 150 lbs., use the FedEx Express Freight US Airbill.

## 5 Packaging  *Declared value limit $500.

☒ FedEx Envelope*   ☐ FedEx Pak*   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

## 6 Special Handling and Delivery Signature Options
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ Saturday Delivery
NOT available for FedEx Priority Overnight, FedEx 2Day A.M., or FedEx Express Saver.

**Does this shipment contain dangerous goods?**
One box must be checked.

☒ No   ☐ Yes As per attached Shipper's Declaration   ☐ Yes Shipper's Declaration not required   ☐ Dry Ice Dry Ice, 9, UN 1845 ___ x ___ kg   ☐ Cargo Aircraft Only

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging.
Restrictions apply for dangerous goods—see the current FedEx Service Guide.

☒ No Signature Required
Package may be left without obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only.

## 7 Payment Bill to:

☒ Sender Acct No. in Section 1 will be billed.   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

Enter FedEx Acct. No. or Credit Card No. below.

FedEx Acct. No. _____

Credit Card No. _____

Total Packages ___   Total Weight ___ lbs.   Total Declared Value† $ ___ .00

†Our liability is limited to US$100 unless you declare a higher value. See the back for details. By using this Airbill you agree to the service conditions on the back of this Airbill and in the current FedEx Service Guide, including terms that limit our liability.

Rev. Date 2/02 • Part #158564 • © 1994–2002 FedEx • PRINTED IN U.S.A.

611

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE. NO POUCH NEEDED.

# Terms and Conditions Summary

*For the current FedEx Service Guide, which contains the complete Terms and Conditions, go to fedex.com.*

**Definitions**   On this Airbill, "we", "our", "us", and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents.

**Agreement To Terms**   By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at **fedex.com** or at a FedEx location. You also agree to those terms on behalf of any third party with an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill**   You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment**   Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card must be tendered at a staffed shipping location, and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to US$100. You may pay an additional charge for each additional US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits.

- We won't be liable:

  - for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package.

  - if you or the recipient violates any of the terms of our Agreement.

  - for loss of or damage to shipments of prohibited items.

  - for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the US$500, US$1,000, or US$50,000 per package limit described above. (Example: 5 packages can have a total declared value of up to US$250,000.) In that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim**   YOU MUST MAKE ALL CLAIMS IN WRITING or online at fedex.com and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to request a claim form. We'll send you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from those charges.

If the recipient accepts your package without noting any damage on the delivery record, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect**   We may, at our option, open and inspect your packages before or after you give them to us to deliver.

**Right Of Rejection**   We reserve the right to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel, or if the shipment is prohibited by law, or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services**   C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please use a FedEx C.O.D. Airbill.

**Air Transportation Tax Included**   A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee**   In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 161134 • Rev. Date 4/22

  

**Tracking ID:** 818404325057      Local Scan Time ∨

    This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818404325057 |
| **Delivered** | Wednesday, 9/25/24, 2:02 PM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | ABBEVILLE, GA, US |
| **Ship date** | Tuesday, 9/24/24 |
| **Service** | FedEx Priority Overnight |
| **Special handling** | Deliver Weekday |

⤓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

**FOLLOW FEDEX**       Ⓟ

© FedEx 1995-2025    Site Map | Terms of Use | Privacy & Security | Ad Choices

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818404325057

---

**Delivery Information:**

---

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | |
| **Signed for by:** | K.Walker | **Delivery Location:** | PO BOX 397 |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday | | ABBEVILLE, GA, 31001 |
| | | **Delivery date:** | Sep 25, 2024 14:02 |

**Shipping Information:**

---

| | | | |
|---|---|---|---|
| **Tracking number:** | 818404325057 | **Ship Date:** | Sep 24, 2024 |
| | | **Weight:** | |

**Recipient:**
WARDEN CHARLES MIMS, WILCOXX STATE PRISON
PO BOX 397
ABBEVILLE, GA, US, 31001

**Shipper:**
VASMIM HEWLETT, ERIC J HERTZ PC
8300 DUNWOODY PL STE 210
ATLANTA, GA, US, 303503323

**Reference**                    ROBERSON

Signature Proof of Delivery is not currently available for this Tracking Number.  Availability of signature
images may take up to 5 days after delivery date. Please try later, or contact Customer Service at
1.800.Go.FedEx(R) 800.463.3339.

Thank you for choosing FedEx

**FedEx Express**

**Package US Airbill**

FedEx Tracking Number: 8184 0432 5046

**1 From** Please print and press hard.

Date 9/2/24

Sender's FedEx Account Number 4312-0368-5

SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name: Jasmine Hewlett    Phone 404 577-8111

Company ERIC J HERTZ PC

Address 8300 DUNWOODY PL

Dept./Floor/Suite/Room

City ATLANTA    State GA    ZIP 30350-3323

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.

Roberson

**3 To**

Recipient's Name Warden, Michael Thomas    Phone ( )

Company Dodge State Prison

Address P.O. Box 276    Dept./Floor/Suite/Room

We cannot deliver to P.O. boxes or P.O. ZIP codes.

Use this line for the HOLD location address or for continuation of your shipping address.

City Chester    State GA    ZIP 31012

☐ Hold Weekday
FedEx location address
REQUIRED. NOT available for FedEx First Overnight.

☐ Hold Saturday
FedEx location address
REQUIRED. Available ONLY for FedEx Priority Overnight and FedEx 2Day to select locations.

0141375807

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com

---

NUR3

**Sender's Copy**

From (Ship.) 0215

**4 Express Package Service**    *To most locations.

Packages up to 150 lbs.
For packages over 150 lbs., use the FedEx Express Freight US Airbill.

**Next Business Day**

☐ FedEx First Overnight
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5 Packaging**    *Declared value limit $500.

☒ FedEx Envelope*    ☐ FedEx Pak*    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6 Special Handling and Delivery Signature Options**    Fee may apply. See the FedEx Service Guide.

☐ Saturday Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☒ No Signature Required
Package may be left without obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only.

**Does this shipment contain dangerous goods?**
One box must be checked.

☒ No
☐ Yes
As per attached Shipper's Declaration.
☐ Yes
Shipper's Declaration not required.
☐ Dry Ice
Dry Ice, 9, UN 1845 ___ kg

☐ Cargo Aircraft Only

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging or placed in a FedEx Express Drop Box.

**7 Payment**    Bill to:

☒ Sender
Acct No.
Section 1 will be billed.

☐ Recipient
☐ Third Party
☐ Credit Card
☐ Cash/Check

Enter FedEx Acct. No. or Credit Card No. below.

FedEx Acct. No. ___

Total Packages ___    Total Weight ___ lbs    Total Declared Value† $ ___ .00

†Our liability is limited to US$100 unless you declare a higher value. See back for details. By using this Airbill you agree to the service conditions on the back of this Airbill and in the current FedEx Service Guide.

Rev. Date 4/22 • Part #158134 • ©1994–2022 FedEx • PRINTED IN U.S.A.

611

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE. NO POUCH NEEDED.

# Terms and Conditions Summary

For the current FedEx Service Guide, which contains the complete Terms and Conditions, go to fedex.com.

**Definitions** On this Airbill, "we," "our," "us," and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents.

**Agreement To Terms** By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at fedex.com or at a FedEx location. You also agree to those terms on behalf of any third party with an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill** You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment** Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card must be tendered at a staffed shipping location, and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to US$100. You may pay an additional charge for each additional US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits.

- We won't be liable:
  - for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package;
  - if you or the recipient violates any of the terms of our Agreement.

- for loss of or damage to shipments of prohibited items.

- for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the US$500, US$1,000, or US$50,000 per package limit described above. (Example: 5 packages can have a total declared value of up to US$250,000) In that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim** YOU MUST MAKE ALL CLAIMS IN WRITING or online at fedex.com and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to report a loss; however, you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from those charges.

If the recipient accepts your package without noting any damage on the delivery record, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect** We may, at our option, open and inspect your packages before or after you give them to us to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel, or if the shipment is prohibited by law, or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**Right Of Rejection** We reserve the right to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel, or if the shipment is prohibited by law, or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services** C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please use a FedEx C.O.D. Airbill.

**Air Transportation Tax Included** A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee** In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 163134 • Rev. Date 4/22

 Sign Up or Log In  

**Tracking ID:** 818404325046            Local Scan Time ∨

   This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818404325046 |
| **Delivered** | Wednesday, 9/25/24, 9:43 AM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | CHESTER, GA, US |
| **Ship date** | Tuesday, 9/24/24 |
| **Service** | FedEx First Overnight |
| **Special handling** | Deliver Weekday |

↓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

**FOLLOW FEDEX**     

© FedEx 1995-2025          Site Map  |  Terms of Use  |  Privacy & Security  |  Ad Choices

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818404325046

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | |
| **Signed for by:** | J.RYAN | **Delivery Location:** | PO BOX 276 |
| **Service type:** | FedEx First Overnight | | |
| **Special Handling:** | Deliver Weekday | | CHESTER, GA, 31012 |
| | | **Delivery date:** | Sep 25, 2024 09:43 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 818404325046 | **Ship Date:** | Sep 24, 2024 |
| | | **Weight:** | |

**Recipient:**
WARDEN MICHAEL THOMAS, DODGE STATE PRISON
PO BOX 276
CHESTER, GA, US, 31012

**Shipper:**
JASMINE HEWLETT, ERIC J HERTZ PC
8300 DUNWOODY PL STE 210
ATLANTA, GA, US, 303503323

**Reference**          ROBERSON



Thank you for choosing FedEx

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Georgia Department of Corrections
*Department Headquarters
7 MLK Jr Dr Suite 543
Atlanta, GA 30334

9590 9402 7448 2055 2064 92

2. Article Number (Transfer from service label)

7021 1970 0000 3980 6849

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
  ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
  (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt



United States
Postal Service

USPS TRACKING #

9590 9402 7448 2055 2064 92

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Eric J. Hertz, PC
8300 Dunwoody Pl., Ste. 210
Atlanta, Georgia 30350



☰                                                              🔍

# USPS Tracking®

Tracking    /    FAQs >

**Track Packages Anytime, Anywhere** Get the free Informed Delivery® feature to receive automated notifications on your packages    **Learn More**

Remove ✕

**Tracking Number:**
## 70211970000039806849

📋 Copy    ⚐ Add to Informed Delivery

### Latest Update

Your item has been delivered and is available at a PO Box at 12:25 pm on October 2, 2024 in ATLANTA, GA 30303.

**Get More Out of USPS Tracking:**
📇 USPS Tracking Plus®

✓ **Delivered**
**Delivered, PO Box**
ATLANTA, GA 30303
October 2, 2024, 12:25 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?**

| Text & Email Updates | ⌄ |
|---|---|
| USPS Tracking Plus® | ⌄ |
| Product Information | ⌄ |

See Less ⌃

Track Another Package

Enter tracking or barcode numbers    🔍

## Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**

Feedb



**HELPFUL LINKS**

Contact Us

Site Index

FAQs

Feedback

**USPS JOBS**

Careers

**ON ABOUT.USPS.COM**

About USPS Home

Newsroom

USPS Service Updates

Forms & Publications

Government Services

**OTHER USPS SITES**

Business Customer Gateway

Postal Inspectors

Inspector General

Postal Explorer

National Postal Museum

Resources for Developers

PostalPro

**LEGAL INFORMATION**

Privacy Policy

Terms of Use

FOIA

No FEAR Act/EEO Contacts

Fair Chance Act

Accessibility Statement

Copyright © 2025 USPS. All Rights Reserved.

     



Case 3:25-cv-00084-DHB-BKE    Document 1-1    Filed 06/13/25    Page 225 of 257

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE. NO POUCH NEEDED.

MUR3

**FedEx** Express

**Package**
**US Airbill**

FedEx
Tracking
Number

8184 0432 5024

Sender's Copy

**1 From** Please print and press hard.

Date 9/24/24

Sender's FedEx
Account Number    4312-0368-5
SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's
Name  Jasmine Hewlett    Phone 404 577-8111

Company  ERIC J HERTZ PC

Address  8300 DUNWOODY PL                    Dept./Floor/Suite/Room

City ATLANTA    State GA    ZIP 30350-3323

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.    Roberson

**3 To**
Recipient's
Name    Phone (    )

Company  Georgia Department Of Corrections

Address  300 Patrol Road    Dept./Floor/Suite/Room
We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address  Upshaw Hall
Use this line for the HOLD location address or for continuation of your shipping address.

City Forsyth    State GA    ZIP 31029

0141375807

**4 Express Package Service**    *To most locations.

**Next Business Day**

☒ FedEx First Overnight.
Earliest next business morning delivery to select
locations. Friday shipments will be delivered on
Monday unless SATURDAY Delivery is selected.

☐ FedEx Priority Overnight.
Next business morning.* Friday shipments will be
delivered on Monday unless SATURDAY Delivery
is selected.

☐ FedEx Standard Overnight.
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day.
Second business afternoon.* Thursday shipments
will be delivered on Monday unless SATURDAY
Delivery is selected.

☐ FedEx Express Saver.
Third business day.*
Saturday Delivery NOT available.

**Packages up to 150 lbs.**
For packages over 150 lbs., use the
FedEx Express Freight US Airbill.

**5 Packaging**    *Declared value limit $500.

☒ FedEx Envelope*    ☐ FedEx Pak*    ☐ FedEx
Box    ☐ FedEx
Tube    ☐ Other

**6 Special Handling and Delivery Signature Options**    Fees may apply. See the FedEx Service Guide.

☐ Saturday Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☒ No Signature Required
Package may be left without
obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address
may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's
address, someone at a neighboring
address may sign for delivery. For
residential deliveries only.

**Does this shipment contain dangerous goods?**
One box must be checked.

☐ No    ☐ Yes
As per attached
Shipper's Declaration.    ☐ Yes
Shipper's Declaration
not required.    ☐ Dry Ice
Dry Ice, 9, UN 1845, __ x __ kg

☐ Cargo Aircraft Only

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging.
Restrictions apply for dangerous goods—see the current FedEx Service Guide.

**7 Payment** *Bill to:*

☒ Sender
Acct No.
Section 1 will
be billed.    ☐ Recipient    ☐ Third Party    Enter FedEx Acct. No. below.

FedEx Acct. No.

Total Packages    Total Weight    Total Declared Value†

___    ___ lbs.    $ .00

†Our liability is limited to US$100 unless you declare a higher value. See back for details. By using this airbill
you agree to the service conditions on the back of this airbill and in the current FedEx Service Guide,
including terms that limit our liability.

Rev. Date 4/22 • Part #163134 • ©1994–2022 FedEx • PRINTED IN U.S.A.

611

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com

# Terms and Conditions Summary
For the current FedEx Service Guide, which contains the complete *Terms and Conditions*, go to fedex.com.

**Definitions**  On this Airbill, "we," "our," "us," and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents.

**Agreement To Terms**  By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at fedex.com or at a FedEx location. You also agree to those terms on behalf of any third party with an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill**  You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment**  Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card must be tendered at a staffed shipping location, and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to default authorized US$100. You may pay an additional charge for each declared US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits.

- We won't be liable:
  - for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package.
  - if you or the recipient violates any of the terms of our Agreement.
  - for loss of or damage to shipments of prohibited items.
  - for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the total declared value per package described above. (Example: 5 packages can have a total declared value of up to US$250,000.) In that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim**  YOU MUST MAKE ALL CLAIMS IN WRITING or online at fedex.com and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

- You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to report a claim; however, you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from those charges.

If the recipient accepts your package without noting any damage on the delivery record, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect**  We may, at our option, open and inspect your packages before or after you give them to us to deliver.

**Right Of Rejection**  We reserve the right to reject a shipment when such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel; or if the shipment is prohibited by law; or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services**  C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please use a FedEx C.O.D. Airbill.

**Air Transportation Tax Included**  A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee**  In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 163134•Rev. Date 4/22

 **FedEx.** Sign Up or Log In  

Tracking ID: 818404325024        Local Scan Time ⌄

 (i)    This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818404325024 |
| **Delivered** | Wednesday, 9/25/24, 8:36 AM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | FORSYTH, GA, US |
| **Ship date** | Tuesday, 9/24/24 |
| **Service** | FedEx First Overnight |
| **Special handling** | Deliver Weekday |

⤓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

**FOLLOW FEDEX**      

© FedEx 1995-2025                Site Map  |  Terms of Use  |  Privacy & Security  |  Ad Choices

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818404325024

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | |
| **Signed for by:** | C.WILLIAM | **Delivery Location:** | 300 PATROL RD |
| **Service type:** | FedEx First Overnight | | |
| **Special Handling:** | Deliver Weekday | | FORSYTH, GA, 31029 |
| | | **Delivery date:** | Sep 25, 2024 08:36 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 818404325024 | **Ship Date:** | Sep 24, 2024 |
| | | **Weight:** | |

**Recipient:**
GEORGIA DEPARTMENT OF CORRECTI
300 PATROL RD UPSHAW HALL
FORSYTH, GA, US, 31029

**Shipper:**
JASMINE HEWLETT, ERIC J HERTZ PC
8300 DUNWOODY PL STE 210
ATLANTA, GA, US, 303503323

**Reference**                   ROBRESON



Thank you for choosing FedEx

**FedEx Express**

**Package US Airbill**

FedEx Tracking Number **8184 0432 5013**

**1 From** Please print and press hard.

Date **3/24/24**

Sender's FedEx Account Number **4312-0368-5**
SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name **Jasmine Hewlett** Phone **404 577-9111**

Company **ERIC J HERTZ PC**

Address **8300 DUNWOODY PL**

Dept./Floor/Suite/Room

City **ATLANTA** State **GA** ZIP **30350-3323**

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.

**3 To**

Recipient's Name **Susan Setterstrom** Phone ( )

Company **Department of Administrative Services Risk Management Division**

Address **200 Piedmont Ave SE**

Dept./Floor/Suite/Room

Address **Suite 1804, West Tower**

City **Atlanta** State **GA** ZIP **30334**

We cannot deliver to P.O. boxes or P.O. ZIP codes.

Use this line for the HOLD location address or for continuation of your shipping address.

**0141375807**

---

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com

---

MUR3

**Sender's Copy**

**Form 0215**

**4 Express Package Service** *To most locations.*

**Next Business Day**
- [✓] FedEx First Overnight
- [ ] FedEx Priority Overnight
- [ ] FedEx Standard Overnight

**2 or 3 Business Days**
- [ ] FedEx 2Day A.M.
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**Packages up to 150 lbs.**

**5 Packaging** *Declared value limit $100.*
- [ ] FedEx Envelope*
- [ ] FedEx Pak*
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6 Special Handling and Delivery Signature Options**
- [ ] Saturday Delivery
- [✓] No Signature Required
- [ ] Direct Signature
- [ ] Indirect Signature

**Does this shipment contain dangerous goods?**
- [ ] Yes
- [ ] No
- [ ] Yes
- [ ] Dry Ice
- [ ] Cargo Aircraft Only

**7 Payment** *Bill to:*
- [✓] Sender
- [ ] Recipient
- [ ] Third Party

Enter FedEx Acct. No. below.

FedEx Acct. No.

Total Packages    Total Weight    Total Declared Value†

**611**

# Terms and Conditions Summary

For the current FedEx Service Guide, which contains the complete Terms and Conditions, go to fedex.com.

**Definitions**   On this Airbill, "we," "our," "us," and "FedEx" refer to Federal Express Corporation, its employees, and agents. "You" and "your" refer to the sender, its employees, and agents.

**Agreement To Terms**   By giving us your package to deliver, you agree to all the terms on this Airbill and in the current FedEx Service Guide, which is available at **fedex.com** or at a FedEx location. You also agree to those terms on behalf of any third party with an interest in the package. If there is a conflict between the current FedEx Service Guide and this Airbill, the current FedEx Service Guide will control. No one is authorized to change the terms of our Agreement.

**Responsibility For Packaging And Completing Airbill**   You are responsible for adequately packaging your goods and properly filling out this Airbill. If you omit the number of packages and/or weight per package, our billing will be based on our best estimate of the number of packages we received and/or an estimated "default" weight per package as determined by us.

**Responsibility For Payment**   Even if you give us different payment instructions, you will always be primarily responsible for all delivery costs, as well as any cost we incur in either returning your package to you or warehousing it pending disposition. All shipments originating in the U.S. and paid for with cash, check, debit or credit card must be tendered at a stated FedEx Retail Rates, location, and will be charged FedEx Retail Rates.

**Limitations On Our Liability And Liabilities Not Assumed**

- Unless a higher value is declared and paid for, our liability for each package is limited to US$100. You may pay an additional charge for each additional US$100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance.

- In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential, in excess of the declared value of a shipment, whether or not FedEx had knowledge that such damages might be incurred, including but not limited to loss of income or profits.

- We won't be liable:
  - for your acts or omissions, including but not limited to improper or insufficient packing, securing, marking, or addressing, or those of the recipient or anyone else with an interest in the package.
  - if you or the recipient violates any of the terms of our Agreement.
  - for loss of or damage to shipments of prohibited items.
  - for loss, damage, or delay caused by events we cannot control, including but not limited to acts of God, perils of the air, weather conditions, acts of public enemies, war, strikes, civil commotions, or acts of public authorities with actual or apparent authority.

**Declared Value Limits**

- The maximum declared value allowed for a FedEx Envelope or FedEx Pak shipment is US$500.

- For other shipments, the maximum declared value allowed is US$50,000 per package, unless your package contains items of extraordinary value, in which case the maximum declared value allowed is US$1,000 per package.

- Items of extraordinary value include shipments containing such items as artwork, jewelry, furs, precious metals, negotiable instruments, and other items listed in the current FedEx Service Guide.

- You may send more than one package on this Airbill and fill in the total declared value for all packages, not to exceed the US$500, US$1,000, or US$50,000 per package limit described above. (Example: 5 packages can have a total declared value of up to US$250,000 in that case, our liability is limited to the actual value of the package(s) lost or damaged, but may not exceed the maximum allowable declared value(s) or the total declared value, whichever is less. You are responsible for proving the actual loss or damage.

**Filing A Claim**   YOU MUST MAKE ALL CLAIMS IN WRITING or online at **fedex.com** and notify us of your claim within strict time limits set out in the current FedEx Service Guide.

You may call our Customer Service department at 1.800.GoFedEx 1.800.463.3339 to report a claim; however, you must still file a timely written claim. We aren't obligated to act on any claim until you have paid all transportation charges, and you may not deduct the amount of your claim from those charges.

If the recipient accepts your package without noting any damage on the delivery receipt, we will assume the package was delivered in good condition. For us to process your claim, you must make the original shipping cartons and packing available for inspection.

**Right To Inspect**   We may, at our option, open and inspect your packages before or after you give them to us to deliver.

**Right Of Rejection**   We reserve the right to reject a shipment or to return such shipment would be likely to cause delay or damage to other shipments, equipment, or personnel; or if the shipment is prohibited by law; or if the shipment would violate any terms of our Airbill or the current FedEx Service Guide.

**C.O.D. Services**   C.O.D. SERVICE IS NOT AVAILABLE WITH THIS AIRBILL. If C.O.D. Service is required, please use a FedEx C.O.D. Airbill.

**Air Transportation Tax Included**   A federal excise tax when required by the Internal Revenue Code on the air transportation portion of this service, if any, is paid by us.

**Money-Back Guarantee**   In the event of untimely delivery, FedEx will, at your request and with some limitations, refund or credit all transportation charges. See the current FedEx Service Guide for more information.

Part 163134 • Rev. Date 4/22

 Sign Up or Log In 

**Tracking ID:** 818404325013 

Local Scan Time ⌄

   This is an older tracking ID. We're displaying all of the information we have.

| | |
|---|---|
| **Tracking ID** | 818404325013 |
| **Delivered** | Wednesday, 9/25/24, 10:24 AM |
| **Delivery Status** | Delivered |
| **From** | ATLANTA, GA, US |
| **To** | ATLANTA, GA, US |
| **Ship date** | Tuesday, 9/24/24 |
| **Service** | FedEx First Overnight |
| **Special handling** | Deliver Weekday |

⤓ **Obtain proof of delivery**

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
FedEx Developer Portal
FedEx Logistics
ShopRunner

**LANGUAGE**

 United States

**FOLLOW FEDEX**      

© FedEx 1995-2025

Site Map  |  Terms of Use  |  Privacy & Security  |  Ad Choices

May 08, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 818404325013

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | |
| Signed for by: | Q.FREEMAN | Delivery Location: | 200 PIEDMONT AVE SE |
| Service type: | FedEx First Overnight | | |
| Special Handling: | Deliver Weekday | | ATLANTA, GA, 30334 |
| | | Delivery date: | Sep 25, 2024 10:24 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 818404325013 | Ship Date: | Sep 24, 2024 |
| | | Weight: | |

Recipient:
SUSAN JEFFERSTROM RISK MANAGEM, DEPARTMENT OF
ADMINISTRATIVE S
200 PIEDMONT AVE SE STE 1804 W
ATLANTA, GA, US, 30334

Shipper:
JASMINE HEWLETT, ERIC J HERTZ PC
8300 DUNWOODY PL STE 210
ATLANTA, GA, US, 303503323

Reference                    ROBERSON



Thank you for choosing FedEx

**25-C-05638-S2**
**5/13/2025 9:17 AM**
**TIANA P. GARNER, CLERK**

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **NEQWAUN ROBERSON** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIVIL ACTION FILE NO:** |
| **v.** | ) **25-C-05638-S2** |
| | ) |
| **TYRONE OLIVER, in his individual capacity;** | ) |
| **JAMIE CLARK, in his individual capacity;** | ) |
| **AHMED HOLT, in his individual capacity;** | ) |
| **TOMMY BOWEN, in his individual capacity;** | ) |
| **MARGARET BROWN, in her individual** | ) |
| **capacity;** | ) |
| **KEVIN HARDY, in his individual capacity;** | ) |
| **C. GOOCH, in his individual capacity; and** | ) |
| **GEORGIA DEPARTMENT OF** | ) |
| **CORRECTIONS.** | ) |
| | ) **Jury Trial** |
| **Defendants.** | ) **Demanded** |

## <u>CERTIFICATE REQUIRED BY O.C.G.A. § 50-21-35</u>

COMES NOW the undersigned counsel of record for Plaintiff in the above-captioned action and, pursuant to Official Code of Georgia Annotated <u>§ 50-21-35</u>, hereby certifies that a true and correct copy of the Summons and Complaint for Damages in said action, showing the date of filing, has been mailed to the Attorney General of the State of Georgia at his usual office address, by *statutory overnight delivery*, return receipt requested.

Respectfully submitted this 13TH day Of May, 2025.

**ERIC J. HERTZ, P.C.**

By:    */s/    e    . Hertz*
ERIC J. HERTZ
GA State Bar No. 349501
*hertz@hertz-law.com*
ALEX S. HERTZ
Georgia Bar No. 420971
*alex@hertz-law.com*

*Counsel for Plaintiff*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Tel: (404) 577-8111
Fax: (404) 577-8116

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**5/19/2025 12:07 PM**
TIANA P. GARNER, CLERK

## AFFIDAVIT OF SERVICE

State of Georgia             County of Gwinnett             State Court

Case Number: 25-C-05638-S2

Plaintiff: **Neqwaun Roberson**
vs.
Defendant: **Tyrone Oliver, et al**

For:
Eric Hertz
Eric J. Hertz, P.C.
8300 Dunwoody Pl.
Ste 210
Atlanta, GA 30350

Received by Ancillary Legal Corporation on the 13th day of May, 2025 at 12:35 pm to be served on **Georgia Department of Corrections c/o Dept of Administrative Services Risk Management Services, 200 Piedmont Ave SE, Ste 1804 W Tower, Atlanta, GA 30334**.

I, James Stiggers, being duly sworn, depose and say that on the **14th day of May, 2025** at **12:11 pm, I:**

served **Georgia Department of Corrections c/o Dept of Administrative Services Risk Management Services** by delivering a true copy of the **Summons, Complaint for Damages, Exhibits, Attorney General Certificate** to: Dept of Administrative Services Risk Management Services as **Registered Agent, BY LEAVING THE SAME WITH** Vanessa Graham as **Authorized to Accept** at the address of: **200 Piedmont Ave SE, Ste 1804 W Tower, Atlanta, GA 30334**.

**Additional Information pertaining to this Service:**
5/14/2025  12:11 pm  Perfected corporate service at 200 Piedmont Ave SE Ste 1804 W Tower, Atlanta, GA 30334. First attempt documents have now been accepted by Vanessa Graham Administration Assistant. Uploading photos

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of the parties. I am 18 or more years of age and am authorized to serve process.

Subscribed and Sworn to before me on the 16th
day of May, 2025 by the affiant
who is personally known to me.

_____
NOTARY PUBLIC

James Stiggers
Process Server

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025008216
Ref: Roberson

FIONA K LEONARD
My Commission Expires
NOTARY
PUBLIC
December 19, 2026
DEKALB COUNTY, GEORGIA

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0b

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**

**5/19/2025 12:07 PM**

**TIANA P. GARNER, CLERK**

SHERIFF'S ENTRY OF SERVICE

| | |
|---|---|
| Superior Court ☐ | Magistrate Court ☐ |
| State Court ☒ | Probate Court ☐ |
| Juvenile Court ☐ | |

Civil Action No. STSV2025000052

Date Filed 4/24/2025

Georgia, Tattnall County

Attorney's Address
Eric Hertz

Eric J. Hertz, P.C., 8300 Dunwoody Pl., Ste 210, Atlanta, GA 30350

_____
George Luckett
_____ Plaintiff

VS.

Name and Address of Party to Served
Jamie Clark

300 Patrol Rd, Forsyth, GA 31029

_____
Tyrone Oliver, et al
_____ Defendant

_____
_____ Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant _Jamie Clark_ _____ a corporation by leaving a copy of the within action and summons with _Jamie Clark_ _____.
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

_____

**NON EST**
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

_____

This __12__ day of __May__, 20__25__.

_R. Hilliard 625_

DEPUTY

**ANC Job Id 2025007342**                                                      **PLAINTIFF'S COPY**

SHERIFF'S ENTRY OF SERVICE

|  |  |  |
|---|---|---|
| Superior Court | ☐ | Magistrate Court ☐ |
| State Court | ☒ | Probate Court ☐ |
| Juvenile Court | ☐ | |

Civil Action No. STSV2025000052

Date Filed 4/24/2025

Georgia, Tattnall County

Attorney's Address
Eric Hertz

Eric J. Hertz, P.C., 8300 Dunwoody Pl., Ste 210, Atlanta, GA 30350

_____
George Luckett
                                        Plaintiff

VS.

Name and Address of Party to Served
Jamie Clark

300 Patrol Rd, Forsyth, GA 31029

_____
Tyrone Oliver, et al
                                        Defendant

_____
                                        Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant *Jamie Clark* _____ a corporation by leaving
a copy of the within action and summons with *Jamie Clark* _____.
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

_____

**NON EST**
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

_____

This _____ day of _____, 20____ .

_____
DEPUTY

ANC Job Id 2025007342

CLERK'S COPY

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**25-C-05638-S2**
**5/19/2025 12:07 PM**
**TIANA P. GARNER, CLERK**

SHERIFF'S ENTRY OF SERVICE

| | |
|---|---|
| Superior Court ☐ | Magistrate Court ☐ |
| State Court ☒ | Probate Court ☐ |
| Juvenile Court ☐ | |

Civil Action No. STSV2025000052

Date Filed 4/24/2025

Georgia, Tattnall County

Attorney's Address
Eric Hertz

George Luckett

Plaintiff

Eric J. Hertz, P.C., 8300 Dunwoody Pl., Ste 210, Atlanta, GA 30350

VS.

Name and Address of Party to Served
Jacob B Beasley

Tyrone Oliver, et al

Defendant

9676 Hwy 301, Glennville, GA 30427

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _Kathy Maltia_ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _Tiffany Nail_ _Admin Assist_ described as follows: age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant _____ a corporation by leaving a copy of the within action and summons with _____.
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

_____

**NON EST**
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

This _12_ day of _MAL_, 20 _25_

DEPUTY

ANC Job Id 2025007339

PLAINTIFF'S COPY

* 23/92

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**5/30/2025 9:15 AM**
TIANA P. GARNER, CLERK

## <u>AFFIDAVIT OF SERVICE</u>

**State of Georgia**               **County of Gwinnett**               **State Court**

Case Number: 25-C-05638-S2

Plaintiff: **Neqwaun Roberson**
vs.
Defendant: **Tyrone Oliver, et al**

For:
Eric Hertz
Eric J. Hertz, P.C.
8300 Dunwoody Pl.
Ste 210
Atlanta, GA 30350

Received by Ancillary Legal Corporation on the 13th day of May, 2025 at 12:30 pm to be served on **Georgia Department of Corrections c/o Authorized Designee, 300 Patrol Rd, Forsyth, GA 31029**.

I, Michael Harbuck, being duly sworn, depose and say that on the **29th day of May, 2025** at **1:30 pm, I**:

served Georgia Department of Corrections c/o Authorized Designee by delivering a true copy of the **Summons, Complaint for Damages, Exhibits, Attorney General Certificate** to: **Robyn Sidlowksi** as **Authorized to Accept** for **Georgia Department of Corrections**, at the address of: **300 Patrol Rd, Forsyth, GA 31029**.

**Additional Information** pertaining to this Service:
5/29/2025  1:30 pm  Perfected corporate service at 300 Patrol Rd Forsyth, GA 31029. Served Robyn Sidlowski the legal administrative assistant.

**Description** of Person Served: Age: ~60, Sex: F, Race/Skin Color: White, Height: ~5'2", Weight: 125, Hair: Black, Glasses: -

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of the parties. I am 18 or more years of age and am authorized to serve process.

Subscribed and Sworn to before me on the 29
day of May, 2025 by the affiant
who is personally known to me.

_____
NOTARY PUBLIC

**Michael Harbuck**
Process Server

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025008215
Ref: Roberson

HEIDI JOY HARBUCK
MY COMMISSION EXPIRES
NOTARY
PUBLIC
JUNE 14, 2025
HOUSTON COUNTY, GEORGIA

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0b

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**5/30/2025 9:15 AM**
TIANA P. GARNER, CLERK

## AFFIDAVIT OF SERVICE

State of Georgia                    County of Gwinnett                    State Court

Case Number: 25-C-05638-S2

Plaintiff:
**Neqwaun Roberson**

vs.

Defendant:
**Tyrone Oliver, et al**

For:
Eric Hertz
Eric J. Hertz, P.C.
8300 Dunwoody Pl.
Ste 210
Atlanta, GA 30350

Received by Ancillary Legal Corporation on the 13th day of May, 2025 at 12:20 pm to be served on **Tyrone Oliver, 300 Patrol Rd, Forsyth, GA 31029**.

I, Michael Harbuck, being duly sworn, depose and say that on the **29th day of May, 2025** at **1:30 pm**, I:

served Tyrone Oliver by delivering a true copy of the **Summons, Complaint for Damages, Exhibits, Attorney General Certificate** to: **Robyn Sidlowski** as **Authorized to Accept** for **Tyrone Oliver**, at the address of: **300 Patrol Road, Lies Hall, Forsyth, GA 31029**.

Additional Information pertaining to this Service:
5/29/2025  1:30 pm  Perfected corporate service at 300 Patrol Road, Lies Hall, Forsyth, GA 31029.
Documents were delivered to Robyn Sidlowski, legal administrative assistant, who was a white female, approximately 60 years old, 5'2", tall, black hair, and 125 pounds.

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of the parties. I am 18 or more years of age and am authorized to serve process.

Subscribed and Sworn to before me on the 29
day of May, 2025 by the affiant
who is personally known to me.

NOTARY PUBLIC

**Michael Harbuck**
Process Server

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025008212
Ref: Roberson

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0c

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

25-C-05638-S2

6/3/2025 1:52 PM
TIANA P. GARNER, CLERK

SHERIFF'S ENTRY OF SERVICE

| | |
|---|---|
| Civil Action No. 25-C-05638-S2 | Superior Court ☐   Magistrate Court ☐<br>State Court ☒   Probate Court ☐<br>Juvenile Court ☐ |
| Date Filed 5/9/2025 | Georgia, Gwinnett County |
| Attorney's Address<br>Eric Hertz | Neqwaun Roberson |
| | Plaintiff |
| Eric J. Hertz, P.C., 8300 Dunwoody Pl., Ste 210, Atlanta, GA 30350 | VS. |
| Name and Address of Party to Served<br>C Gooch | Tyrone Oliver, et al |
| | Defendant |
| 2971 Old Bethel Church Rd, Chester, GA 31012 | |
| | Garnishee |

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant ___C Gooch___ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows: age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant _____ a corporation by leaving a copy of the within action and summons with _____.
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

RECORDED

**NON EST**
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

MAY 27 2025
SHERIFF'S OFFICE
DODGE COUNTY

This __27__ day of __May__, 20__25__.

DEPUTY _Cpl. Nik E. Shofft_

ANC Job Id 2025008222

CLERK'S COPY

SHERIFF'S ENTRY OF SERVICE

|  |  |
|---|---|
| Civil Action No. 25-C-05638-S2 | Superior Court ☐    Magistrate Court ☐<br>State Court ☒    Probate Court ☐<br>Juvenile Court ☐ |

Date Filed 5/9/2025

Georgia, Gwinnett County

Attorney's Address
Eric Hertz

Neqwaun Roberson

Eric J. Hertz, P.C., 8300 Dunwoody Pl., Ste 210, Atlanta, GA 30350

Plaintiff

VS.

Name and Address of Party to Served
C Gooch

Tyrone Oliver, et al

2971 Old Bethel Church Rd, Chester, GA 31012

Defendant

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant ___ C Gooch _____ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows: age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant _____ a corporation by leaving a copy of the within action and summons with _____.
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

RECORDED

**NON EST**
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

MAY 27 2025
SHERIFF'S OFFICE
DODGE COUNTY

This ___27___ day of ___May_____, 20_25_____.

DEPUTY _Cpl. Ael E Sh____

ANC Job Id 2025008222

PLAINTIFF'S COPY

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**

**6/3/2025 1:52 PM**
TIANA P. GARNER, CLERK

**SHERIFF'S ENTRY OF SERVICE**

| | |
|---|---|
| Superior Court ☐ | Magistrate Court ☐ |
| State Court ☒ | Probate Court ☐ |
| Juvenile Court ☐ | |

Civil Action No. 25-C-05638-S2

Date Filed 5/9/2025

Georgia, Gwinnett County

Attorney's Address
Eric Hertz

Eric J. Hertz, P.C., 8300 Dunwoody Pl., Ste 210, Atlanta, GA 30350

Neqwaun Roberson

Plaintiff

VS.

Name and Address of Party to Served
Kevin Hardy

2971 Old Bethel Church Rd, Chester, GA 31012

Tyrone Oliver, et al

Defendant

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _Kevin Hardy_ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows: age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant _____ a corporation by leaving a copy of the within action and summons with _____.
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

RECORDED

MAY 27 2025

SHERIFF'S OFFICE
DODGE COUNTY

**NON EST**
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

This ___27___ day of ___May___, 20_25_.

DEPUTY _Cpl. M. E. Shepard_

ANC Job Id 2025008221

**PLAINTIFF'S COPY**

SHERIFF'S ENTRY OF SERVICE

| | |
|---|---|
| Civil Action No. 25-C-05638-S2 | Superior Court ☐   Magistrate Court ☐<br>State Court ☒   Probate Court ☐<br>Juvenile Court ☐ |
| Date Filed 5/9/2025 | Georgia, Gwinnett County |

Attorney's Address
Eric Hertz

Eric J. Hertz, P.C., 8300 Dunwoody Pl., Ste 210, Atlanta, GA 30350

Neqwaun Roberson
_____ Plaintiff

VS.

Tyrone Oliver, et al
_____ Defendant

Name and Address of Party to Served
Kevin Hardy

2971 Old Bethel Church Rd, Chester, GA 31012

_____

_____ Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ Kevin Hard _____ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant _____ a corporation by leaving
a copy of the within action and summons with _____.
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

RECORDED

**NON EST**
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

MAY 27 2025
SHERIFF'S OFFICE
DODGE COUNTY

This ___27___ day of ___May_____, 20_25____.

DEPUTY _Cpl. Mr. E. Shepherd_____        _____

ANC Job Id 2025008221                                              CLERK'S COPY

6/12/25, 6:17 PM  Case 3:25-cv-00084-DHB-BKE re:Search GA Document 1-1 VS OLIVER et al 25-C-05638-S2 Filed 06/13/25 Page 245 of 257

https://researchga.tylerhost.net/CourtRecordsSearch/ViewCasePrint/be27e75fc85045688740b222b1e6a0cb

# Case Information

# ROBERSON VS OLIVER et al

25-C-05638-S2

Location
Gwinnett - State Court

Case Category
Civil

Case Type
Tort - General

Case Filed Date
5/9/2025

Judge
Shawn Bratton

Case Status
Pending

## Parties [9]

| Type | Name | Nickname/Alias | Attorneys |
|------|------|----------------|-----------|
| Plaintiff | ROBERSON, NEQWAUN | | HERTZ, ALEX SCOTT, HERTZ, ERIC J |
| Defendant | GEORGIA DEPARTMENT OF CORRECTIONS | | Pro Se |
| Defendant | BOWEN, TOMMY | | Pro Se |
| Defendant | BROWN, MARGARET | | Pro Se |
| Defendant | CLARK, JAMIE | | Pro Se |
| Defendant | GOOCH , C | | Pro Se |
| Defendant | HARDY, KEVIN | | Pro Se |
| Defendant | HOLT, AHMED | | Pro Se |
| Defendant | OLIVER, TYRONE | | Pro Se |

## Events [25]

| Date | Event | Index # | Type | Comments | Documents |
|------|-------|---------|------|----------|-----------|
| 5/9/2025 | Filing | | Summons | HOLT | Summons Ahmed Holt.pdf.pdf |
| 5/9/2025 | Filing | | Summons | CLARK | Summons Jamie Clark.pdf.pdf |
| 5/9/2025 | Filing | | Summons | GDC | Summons GDC.pdf.pdf |
| 5/9/2025 | Filing | | General Civil/Dom Relations Case Filing Form | | Gwinnett Civil Domestic Filing Form.pdf.pdf |
| 5/9/2025 | Filing | | Complaint with Jury Demand | | 2025 05-09 Complaint and Exhibit A - Roberson.pdf.pdf |
| 5/9/2025 | Filing | | Summons | OLIVER | Summons Tyrone Oliver.pdf.pdf |
| 5/9/2025 | Filing | | Summons | GOOCH | Summons C Gooch.pdf.pdf |
| 5/9/2025 | Filing | | Summons | BROWN | Summons Margaret Brown.pdf.pdf |
| 5/9/2025 | Filing | | Summons | HARDY | Summons Kevin Hardy.pdf.pdf |
| 5/9/2025 | Filing | | Summons | BOWEN | Summons Tommy Bowen.pdf.pdf |
| 5/13/2025 | Filing | | CERTIFICATION | ATTORNEY GENERAL | 2025 05-13 Atty General Certificate.pdf.pdf |
| 5/19/2025 | Service | | Summons | - | - |
| 5/19/2025 | Filing | | Affidavit of Service | | 2025 05-19 GDC Risk Management Original Executed Affidavit of Service.pdf.pdf |
| 5/19/2025 | Filing | | Sheriff/Marshall's Service | **WRONG CASE** | 2025 05-19 Jamie Clark Original Executed Affidavit.pdf.pdf |
| 5/19/2025 | Filing | | Sheriff/Marshall's Service | **WRONG CASE** | 2025 05-19 Kathy Martin Executed Sheriffs Entry of Service.pdf.pdf |
| 5/30/2025 | Service | | Summons | - | - |
| 5/30/2025 | Service | | Summons | - | - |

| Date | Event | Index # | Type | Comments | Documents |
|------|-------|---------|------|----------|-----------|
| 5/30/2025 | Filing | | Affidavit of Service | | 2025 05-29 Aff of Service GDC Patrol Road.pdf.pdf |
| 5/30/2025 | Filing | | Affidavit of Service | | 2025 05-29 Aff of Service Tyrone Oliver.pdf.pdf |
| 6/3/2025 | Service | | Summons | - | - |
| 6/3/2025 | Service | | Summons | - | - |
| 6/3/2025 | Filing | | Sheriff/Marshall's Service | | 2025 06-03 Kevin Hardy Executed Sheriffs Entry of Service.pdf.pdf |
| 6/3/2025 | Filing | | Sheriff/Marshall's Service | | 2025 06-03 C Gooch Executed Sheriffs Entry of Service.pdf.pdf |
| 6/5/2025 | Filing | | Affidavit of Service | | 2025 06-05 Ahmed Holt Executed Affidavit of Service.pdf.pdf |
| 6/5/2025 | Filing | | Affidavit of Service | | 2025 06-05 Jamie Clark Executed Affidavit of Service.pdf.pdf |

© 2025 Tyler Technologies, Inc. | All Rights Reserved

Version: 2025.4.21.1243



EMPOWERED BY
TYLER TECHNOLOGIES

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

25-C-05638-S2

5/9/2025 5:07 PM

TIANA P. GARNER, CLERK

**General Civil and Domestic Relations Case Filing Information Form**

☐ Superior or ☒ State Court of  Gwinnett State Court  County

| For Clerk Use Only | |
|---|---|
| **Date Filed** _____ | **Case Number** 25-C-05638-S2 _____ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**
NEQWAUN ROBERSON

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**
TYRONE OLIVER

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

JAMIE CLARK

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

AHMED HOLT

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

TOMMY BOWEN

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** Alex Scott Hertz     **State Bar Number** _____  **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☒ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____        _____
**Case Number**                          **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____  **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**

**5/9/2025 5:07 PM**

**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

CIVIL ACTION **25-C-05638-S2**
NUMBER: _____

_____
PLAINTIFF

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**  Ahmed Holt

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ~~9th~~ 12TH _____ day of **May** _____, 20**25** .

Tiana P. Garner
**Clerk of State Court**

By _____
**Deputy Clerk**

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**

**5/9/2025 5:07 PM**
**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

_____

PLAINTIFF

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

_____

DEFENDANT

CIVIL ACTION
NUMBER: **25-C-05638-S2**
_____

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**   C. Gooch

   You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ~~9th~~ 12TH _____ day of **May** _____, 20**25** .

Tiana P. Garner
**Clerk of State Court**

By _____
Deputy Clerk

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**6/5/2025 8:33 AM**
TIANA P. GARNER, CLERK

## AFFIDAVIT OF SERVICE

State of Georgia                    County of Gwinnett                    State Court

Case Number: 25-C-05638-S2

Plaintiff: **Neqwaun Roberson**
vs.
Defendant: **Tyrone Oliver, et al**

For:
Eric Hertz
Eric J. Hertz, P.C.
8300 Dunwoody Pl.
Ste 210
Atlanta, GA 30350

Received by Ancillary Legal Corporation on the 13th day of May, 2025 at 12:25 pm to be served on **Ahmed Holt, 300 Patrol Rd, Forsyth, GA 31029**.

I, Michael Harbuck, being duly sworn, depose and say that on the **2nd day of June, 2025** at **9:45 am**, I:

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **Summons, Complaint for Damages, Exhibits, Attorney General Certificate** to: **Ahmed Holt** at the address of: **300 Patrol Rd, Forsyth, GA 31029**.

**Additional Information pertaining to this Service:**
6/2/2025  9:45 am  Perfected individual service at 300 Patrol Rd Forsyth, GA 31029. Served Ahmed Holt directly.

**Description** of Person Served: Age: ~45, Sex: M, Race/Skin Color: Black, Height: ~6'1", Weight: 225, Hair: Black, Glasses: N

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of  the parties. I am 18 or more years of age and am authorized to serve process.

**Michael Harbuck**
Process Server

Subscribed and Sworn to before me on the 2
day of June 2025 by the affiant
who is personally known to me.

NOTARY PUBLIC

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025008214
Ref: Roberson

HEIDI JOY HARBUCK
MY COMMISSION EXPIRES
NOTARY
PUBLIC
JUNE 14, 2025
HOUSTON COUNTY, GEORGIA

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0b

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**6/5/2025 8:33 AM**
TIANA P. GARNER, CLERK

## <u>AFFIDAVIT OF SERVICE</u>

State of Georgia        County of Gwinnett        State Court

Case Number: 25-C-05638-S2

Plaintiff: **Neqwaun Roberson**
vs.
Defendant: **Tyrone Oliver, et al**

For:
Eric Hertz
Eric J. Hertz, P.C.
8300 Dunwoody Pl.
Ste 210
Atlanta, GA 30350

Received by Ancillary Legal Corporation on the 13th day of May, 2025 at 12:25 pm to be served on **Jamie Clark, 300 Patrol Rd, Forsyth, GA 31029**.

I, Michael Harbuck, being duly sworn, depose and say that on the **2nd day of June, 2025** at **9:55 am, I:**

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **Summons, Complaint for Damages, Exhibits, Attorney General Certificate** to: Jamie Clark at the address of: **300 Patrol Rd, Forsyth, GA 31029**.

**Additional Information pertaining to this Service:**
6/2/2025  9:55 am  Perfected individual service at 300 Patrol Rd Forsyth, GA 31029. Served Jamie Clark directly.

**Description** of Person Served: Age: ~50, Sex: M, Race/Skin Color: White, Height: ~6'1", Weight: 245, Hair: Gray, Glasses: -

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of  the parties. I am 18 or more years of age and am authorized to serve process.

 

**Michael Harbuck**
Process Server

Subscribed and Sworn to before me on the 2
day of June 2025 by the affiant
who is personally known to me.

NOTARY PUBLIC

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025008213
Ref: Roberson

(Notary seal: HEIDI JOY HARBUCK, NOTARY PUBLIC, HOUSTON COUNTY, GEORGIA, MY COMMISSION EXPIRES JUNE 14, 2025)

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0b

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

25-C-05638-S2

5/9/2025 5:07 PM
TIANA P. GARNER, CLERK

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

_____

PLAINTIFF

|  |  |
|---|---|
| | CIVIL ACTION NUMBER: _____ 25-C-05638-S2 |

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**  Georgia Department of Corrections

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ~~9th~~ 12TH day of **May** _____, 20**25**.

Tiana P. Garner
**Clerk of State Court**

By _____
**Deputy Clerk**

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**

**5/9/2025 5:07 PM**

**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

_____

PLAINTIFF

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

DEFENDANT

CIVIL ACTION
NUMBER: **25-C-05638-S2**
_____

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**   Jamie Clark

   You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ~~9th~~ 12TH day of **May** _____, 20**25** .

Tiana P. Garner
**Clerk of State Court**

By _____
         **Deputy Clerk**

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**5/9/2025 5:07 PM**
**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

_____

PLAINTIFF

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

_____

DEFENDANT

CIVIL ACTION
NUMBER: 25-C-05638-S2 _____

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:** Kevin Hardy

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ~~9th~~ 12TH ____ day of **May** _____, 20**25** .

Tiana P. Garner
**Clerk of State Court**

By _____
**Deputy Clerk**

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**5/9/2025 5:07 PM**
**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

_____

PLAINTIFF

CIVIL ACTION
NUMBER: **25-C-05638-S2** _____

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**  Margaret Brown

   **You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:**

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

**an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.**

This ~~**9th**~~ 12TH ____ **day of May** _____, 20**25** .

Tiana P. Garner
**Clerk of State Court**

By_____
**Deputy Clerk**

**INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.**

SC-1 Rev. 2011

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**
**5/9/2025 5:07 PM**
**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

CIVIL ACTION
NUMBER: 25-C-05638-S2

_____

PLAINTIFF

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**  Tommy Bowen

    **You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:**

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

**an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.**

This ~~9th~~ 12TH day of **May** , 20**25** .

Tiana P. Garner
**Clerk of State Court**

By_____
**Deputy Clerk**

**INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.**

SC-1 Rev. 2011

E-FILED IN OFFICE - TB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**25-C-05638-S2**

**5/9/2025 5:07 PM**

TIANA P. GARNER, CLERK

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

# Neqwaun Roberson

| | CIVIL ACTION |
| --- | --- |
| | NUMBER: **25-C-05638-S2** |

PLAINTIFF

VS.

**Tyrone Oliver, Jamie Clark, Ahmed Holt,**

**Tommy Bowen, Margaret Brown, Kevin Hardy**

**C. Gooch, Georgia Department of Corrections**

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**  Tyrone Oliver

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Alex Hertz
Eric J. Hertz, PC
8300 Dunwoody Place, Suite 210
Atlanta, Georgia 30350

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ~~9th~~ 12TH day of **May** , 20**25** .

Tiana P. Garner
**Clerk of State Court**

By _____
**Deputy Clerk**

**INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.**

SC-1 Rev. 2011